UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RICHARD E. LUBOW, JOSEPH J. BOPP,
DAVID R. BENNETT, FRANK C.
BENEVENTO, and JAMES J. LANDIS,

       Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
STATE, HILLARY R. CLINTON, as Secretary
of State, acting by and through the FOREIGN
SERVICE GRIEVANCE BOARD, and JAMES
L. MILLETTE, as Deputy Assistant Secretary
of State for Global Financial Services,

       Defendants.

CASE NO. 10-0510 (JDB)

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Elliot H. Scherker
scherkere@gtlaw.com
Brigid F. Cech Samole
cechsamoleb@gtlaw.com
Greenberg Traurig, P.A.
1221 Brickell Avenue
Miami, FL 33131
Telephone:  305.579.0500
Facsimile:  305.579.0717

Joe R. Reeder (DC Bar No. 279786)
reederj@gtlaw.com
Danielle M. Diaz (DC Bar No. 982277)
diazd@gtlaw.com
Greenberg Traurig, LLP
2101 L Street, NW, Suite 1000
Washington, DC 20037
Telephone:  202.331.3125
Facsimile:  202.261.0124

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

**Page**

TABLE OF CITATIONS ................................................................... iv

INTRODUCTION ...............................................................................1

STATEMENT OF FACTS .................................................................4

    I.       PLAINTIFFS' SERVICE IN IRAQ. ........................................4

    II.     STATE'S DEMAND FOR REPAYMENT OF OVERTIME PAY. ......................5

        A.    The April 2005 Demand. ...............................................5

        B.    Plaintiffs' Compensation for Their Service in Iraq....................6

            1.    Plaintiffs' payroll status. .............................6

            2.    The August 2004 Overtime Premium Compensation Policy. ...................................................7

            3.    Communications between Plaintiffs and State in late 2004.........................................................9

    III.    PLAINTIFFS' CHALLENGE TO THE OVERPAYMENT DETERMINATION. ...................................................10

        A.    DAS Millette's Ruling. ...............................................10

        B.    The BCA Decision. .....................................................10

        C.    State's Retroactive Application of Enhanced 2005 Pay Caps.........................................................................10

    IV.    PLAINTIFFS' WAIVER REQUESTS.................................12

        A.    State's Refusal to Grant Waivers. ...............................12

            1.    DAS Millette's rejection of the waiver request. ............12

            2.    State's rejection of Plaintiffs' challenge to DAS Millette's decision.....................................13

        B.    The First Foreign Service Grievance Board Appeal.................14

        C.    The Second Round of Waiver Proceedings. ............................16

i

# TABLE OF CONTENTS
(Continued)

**Page**

D.    The Second Foreign Service Grievance Board Appeal. ............................17

ARGUMENT ..................................................................................................................18

I.    STANDARD OF REVIEW. ................................................................................18

II.    STATE'S DETERMINATION THAT PLAINTIFFS WERE OVERPAID IS BASED ON AN ARBITRARY AND CAPRICIOUS INTERPRETATION OF GOVERNING STATUTORY AND REGULATORY PROVISIONS. ........................................20

A.    State's Construction of 5 U.S.C. § 5547 Is Arbitrary and Unreasonable.................................................................................20

1.    Section 5547 cannot be construed retroactively to reduce already-paid overtime pay, based upon an employee's change of assignment or designation during a calendar year. ..................................................20

2.    State's construction of OPM regulations is untenable. ..............................................................................23

3.    State's erroneous construction of Section 5547 and OPM regulations requires a remand. .............................................25

B.    State's August 2005 Decision Retroactively to Apply Increased Pay Caps Requires a Remand for Reconsideration of State's Overpayment Determination. ........................25

III.    STATE'S DENIAL OF PLAINTIFFS' WAIVER REQUEST IS ARBITRARY AND CAPRICIOUS. ..............................................................26

A.    Standard of Review....................................................................26

B.    The FSGB Failed to Follow Its Regulations In Denying Waivers. ....................................................................................27

1.    The FSGB failed to redress DAS Millette's erroneous basis for denying waivers or to shift the burden of proof to State to snow that waivers properly would have been denied. ..................................................27

## TABLE OF CONTENTS
(Continued)

**Page**

C.    FSGB Decision II Is Based On an Erroneous Application of the Waiver Regulations and Is Unsupported by Substantial Evidence ...................................................................................................31

    1.    The FSGB's *ad hoc* creation of an "at fault" basis for denying waiver. ......................................................................32

    2.    The FSGB's decision is unsupported by substantial evidence. ....................................................................................34

CONCLUSION.....................................................................................................38

# TABLE OF CITATIONS

**Page**

## Cases

*Alcoa Inc. v. Fed. Energy Reg. Comm'n*
564 F.3d 1342 (D.C. Cir. 2009) ................................................................... 34

*Am. Fed. of Gov't Employees, AFL-CIO v. Gates*
486 F.3d 1316 (D.C. Cir. 2007) ................................................................... 25

*Am. Fin. Servs. Ass'n v. F.T.C.*
767 F.2d 957 (D.C. Cir. 1985) ..................................................................... 21

*Am. Historical Ass'n v. Nat'l Archives & Records Admin.*
516 F. Supp. 2d 90 (D.D.C. 2007) ............................................................... 25

*American Bioscience, Inc. v. Thompson*
269 F.3d 1077 (D.C. Cir. 2001) ................................................................... 19

*Auer v. Robbins*
519 U.S. 452 (1997) ............................................................................. 24, 33

*Benoit v. U.S. Dep't of Agric.*
577 F.Supp.2d 12 (D.D.C. 2008) ................................................................. 28

*Bettucci v. United States*
14 F. Supp. 2d 45 (D.D.C. 1998) ........................................................... 25, 34

*Bloch v. Powell*
348 F.3d 1060 (D.C. Cir. 2003) ................................................................... 27

*Blue Ocean Inst. v. Gutierrez*
585 F. Supp. 2d 36 (D.D.C. 2008),
*app. dismissed*, 2009 WL 1456322 (D.C. Cir. May 5, 2009) ......................... 20

*Catholic Health Initiatives v. Sebelius*
658 F. Supp. 2d 113 (D.D.C. 2009) .............................................................. 23

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*
467 U.S. 837 (1984) ............................................................................. 20, 24

*Clark County, Nev. v. Fed. Aviation Min.*
522 F.3d 437 (D.C. Cir. 2008) ..................................................................... 26

# TABLE OF CITATIONS
### (Continued)

**Page**

*Coeur Alaska, Inc. v. S.E. Alaska Conversation Council*
    --- U.S. ---, 129 S. Ct. 2458 (2009) .............................................................. 24

*Cottage Health Sys. v. Sebelius*
    631 F. Supp. 2d 80 (D.D.C. 2009) ............................................................... 19

*Doyle v. Brock*
    821 F.2d 778 (D.C. Cir. 1987) .................................................................... 25

*Ehrman v. United States*
    429 F. Supp. 2d 61 (D.D.C. 2006) ................................................... 29, 34, 35

*El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. U.S. Dep't of Health &*
    *Human Servs.*
    396 F.3d 1265 (D.C. Cir. 2005) .................................................................. 38

*Ethyl Corp. v. Browner*
    989 F.2d 522 (D.C. Cir. 1993) .................................................................... 26

*F.C.C. v. Fox Television Station, Inc.*
    --- U.S. ---, 129 S. Ct. 1800 (2009) .............................................................. 27

*Gonzalez v. U.S. Dep't of State*
    135 F.Supp.2d 193 (D.D.C. 2001) ............................................................... 28

*GTE Serv. Corp. v. F.C.C.*
    205 F.3d 416 (D.C. Cir. 2000) .................................................................... 20

*Humane Soc'y of U.S. v. Kempthorne*
    579 F. Supp. 2d 7 (D.D. Cir. 2008) .............................................................. 25

*John L. Doyne Hosp. v. Johnson*
    603 F. Supp. 2d 172 (D.D.C. 2009) ............................................................. 19

*Kaseman v. Dist. of Columbia*
    444 F.3d 637 (D.C. Cir. 2006) .................................................................... 21

*Landstar Exp. Am., Inc. v. Fed. Maritime Comm'n*
    569 F.3d 493 (D.C. Cir. 2009) .................................................................... 21

*Lester E. Cox Med. Ctrs. v. Sebelius*
    2010 WL 779743 (D.C. Cir. Mar. 9, 2010) .................................................. 27

# TABLE OF CITATIONS
### (Continued)

**Page**

*Morall v. D.E.A.*
    412 F.3d 165 (D.C. Cir. 2005) ................................................................. 36, 38

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins., et al.*
    463 U.S. 29 (1983) .............................................................................................. 26

*Motor Vehicle Mfrs. v. Ruckleshaus*
    719 F.2d 1159 (D.C. Cir. 1983) .................................................................... 25

*N.E. Hosp. Corp. v. Sebelius*
    --- F. Supp. 2d ---, 2010 WL 1199311 (D.D.C. March 29, 2010) ........................... passim

*Nat'l Ass'n of Broadcasters v. F.C.C.*
    569 F.3d 416 (D.C. Cir. 2009) ...................................................................... 23

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*
    551 U.S. 644 (2007) ...................................................................................... 20

*Nat'l Mining Ass'n v. Kempthorne*
    512 F.3d 702 (D.C. Cir. 2008) ...................................................................... 20

*Nat'l Treas. Employees Union v. Chertoff*
    452 F.3d 839 (D.C. Cir. 2006) ...................................................................... 20

*Natural Resources Defense Council, Inc. v. Daley*
    209 F.3d 747 (D.C. Cir. 2000) ...................................................................... 20

*New Life Evangelistic Ctr., Inc. v. Sebelius*
    672 F. Supp. 2d 61 (D.D.C. 2009) ................................................................ 38

*Northpoint Tech., Ltd. v. F.C.C.*
    412 F.3d 145 (D.C. Cir. 2005) ...................................................................... 23

*Olson v. Clinton*
    602 F. Supp. 2d 93 (D.D.C. 2009) ............................................................ 34, 35

*Penick Corp., Inc. v. Drug Enforcement Admin.*
    491 F.3d 483 (D.C. Cir. 2007) ...................................................................... 27

*Peter Pan Bus Lines, Inc. v. Fed. Motor Carrier Safety Admin.*
    471 F.3d 1350 (D.C. Cir. 2006) .................................................................... 25

# TABLE OF CITATIONS
### (Continued)

**Page**

*Raffin v. Surface Transp. Bd.*
592 F.3d 195 (D.C. Cir. 2010) ............................................................. 27, 29

*Rempfer v. Sharfstein*
583 F.3d 860 (D.C. Cir. 2009),
*cert. denied,* --- U.S. ---, 2010 WL 680561 (March 1, 2010) ..................... 1, 19

*Robinson v. Nat'l Transp. Safety Bd.*
28 F.3d 210 (D.C. Cir. 1994) ............................................................. 34, 36, 38

*S.E. Conference v. Vilsack*
--- F. Supp. 2d ---, 2010 WL 537562 (D.D.C. Feb. 17, 2010) ......................... 19

*Scott v. England*
264 F.Supp.2d 5 (D.D.C. 2002) ............................................................. 28

*Shea v. United States*
45 F. Supp. 2d 54 (D.D. Cir. 1999) ......................................................... 31

*Sierra Club v. Van Antwerp*
560 F. Supp. 2d 21 (D.D.C. 2008) ......................................................... 26

*Toy v. United States*
263 F. Supp. 2d 1 (D.D.C. 2002) ......................................................... 27, 35

*United States v. Mead*
533 U.S. 218 (2001) ......................................................................... 24

*United States v. Paddack*
825 F.2d 504 (D.C. Cir. 1987) ............................................................. 27

*Verizon Tel. Cos. v. F.C.C.*
570 F.3d 294 (D.C. Cir. 2009) ............................................................. 34

*Wedgewood Village Pharm. v. Drug Enforcement Admin.*
509 F.3d 541 (D.C. Cir. 2007) ............................................................. 31

*Wright v. Foreign Service Bd.*
503 F. Supp. 2d 163 (D.D.C. 2007) ......................................................... 34

### **Statutes**

22 C.F.R. § 34.18(b)(ii) ..................................................................... 33

# TABLE OF CITATIONS
(Continued)

**Page**

22 C.F.R. § 34.18(b)(iv)........................................................................... 27, 33

22 C.F.R. § 905.1 ..................................................................................... 28, 30

22 C.F.R. § 905.1(b) ...................................................................................... 31

22 C.F.R. 905.1(a) .......................................................................................... 30

22 U.S.C. § 4137 ............................................................................................ 28

22 U.S.C. § 4140 ............................................................................................ 27

22 U.S.C. § 4140(a) ....................................................................................... 28

5 C.F.R. § 550.102 ......................................................................................... 21

5 C.F.R. § 550.103(4) .................................................................................... 21

5 C.F.R. § 550.105 ........................................................................................... 8

5 C.F.R. § 550.106 ...................................................................................... 8, 23

5 C.F.R. § 550.106(c) .................................................................................... 22

5 C.F.R. § 550.107 ...................................................................................... 8, 23

5 U.S.C. § 5542(d) ......................................................................................... 22

5 U.S.C. § 5542a ............................................................................................ 22

5 U.S.C. § 5547............................................................................................ passim

5 U.S.C. § 5547(a) ......................................................................................... 21

5 U.S.C. § 5547(a)(b)(1) ................................................................................ 21

5 U.S.C. § 5547(a)(b)(2) ................................................................................ 21

5 U.S.C. § 5547(a)(b)(3) ................................................................................ 21

5 U.S.C. § 5547(a)(b)(4) ................................................................................ 21

5 U.S.C. § 5584............................................................................................ 16, 17

## TABLE OF CITATIONS
(Continued)

**Page**

5 U.S.C. § 706(2)(A) ............................................................................ 19, 26, 34

5 U.S.C. § 706(2)(C) ...................................................................................... 19

5 U.S.C. § 706(2)(D) ...................................................................................... 19

5 U.S.C. § 706(a)(2) ................................................................................... 2, 23

### Regulations

22 C.F.R. § 34.18(b)(1)(iv) ........................................................................ 16, 17

22 C.F.R. § 34.18(b)(1)(iv)(E) .................................................................... 3, 16

22 C.F.R. § 34.18(b)(i) ........................................................................... 4, 32, 33

22 C.F.R. § 34.18(b)(iv)(D) ........................................................................ 27, 28

22 C.F.R. § 34.18(b)(iv)(E) ........................................................................ 27, 29

22 C.F.R. § 905.1(c) ............................................................................ 4, 30, 31

5 C.F.R. § 550 ............................................................................................. 23

69 F.R. 55941 ......................................................................................... 8, 23

### Other Authorities

Emergency Supplemental Appropriations Act for Defense, the Global War on
    Terror, and Tsunami Relief of 2005
    Pub. L. No. 109-13, 119 Stat. 231, § 1008 ..................................................... 11

Plaintiffs, Richard E. Lubow, Joseph J. Bopp, David R. Bennett, Frank C. Benevento, and James L. Landis (collectively, Plaintiffs) file this Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment.

## INTRODUCTION

In late 2003, Defendant United States Department of State (State) urgently sought volunteers from the ranks of the Bureau of Diplomatic Security (DS) to deploy to Iraq in support of State's attempt to establish a diplomatic presence in Iraq, after the fall of Saddam Hussein's regime. Plaintiffs, all veteran DS agents, volunteered to serve in the "worst threat environment in the world," and did so with distinction, as State recognized in its August 2004 Superior Honor Award to Plaintiffs and their DS colleagues for accomplishments that "were already [the] stuff of legends," including having "built the infrastructure … that will protect" State's mission in Iraq "through the certain-to-be tumultuous first-half century of the new millennium."

Within two months of Plaintiffs' return from a year of difficult and dangerous service in early 2005, State delivered demands for repayment of overtime pay, ranging from $450 to $10,000. State asserted that it had overpaid Plaintiffs for overtime, in excess of the annual overtime pay cap, and threatened salary offsets and collection efforts. Over the past five years, Plaintiffs have exhausted every remedy within State's administrative structure.

Plaintiffs challenged State's determination that their pay exceeded overtime limits and, after that challenge was rejected, sought – given the mandatory nature of their undisputed and highly dangerous overtime work – State's exercise of its power to waive repayment. Ultimately, however, only one member of Defendant Foreign Service Grievance Board (FSGB) agreed, leaving FSGB to deny these career government servants' request by a 2-1 vote. Finding no relief after navigating a labyrinth of administrative hurdles, Plaintiffs brought this action.

Plaintiffs' summary judgment motion tracks this Court's April 1, 2010 order, and seeks appropriate relief for challenges to agency action under the Administrative Procedure Act. *E.g., Rempfer v. Sharfstein,* 583 F.3d 860, 865 (D.C. Cir. 2009), *cert. denied,* --- U.S. ---, 2010 WL 680561 (March 1, 2010); *N.E. Hosp. Corp. v. Sebelius,* --- F. Supp. 2d ---, 2010 WL 1199311, *3

1

(D.D.C. March 29, 2010).[1]  Plaintiffs challenge both the overpayment ruling and State's refusal to waive the alleged debts:

1.     **The Alleged Overpayments.**  5 U.S.C. § 5547 establishes premium pay caps for federal employees within an employee's overall salary figure, such that premium pay is capped at an amount that is less than the overall pay cap.  DS agents' premium pay caps vary, depending on an agent's duty station.  Plaintiffs initially were assigned to Iraq on a "temporary duty" (TDY) basis, putting them under the Washington, D.C. premium pay cap.  Due in part to Plaintiffs' extraordinary efforts, the United States Embassy opened in Baghdad in July 2004, whereupon Plaintiffs administratively were transferred to overseas status at the new Embassy (although their duties remained the same), triggering a reduced premium pay cap.

Defendant Deputy Assistant Secretary of State James L. Millette (DAS Millette) and the Board of Contract Appeals (BCA), applied by the reduced cap retroactively to the *entire year* and deemed Plaintiffs' pay for required overtime work to have exceeded the pay cap. Defendants construed Section 5547 to mandate retroactive application of the cap in effect during the year's last pay period, even if doing so would require an employee who receives proper overtime pay to be subject to a *post hoc* overpayment determination.  That construction is so irrational as to require its rejection, even under the deferential administrative-review standard.  5 U.S.C. § 706(a)(2).

State's decision that Section 5547 mandates retroactive reduction of the premium pay cap meant that Plaintiffs, except for certain mandatory law-enforcement overtime, were capped *before* they worked the first hour of additional overtime.  That absurd construction of Section

---

[1] State will be filing the FSGB administrative records, which records State has provided to counsel for the parties, in six separate volumes, some of which are limited to avoid unnecessary duplication.  The symbol "AR" will designate the FSGB record in Plaintiff Landis's proceedings, which includes most items pertaining to all Plaintiffs.  Where necessary, reference will be made to the administrative records for Mr. Benevento ("FBAR"), Mr. Bennett ("DBAR"), Mr. Bopp ("JBAR"), and Mr. Lubow ("RLAR").  Plaintiffs are submitting, as exhibits to this memorandum, items taken from State's records that are omitted from the FSGB administrative record, including items pertinent to Plaintiffs' challenge to the initial overpayment ruling.

5547 must be rejected, together with State's similar construction of the September 2004-issued Office of Personal Management (OPM) regulations, which governed premium pay caps in Iraq.

Finally, and independently, State's August 2005 decision retroactively to apply its waiver of the premium pay-cap rules adopted by Congress in early 2005 – for the express purpose of protecting all State employees deployed to Iraq from *post hoc* demands to forfeit hard-earned overtime pay – constitutes an intervening stand-alone event that requires a remand for reconsideration.  Under the 2005 legislation and State's retroactive application of the 2005 pay caps, Plaintiffs cannot be deemed to have been "overpaid" in the first instance, because State cannot to have it both ways:  first, to demand retroactive application of the pay cap in effect during the last pay period of a calendar year, to Plaintiffs' disadvantage; and second, to then refuse Plaintiffs the benefit of State's own retroactive application of the 2005 pay cap.

    **2.**    **The Waiver Rulings.**  The FSGB overturned DAS Millette's first decision refusing to waive collection of the alleged overpayment, because DAS Millette misapplied the factors established in the governing regulations, but upheld DAS Millette's decision on remand again to deny the requested waivers.  The FSGB legally erred, for two reasons:  (i) DAS Millette failed to apply the governing criteria in denying the waivers for a second time, which error required the FSGB to shift the burden to State to demonstrate that the same result lawfully could have been reached by applying the correct criteria, and the FSGB failed to shift that burden or otherwise grant relief to Plaintiffs; and (ii) the FSGB upheld DAS Millette's legally flawed decision by crafting a new, and extra-regulatory, basis for denying waiver, *i.e.,* that, although Plaintiffs were not at fault – as the FSGB ruled in its first decision – Plaintiffs were somehow sufficiently "at fault" for denial of waivers.

    DAS Millette erred in failing to address "[w]hether recovery of the claim would be unconscionable under the circumstances," as State regulations require for waiver determinations. 22 C.F.R. § 34.18(b)(1)(iv)(E).  The FSGB noted DAS Millette's error, but failed to shift to State the burden of showing the equivalent of harmless error – that DAS Millette "would have taken the same action" regardless of his error, as FSGB's regulations require, 22 C.F.R. § 905.1(c) –

3

and instead the FSGB undertook to create a hitherto-unknown basis for denying waiver.  The FSGB's decision is thus arbitrary and capricious as a matter of law.

Even were that not so, the FSGB's basis for denying waiver is flawed.  The first FSGB decision rejected DAS Millette's determination that Plaintiffs could not seek waivers in the first instance because *Plaintiffs* were "at fault" for the erroneous overpayments, which determination barred Plaintiffs from being heard to seek a waiver.  22 C.F.R. § 34.18(b)(i) (State may not grant waiver "if there exists … an indication of … fault or lack of good faith on the part of the employee").  The FSGB ruled that Plaintiffs were *not* at fault, and remanded for DAS Millette to analyze the factors that should govern discretion in granting waivers.  On its review of DAS Millette's admittedly flawed denial, however, the FSGB ruled that Plaintiffs should be denied waivers because they "were put on notice of November [2004] that they were approaching or had already exceeded the pay cap" – precisely the determination that the FSGB had overturned in 2008, in ruling that Plaintiffs were entitled to request waivers.

## STATEMENT OF FACTS

### I.   PLAINTIFFS' SERVICE IN IRAQ.

In August 2003, State requested volunteers, "on an urgent basis, to fill critical needs … in Iraq" for one-year tours of duty.  (AR:191-93).  Plaintiffs, all career government servants and DS veterans, responded to State's call.  Exhibit (hereinafter "Ex.") 1.[2]  Their critical service was recognized in DS's August 2004 Superior Honor Award to Plaintiffs and their colleagues:

> The RSO staff in Baghdad, all of whom volunteered to serve in the most difficult environment in the world, represent our nation's best hope for the future US relationship with Iraq.  The men and women of DS who have contributed so much to establish the US Embassy in Baghdad and to protect their colleagues … deserve the highest praise we can give them.  Their accomplishments are already stuff of legends in DS, DOS and [the Department of Defense], and when they have completed their tours, they would have built the infrastructure of the Security Office that will protect the US Government in Iraq through the certain-to-be-tumultuous first half-century of the new millennium.

---

[2] Plaintiffs' careers, which include numerous commendations and honors for their DS service, are summarized in their previously filed Declarations, which are attached as Exhibit 1.

> … [T]he RSO staff created an effective security program despite obstacles which would have stymied even the most determined souls. When most of the team arrived in early 2004, they found themselves in a country with no functional security forces, working for an organization with an incoherent force protection structure, facing threats of mortar rocket attacks, car bombs, sniper attacks, small arms attacks, and suicide bombers, to name a few….

(Ex.2).[3]   The formal citation commends the DS agents for "remain[ing] constantly vigilant and always on duty," and for service that "is worthy of the highest commendation." *Id.*

## II.   STATE'S DEMAND FOR REPAYMENT OF OVERTIME PAY.

### A.   The April 2005 Demand.

Following their return from Iraq in early 2005, each Plaintiff received an identical letter from State, demanding return of their pay for required overtime work:

> Everyone from the Secretary of State and down appreciates the efforts you have been putting forth in support of the President's Foreign Policy goal under such trying conditions. …. Section 5547 of Title V of the United States Code imposes a cap on the total basic pay plus premium pay a Federal Employee may earn. This cap is normally applied bi-weekly but can be applied annually when a covered employee is performing overtime or other premium pay hours in connection with a situation that has been deemed to be an emergency posing a threat to life or property. The ongoing response to the September 11 terrorists attacks and the war in Iraq have each been determined to constitute such an emergency. Unfortunately, since the law that permits this flexibility envisioned a short-term emergency, the extended period of your emergency support service has led to an overpayment in your paid year 2004 earnings.

(AR:28-33).[4]

---

[3] Plaintiffs Bopp, Landis and Benevento were singled out for having "developed a first-rate protection program," including "developing operational requirements, managing the day-to-day tactics … details, [and] coordinating support with the US military." *Id.* Mr. Benevento "oversaw the activities of the Mobile Security Division, charged with providing protection at the highest threat situations," and "[h]is attention to detail and insistence on a standard of excellent performance … resulted in no losses or serious injuries … during this period," despite working in "the worst threat environment in the world" and facing frequent attacks. *Id.* Mr. Lubow was recognized for "lead[ing] the Embassy's effort to recruit and investigate foreign national employees" and for having "initiated a major investigation into the theft of [government] equipment." *Id.* Mr. Bennett "developed and managed a logistics program worthy of a mid-sized city manager," despite "the threat of his environment." *Id.*

[4] The sums demanded by State range from $482.68 to $10,607.04. *Id.* Following Plaintiffs' initiation of this action, State agreed to withhold collection pending disposition. (DE:10).

## B.    Plaintiffs' Compensation for Their Service in Iraq.

### 1.    Plaintiffs' payroll status.

Plaintiffs were assigned to Iraq in December 2003 on a TDY basis, *i.e.,* their pay scale was based on Washington, D.C. caps.  (Exs.7-9).  By statute, "premium pay," which includes overtime, is capped on a bi-weekly basis, but the government has authority to apply the cap on an annual basis for emergency situations.  5 U.S.C. § 5547.  In 2004, the annual premium pay cap for State employees serving overseas was $128,200, and the cap for employees on TDY assignments, such as Plaintiffs at the time of their deployment, was $130,305.  (Ex.10).

Confusion concerning pay caps was evident from the earliest days of DS operations in Iraq.  (Ex.11).[5]  As of March 2004, the question was unresolved, which raised the possibility of employees "not receiving any pay for the last 2 or three months of the year" (Exs.11-E, 11-F).[6] On April 12, 2004, Mr. Landis e-mailed State administrators that "[t]he pay cap for those of us serving in Iraq still has not been lifted."  (Ex.11-G).  On April 16, 2004, State responded that yearly caps had been approved in October 2003, but had not been implemented "due to the conflicting priorities regarding implementation of the 2004 pay rate adjustments and the technical adjustments required."  (Ex.11-H).  State was unable "to commit to an exact date when the cap will be lifted and individuals retroactively paid for time worked while in Iraq," but, assured Plaintiffs of full payment for overtime:   "Payroll is adamant that all individuals who have served or are serving in Iraq *will receive full compensation*."  *Id.*  (emphasis added).

On April 23, 2004, State released "the final version of the pay cap" for personnel in Iraq. (Exs.11-I, 11-J).   The "[p]remium compensation cap" was $128,200 "for those assigned overseas," and $130,305 "for those assigned to Washington," which included Plaintiffs' service

---

[5]  E-mail exchanges between State and Plaintiffs are included in the administrative record (AR:46-53;  FBAR:47-53;  DBAR:53-59;  RLAR:64-69;  JBAR:63-68;  AR:316), but not all pertinent exchanges.  For ease of reference, all e-mails are assembled in Exhibit 11.

[6]  In February 2004, Mr. Bennett asked State about the pay caps.  (Ex.11-A).  The response was "[w]e still seem to be dealing with the issue of whether or not the biweekly pay cap has been lifted for employees serving in Iraq."  (Ex.11-B).  On March 11, 2004, State advised that "[t]he issue of pay caps for employees serving in Iraq is being researched."  (Ex.11-C, 11-D).

on a TDY basis in Iraq.  *Id.*  On May 11, 2004, State's Human Resources Office in Baghdad informed Plaintiffs and other personnel serving in Iraq of "changes" to the payroll system, including that State had "eliminated the bi-weekly cap on overtime earnings." (Ex.11-K).

Because overtime pay, unlike other components of Plaintiffs' compensation, cannot be "rolled over" into the next pay year, State informed Plaintiffs that State would pay out earned overtime immediately, while rolling other pay components into Plaintiffs' first 2005 paycheck:

> *What we want to do is pay any earnings that cannot be rolled over to the new calendar year as soon as possible up to the appropriate capping level.*  Any earnings that can be rolled will continue to be rolled from year to year until they are paid out in full….

*Id.*  (emphasis added).

In July 2004, State issued a cable outlining revisions to the Iraq Service Recognition Package (ISRP), which reiterated State's commitment to pay earned overtime in 2004:

> …. [T]he combination of base pay plus premium pay (whether in the form of overtime pay or compensatory time off) for those serving in Iraq is capped annually at … $128,200 for those assigned to Iraq, $130,305 for those on TDY to Iraq ….  *Payroll will pay out any overtime pay first, projecting out until the end of the year how much premium pay an employee can earn before hitting the annual cap.*  Any amount of premium pay over the cap is forfeited; premium pay does not roll over into succeeding years as danger pay and hardship differential do.

(AR:27) (emphasis added).  Also in July 2004, Plaintiffs were assigned permanently to the new Embassy in Baghdad, transforming their status from TDY to permanent assignment, which also reduced their premium pay to $128,200.  (Ex.1; AR:340).

## 2.     The August 2004 Overtime Premium Compensation Policy.

On August 15, 2004, State's U.S. Mission Iraq issued an Administrative Notice, titled "DOS Overtime Premium Compensation Policy, Baghdad" (the August 2004 Policy), as the "Embassy policy" for State personnel on assignment to Iraq.  (AR:80, 90-97).[7]  State recognized that "[w]orking in Iraq is a unique experience with unusual demands," including "the expectation

---

[7] State submitted the August 2004 Policy to the FSGB during the first round of proceedings on Plaintiffs' waiver request.  (AR:80)*.*  State's cover memorandum acknowledges that the policy was comprehensively distributed to State personnel serving in the Baghdad Embassy.  *Id.*

… that all employees will perform a certain level of overtime hours," *i.e.,* "as many hours of overtime as will be required to complete the job." (AR:92).

The August 2004 Policy confirms that State had waived the bi-weekly overtime cap for eligible employees, replacing it with an annual cap." (AR:92). The policy states that "[t]here is no rollover provision for the premium pay cap, and excess amounts are forfeited." *Id.* To avoid putting employees who worked overtime work in jeopardy, State announced a mechanism for projecting overtime payments and withholding some premium pay until year's end:

> For those subject to an annual cap, the payroll system projects an employee's basic rate of pay and premium compensation over the course of the year and may defer payment of premium compensation to ensure that the employee does not receive large amounts early in the year, which could cause the employee to exceed the cap and thus be indebted to the government. Premium pay amounts that exceed the biweekly cap but do not cause the projected amount to exceed the annual cap will be included in the employee's earnings in the pay period following receipt of time and attendance [records] by the Federal Service Center/Charleston. At the end of the year, if the employee is owed premium compensation that had been deferred but that would not cause the annual cap to be exceeded, the employee will be paid for that premium pay. Amounts in excess of the annual cap cannot be paid.

*Id.*[8] State promised that "payroll monitors an employee's basic rate of premium compensation over the course of the year" so as to ensure that overtime pay does not "jeopardize the employee's ability to receive basic pay by the end of the calendar year or which could cause the employee to receive premium pay above the cap and thus be indebted to the government." *Id.*

OPM issued regulations on September 17, 2004, to "govern[] payment of premium pay and premium pay limitations for Federal employees" under Section 5547, effective October 18, 2004. 5 C.F.R. §§ 550.105, 550.106, 550.107; 69 F.R. 55941 (Sept. 17, 2004). The regulations require the government to use the pay cap "in effect at the end" of the pertinent calendar year in calculating premium pay limitations, and also authorize the government to defer overtime

---

[8] The August 2004 Policy distinguishes between "regularly scheduled" overtime, which is "officially scheduled prior to the beginning of the administrative workweek," and "irregular" – meaning unscheduled overtime work. (AR:94). According to the policy, "[o]vertime pay is MANDATORY for regularly scheduled overtime hours," but irregular overtime is to be compensated with "compensatory time off instead of overtime pay." *Id.* (capitals in original).

payments until year's end to protect against overpayments.  *Id.*[9]

### 3.   Communications between Plaintiffs and State in late 2004.

On November 24, 2004, State, through an administrator, Sally Malvian, informed each

Plaintiff that "[t]he Department is currently conducting a review of premium pay earnings

involving employees supporting the effort in Iraq."  (Ex.11-L).  Ms. Malvian further stated:

> During our review we have determined that your earnings applicable toward a
> 2004 annual premium pay cap *have already or will shortly put you above the cap
> for the current pay year.*
>
> The Department cannot pay any premium compensation that would cause your
> combined basic pay plus premium pay to exceed $128,200.  If such payments are
> made erroneously, the Department is obligated to seek collection of such
> overpayments.
>
> *We will contact you with additional details concerning your specific situation as
> we finalize our review of the overtime payments*….

*Id.*  (emphasis added).[10]   On December 3, 2004, Ms. Malvian informed Plaintiffs:  "Because

there is no provision for rollover of premium pay above the cap, it is possible that by year's end

you will have exceeded the cap and thus be indebted.  The Department sincerely regrets this

---

[9] As State subsequently conceded in a June 2005 letter to then-Senator John Warner of Virginia,
who made inquiry on Mr. Lubow's behalf, State promised more than it could deliver.  (Ex.12).  It
was not until April 1, 2005, following Plaintiffs' return to the United States, that State – because
it supposedly had overpaid employees in 2004 – actually established a system for projecting
overtime pay under the premium pay cap.  (Ex.13) (for 2005, State imposed "administrative cap"
for premium pay, under which State would "withhold premium payments on a biweekly basis to
the extent they exceed the annual premium pay cap when projected over the course of the pay
year," reconciling withheld payments quarterly).  Plaintiffs are thus, to a very significant extent,
the victims of State's inadequate accounting practices:  if State had delivered on its 2004
promises, Plaintiffs could not have exceeded the salary cap, because other salary components
would have been held back and paid in 2005 and/or because State would have monitored their
compensation and they would not have been required to work unpaid overtime.

[10] Responding to Mr. Bopp's question as to whether he could "track how much I had received
annually to ensure that I did not exceed the $128,200 cap," Ms. Malvian explained that "a
change in payroll processing … led to this problem," and stated that "*the onus is not and should
not be on the employee.*"  (Exs.11-M, 11-N) (emphasis added).  State never told Plaintiffs to stop
working overtime, and Plaintiffs continued to work the 12-18 hour days that they had been
working throughout their service in Iraq.  *Id.*  And State continued to require Plaintiffs to work
overtime, and to pay them for this work.  (Exs.11-N, 14-15).

situation, but we wanted to give affected employees a heads-up as soon as practicable so they would know there had been erroneous payments."  (Ex.11-N) (emphasis added).

## III.   PLAINTIFFS' CHALLENGE TO THE OVERPAYMENT DETERMINATION.

### A.   DAS Millette's Ruling.

The American Foreign Service Association (AFSA), acting on Plaintiffs' behalf, submitted objections to State's interpretation of 5 U.S.C. § 5547.  (Ex.16).  AFSA explained that, because the statute "does not require the rate that applies to the employee's *position* at the end of the year be used, but rather is written to ensure that, if Congress changes either rate in the course of the year, the rate in force at the end of the year is used."  (Ex.16) (original emphasis).  As AFSA noted, State's method meant that "an employee [who] spends nine or ten months working and earning premium pay" in the United States "and who then is assigned to Iraq for the last two months of the year," under a lower cap "could well have exceeded the cap before even deploying to Iraq."  *Id.*  AFSA accordingly requested that Plaintiffs' service on TDY from February 2004 through June 2004 be assessed under the $130,305 cap, and that only the time assigned to the U.S. Embassy in Baghdad on permanent duty should be assessed under the lower cap.  *Id.*

On May 12, 2005, DAS Millette ruled that "the annual premium pay cap must be applied to the entire calendar year."  (Ex.17).  Plaintiffs appealed to the BCA.  (Ex.18).

### B.   The BCA Decision.

On June 22, 2005, the BCA upheld DAS Millette's ruling, relying on OPM's regulations to subject Plaintiffs to the $128,200 pay cap.  (AR:82-89).  If Plaintiffs "received premium pay which exceeded the statutory limitation," then Plaintiffs "owe[] the State a valid debt" even if State "is at fault for making any overpayments."  (AR:85)*.*  The BCA further ruled that State could not implement salary offsets until a determination was made that the proposed repayment schedule complied with regulatory requirements.  (AR:89)*.*

### C.   State's Retroactive Application of Enhanced 2005 Pay Caps.

On May 11, 2005 (the day before DAS Millette's ruling), Congress enacted Public Law

109-13, the Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief of 2005, which, in pertinent part, addressed the President's request to raise the premium pay cap for employees working overtime in war zones:

> The annual limitation on premium pay is particularly significant in limiting the Government's flexibility to appropriately compensate employees assigned overseas to combat zones and on contingency or emergency response operations in the area of responsibility of the Commander of U.S. Central Command. Such employees routinely work extended overtime hours and often reach the annual limitation on premium pay before their overseas tour or operation assignment ends. *Once employees have reached the annual limitation on premium pay, they can be required to work additional overtime hours, but they cannot be paid for those hours. Their situation represents an inequity that has an adverse effect on morale for those working in these highly challenging circumstances.*

(AR:412) (emphasis added). In Section 1008 of the Act, Congress empowered federal agencies to waive the premium pay cap "[d]uring calendar year 2005 … up to $200,000, … including limitations on the aggregate of basic pay and premium pay payable in a calendar year, to an employee who performs work while in an overseas location that is in the area of responsibility of the Commander of the U.S. Central Command, in support of, or related to" military or emergency operations. Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief of 2005, Pub. L. No. 109-13, 119 Stat. 231, § 1008. (Ex.21).

On August 19, 2005 – two months after the BCA's decision became final and exactly one month after State's repayment demand (Ex.22) – State's Under Secretary for Management authorized waiver of the premium pay cap limitation "on the aggregate or basic pay and premium pay payable in calendar year 2005 for employees working in Iraq and Afghanistan." (Ex.25). Moreover, "[i]n recognition of the substantial contributions our employees…make, under very difficult conditions," State determined that pay "earned in excess of this amount and up to the new premium pay cap will be payable in 2006." *Id.* And the premium pay cap waiver was extended to the last pay periods of 2004, *i.e.,* it "will apply to all premium pay earnings payable in calendar year 2005, i.e., *for work performed in pay period 25 of 2004* (pay date January 8, 2005) through pay period 24 of 2005 (pay date December 22, 2005)." *Id.* (emphasis added). "The waiver will apply to all employees eligible to receive premium pay while

11

performing work in Iraq and Afghanistan, and who have met a minimum service requirement of 42 continuous days in country," such that "[a]ny premium pay earned under this new provision that exceeds the statutory limit on aggregate pay … will roll over into calendar year 2006." *Id.*[11]

## IV.   PLAINTIFFS' WAIVER REQUESTS.

### A.   State's Refusal to Grant Waivers.

#### 1.   DAS Millette's rejection of the waiver request.

State issued repayment schedules on July 19, 2005. (Ex.22). On July 28, 2005, AFSA requested DAS Millette to waive the purported overpayments because Plaintiffs were not "at fault for the overpayments," inasmuch as they "were not in control of the amounts [State] was paying them" and, "[e]ven if they were informed at some stage that they might exceed the cap at some time in the future, it appears that they were informed much too late in the year to do anything about the overpayment." (Ex.23). Also, State "did not advise employees what steps to take to avoid or minimize overpayment," and Plaintiffs "had no option since refusing to work the hours required would have placed their colleagues in danger." *Id.*

AFSA noted that "the very nature" of DS Special Agent's duties "places them in harm's way," as they "perform protective duties outside the Green Zone, acting as armed escorts to members of the diplomatic mission both in Baghdad and in the several Regional Embassy Offices around Iraq. *Id.* "To require them to perform these long, dangerous hours of duty, many of which were in fact uncompensated, and then to over pay them because the Department had no way to prevent that [from] happening, truly makes it 'unconscionable' … to seek recovery." *Id.*

DAS Millette denied the waiver request on August 9, 2005, ruling that Plaintiffs were ineligible even to seek waivers, because: (i) the overpayments to Plaintiffs had been "proper"

---

[11] Thus, State "may recompute premium payments that were payable before the law's enactment on May 11, 2005, but after January 1, 2005." *Id.* Premium payments that "may have been forfeited by eligible employees before May 11, 2005, in accordance with the applicable premium pay cap at the time (under 5 U.S.C. § 5547), may be recouped under this new provision up to the limitations established in section 1008." *Id.*

when made, such that Plaintiffs, although purportedly overpaid, could not seek a waiver of "erroneous" overpayments; and (ii) Plaintiffs "knew or should have known through the exercise of due diligence that an error existed but failed to take corrective action." (Ex.24). DAS Millette also "note[d] that the majority of department employees who exceeded the premium pay cap in 2004 were not Diplomatic Security agents," and that a total of 47 employees had "exceeded the cap in amounts ranging from approximately $400 to $38,000." *Id.* According to DAS Millette, "[m]any of these employees have already repaid their indebtedness to the Department in full or are in the process of doing so through a repayment schedule." *Id.* DAS Millette also denied individual requests by Plaintiffs for waivers of repayment (AR:34-40, 42-45; FBAR:28-31; DBAR:47-52; RLAR:50-55, 59-62; JBAR:50-55, 59-62).

### 2.   State's rejection of Plaintiffs' challenge to DAS Millette's decision.

Plaintiffs sought review, challenging DAS Millette's eligibility determinations:

> [B]efore September 2004 it would have been extremely difficult to determine which annual premium pay cap applied, given that the Department was unable to make this determination correctly until OPM promulgated regulations on September 17, 2004. …. As of September 2004, the Department apparently believed that employees in Iraq would be subjected to an annual premium pay cap of $130,305.00 for at least a portion of their service there (or perhaps that no such cap should apply). The Department did not learn that the lower cap would be applicable to employees serving in Iraq until OPM promulgated guidance in the Federal Register on Friday, September 17, 2004. …. Therefore, for almost three-quarters of a calendar year 2004, it would have been impossible for me to take action preventing the erroneous payments.

(AR:15-22; FBAR:4-11; DBAR:22-31; RLAR:26-33; JBAR:26-33). Plaintiffs also relied on State's 2005 decision to apply the enhanced 2005 pay caps retroactively. See Part III.C., *supra.*

Plaintiffs were supported in their waiver requests by Principal Deputy Assistant Secretary of State and Director of the Bureau of Diplomatic Security Joe D. Morton, in a June 20, 2006 submission. (Ex.26). Mr. Morton addressed State on behalf of "dedicated DS Agents who selflessly volunteered to support the Department in Iraq in 2003 during the early years of the reconstruction process." *Id.* Mr. Morton explained that "DS supports the efforts of our agents and champions their cause to retain their earnings":

> [H]aving served in Iraq before significant increases in monthly premium pay limitations, our Agents … easily hit the aggregate pay cap … before the end of the pay year, resulting in debts to the Department.  …. We understand that increased pay caps coupled with legislation applicable to 2005 and 2006 … have essentially eliminated many overpay issues, but our Agents are not covered by current applicable law, who are the pioneers of U.S. reconstruction efforts, deserve more than just bills from the Department….

*Id.*

The pleas of Plaintiffs and Principal Deputy Secretary of State Morton went unheeded. State's Bureau of Human Resources' July 26, 2006 decision refused to grant waivers, ruling that it was "appropriate under the reasonable person standard to charge you with knowledge regarding the amount of pay to which you are entitled on an annual basis as well as knowledge that you have received payments in excess of your proper entitlement."  (AR:4-14).

### B.    The First Foreign Service Grievance Board Appeal.

Plaintiffs sought review before the FSGB in August 2006.  (Ex.27; AR:1-69; FBAR:1-45; DBAR:22-61; RLAR:22-76; JBAR:22-74).  In discovery, State conceded that it "became aware that certain employees were in danger of exceeding the annual 'premium pay cap' … in or around August 2004."  (AR:216).[12]  State also conceded that payroll "did not have a system in place to automatically detect and stop overpayments" in 2004, and that, "[o]nce the bi-weekly premium pay cap was waived, all payments had to be monitored manually."  (AR:219).[13]

On July 28, 2008, the FSGB ruled that DAS Millette had failed correctly to apply statutory and regulatory provisions in denying waivers.  (AR:337-56).   The FSGB first

---

[12] State refused to make available for deposition two State lawyers to testify that that State knew Plaintiffs were approaching the premium pay cap (under State's interpretation) in August 2004. (AR:76, 107, 213).  State submitted identical declarations from the lawyers, each stating that "I cannot attest" to the other's having stated, during an August 2005 meeting with AFSA lawyers, that State "was aware of the overpayment issue but decided not to inform" Plaintiffs because State "believed that such disclosure would 'affect [Plaintiffs'] morale.'"  (AR:218, 221-24). Each stated that "I do not recall that [the other] made such a statement."  *Id.*

[13] By 2007, the ISRP, in addition to providing for a significantly higher premium pay cap of $212,100, established a system for projecting premium pay, under which "'rollover' money will be held back until such time as [the employee] is no longer expected to exceed the pay caps" during a given calendar year.  (AR:329).

overturned DAS Millette's "erroneous payments" ruling, because, "[i]f the payments were not erroneous, the Department would not be seeking to collect them." (AR:348-49). The FSGB next addressed his "at fault" finding, applying the governing standard that "[a]n employee is considered to be 'at fault' if he/she knew or should have known of the pay cap and that erroneous payments were being made, but failed to take corrective action." (AR:349). The FSGB rejected State's reliance on e-mails between February and April 2004, because "[t]he e-mails did not include any clear or specific discussion of the alternative annual cap or how it would be applied or tracked." (AR:350-51). It was not until "OPM issued regulations addressing the issue on September 17, 2004, determining that the cap that applied on the last day of the calendar year would be applied to the full year," that the cap was resolved, *i.e.,* "[t]he government itself … did not know until late 2004 how it would handle the pay cap under the circumstances where employees changed assignments during the year." (AR:351-52).

The FSGB further found that it was not "clear what [Plaintiffs] could have done to avoid overpayments" once they were "notified on November 24" that they were "nearing the pay cap." (AR:352). This was so, according to the FSGB, because "[t]he notice itself was vague," *i.e.,* "[n]o specific dates or amounts are included." (AR:352-53). Moreover, "[e]ven if it had been more specific, it seems unlikely that [Plaintiffs] could have refused to work overtime during [their] remaining months in Iraq." (AR:353). Indeed, "although State was in a better position to interpret the pay cap and monitor [Plaintiffs'] overtime payments against the cap, there is no indication in the record that it took any actions to prevent excess overtime," *e.g.,* "order[ing] [Plaintiffs] to stop working, or even to stop working overtime," even "once it appeared that [they] would reach or exceed the pay cap," or defer[ring] payment of any of [their] premium pay … to avoid overpayment," as OPM's regulations "clearly permitted." (AR:353). Based on these findings, the FSGB overturned the Department's "at-fault" basis for denying eligibility:

> Pay issues for employees assigned to Iraq were both fluid and very complex in 2004. Basic pay, overtime, compensatory time (in lieu of overtime), night differential, holiday pay, Sunday pay, danger pay, differentials, allowances, performance awards and other payments were all thrown in the mix. Some

counted against the annual premium pay cap; some counted against the annual aggregate pay limitation.  Some could be rolled over; some could not.  Given the complexities, the lack of clarity surrounding application of the overtime cap, [Plaintiffs'] inability to take corrective action, and the Department's failure to either track the payments adequately or avail itself of mechanisms to avoid the overpayments, we find that [Plaintiffs are] not at fault for the excess payments.

*Id.*

Because Plaintiffs were "not at fault for the excess payments," the FSGB overturned, "as contrary to law," DAS Millette's ruling that State was precluded from granting … waiver[s]." *Id.*  The FSGB remanded to State for "a determination on the merits whether the collection of these finds 'would be against equity and good conscience and not in the best interest of the United States.'"  (AR:353-54) (quoting 5 U.S.C. § 5584).

### C.   The Second Round of Waiver Proceedings.

Following the FSGB's decision, DAS Millette informed Plaintiffs that "I must now determine whether collection … would be 'against equity and good conscience and not in the best interest of the United States,'" under 5 U.S.C. § 5584, applying 22 C.F.R. § 34.18(b)(1)(iv):

If the deciding official finds no indication of fraud, misrepresentation, fault or lack of good faith on the part of the employee, … the employee is not automatically entitled to a waiver.  Before a waiver can be granted, the deciding official must also determine that collection of the claim against an employee would be against equity and good conscience and not in the best interest of the United States….

(Ex.28).  Among the specified factors in Section 34.18(b)(1)(iv) is "[w]hether recovery of the claim would be unconscionable under the circumstances."  22 C.F.R. § 34.18(b)(1)(iv)(E).

On December 23, 2008, DAS Millette, according *no* consideration to the unconscionability factor, issued his decision rejecting the requested waivers:

I have concluded that it would *not* be "against equity and good conscience" and would be in the "best interest of the United States" to recover the over payment[s] … for exceeding the applicable premium pay cap in calendar year 2004.  I find that your failure to make restitution would result in an unfair gain….  I have had to make this determination for over thirty other employees in the exact same situation and they have paid their debts in full.  Therefore, a waiver of your salary overpayment cannot be made under the provisions of 5 U.S.C. § 5584.

(AR:359-73) (original emphasis).

### D.      The Second Foreign Service Grievance Board Appeal.

Plaintiffs sought FSGB review.  (AR:374-76, 378-79, 388-90, 393).  On January 7, 2010, the FSGB upheld DAS Millette's denial of waivers.  (AR:403-17) (FSGB Decision II).

The FSGB "agree[d] with [Plaintiffs] that it seems unfair that they have to refund payments for overtime worked that they actually performed, when they had no real option but to perform such work, and when those in similar positions in 2005 and subsequent years were paid," particularly because:  (i) "[t]here was a great deal of confusion about the level of the pay cap and how it was to be applied, particularly as their status in Iraq changed from TDY to permanent assignment, making it difficult, if not impossible, for [Plaintiffs] to track their overtime; (ii) Plaintiffs "relied on the Department's assurances that it would monitor premium pay to ensure that the caps would not be exceeded as was its custom"; (iii) "[e]ven if [Plaintiffs] had known they were about to exceed the cap, there was nothing they could do about it, since they could not refuse to work overtime while assigned to Iraq"; (iv) "[t]he Department itself took no actions to prevent excess overtime"; (v) Plaintiffs "volunteered for dangerous duty in a war zone and worked all of the hours of overtime for which they were paid, including those in excess of the cap"; and (vi) "revisions to the Iraq Service Recognition Package approved in 2005 raised the pay cap and allowed excesses in premium pay to be rolled over for payment in the following year, in recognition of the inequity of denying employees pay for overtime actually performed while serving under the dangerous conditions in Iraq."  (AR:406-08, 411-12)

Nonetheless, the FSGB determined that Plaintiffs had failed to "show that the decision to deny a waiver was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law."  (AR:408).  Although recognizing that DAS Millette's ruling "did not deal explicitly with the factor of whether recovery would be 'unconscionable,'" a factor State must consider under 22 C.F.R. § 34.18(b)(1)(iv) – and which DAS Millette had expressly told Plaintiffs that he would consider – the FSGB ruled that DAS Millette had addressed "the equities of the waiver request" and that it had "no basis to overturn the agency's judgment that granting a waiver to [Plaintiffs] would create an unfair gain for them vis-à-vis all those similarly situated employees

who repaid their excess premium pay for 2004 as requested." (AR:412-13).

The FSGB recognized that "our earlier decision found the [Plaintiffs] were not at fault in accepting or failing to prevent excess premium payments in 2004," but relied on administrative decisions that "discouraged the approval of waivers when the employee had reasonably timely notice that payments were or may have been erroneous, even if the employee was not 'at fault.'" (AR:413). "[H]aving applied the factors set forth in its regulations and duly considered the equities involved, the Department did not abuse its discretion in denying [Plaintiffs] waivers of repayment of the excess premium payments they received for 2004." *Id.*

FSGB member Blanford, who was the only member on both FSGB panels, dissented:

> In support of their waiver request, [Plaintiffs] made a number of non-frivolous arguments, several of which are listed in this decision. Millette's letter does not respond to any of the arguments and nothing in the record demonstrates that he considered them. His comments about financial hardship and other employees who did not request waivers are undoubtedly accurate but do not apply, in my opinion, to the [Plaintiffs'] presentations or the merits of their cases.

> [Plaintiffs'] arguments unmistakably address the fifth factor, whether recovery of the claims would be unconscionable under the circumstances. Even if they did not, the agency's list of factors is illustrative, not exclusive. How, then, can Millette assert that the employees, "did not address any of the factors which I may consider"? The phrase "equity and good conscience" implies a careful consideration of the employees' waiver request and there is no evidence that such a reasonable determination occurred.

> I make no judgment on the merits of the claims. In dismissing [Plaintiffs'] claims without examining them, however, I believe the agency acted unreasonably and abused its discretion.

(AR:416-17).

## ARGUMENT

## I.   STANDARD OF REVIEW.

"[W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal." *American Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (footnote omitted); *accord Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009), *cert. denied*, --- U.S. ---, 2010 WL 680561 (Mar. 1, 2010). Although disposition by summary

judgment is appropriate, Rule 56(c) of the Federal Rules of Civil Procedure "does not apply because of the limited role of a court in reviewing the administrative record." *Cottage Health Sys. v. Sebelius*, 631 F. Supp. 2d 80, 89 (D.D.C. 2009) (citations omitted); *accord S.E. Conference v. Vilsack*, --- F. Supp. 2d ---, 2010 WL 537562, *5 (D.D.C. Feb. 17, 2010). "Summary judgment serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *John L. Doyne Hosp. v. Johnson*, 603 F. Supp. 2d 172, 178 (D.D.C. 2009) (citations omitted).  "The entire case on review is a question of law," with this Court's review "based on the agency record and limited to determining whether the agency acted arbitrarily or capriciously." *Rempfer*, 583 F.3d at 865 (citations omitted).

"[I]t is the agency's role to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *N.E. Hosp. Corp. v. Sebelius*, --- F. Supp. 2d ---, 2010 WL 1199311, *3 (D.D.C. Mar. 29, 2010) (citations omitted).  The APA obligates this Court to "hold unlawful and set aside agency action, findings, and conclusions" that are found to be "arbitrary, capricious, or an abuse of discretion or otherwise not in accordance with law," made in excess of statutory authority or "without observance of procedures required by law."  5 U.S.C. § 706(2)(A), (C), (D).  This Court has summarized the key principles that govern its review under Section 706:

> The scope of review … is narrow.  A court is presume that the agency's action is valid.  And court is not to substitute its judgment for that of the agency.  But a court must be satisfied that the agency has examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.

*N.E. Hosp. Corp.*, *supra* at *3 (citations and internal quotations omitted; brackets in original).

**II.    STATE'S DETERMINATION THAT PLAINTIFFS WERE OVERPAID IS BASED ON AN ARBITRARY AND CAPRICIOUS INTERPRETATION OF GOVERNING STATUTORY AND REGULATORY PROVISIONS.**

    **A.    State's Construction of 5 U.S.C. § 5547 Is Arbitrary and Unreasonable.**

        **1.    Section 5547 cannot be construed retroactively to reduce already-paid overtime pay, based upon an employee's change of assignment or designation during a calendar year.**

            **a.    Standard of review.**

Under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), "[t]he first step is determining whether Congress has spoken directly to the 'precise question at issue,' for if it has, then 'the court, as well as the agency must give effect to the unambiguously expressed intent of Congress." *N.E. Hosp., supra* at *3 (quoting *Chevron*).  But if, as here, Congress "has not directly addressed the precise question at issue" in statutory text, such that "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 665 (2007) (quoting *Chevron*).

Courts defer to agency interpretations "based on a permissible construction of the statute," *Nat'l Mining Ass'n v. Kempthorne*, 512 F.3d 702, 709 (D.C. Cir. 2008), and such interpretations "need be only reasonable to warrant deference." *N.E. Hosp., supra* at *3 (citation omitted).  But the courts "will not uphold an interpretation that diverges from any realistic meaning of the statute," *GTE Serv. Corp. v. F.C.C.*, 205 F.3d 416 (D.C. Cir. 2000) (citation and internal quotations omitted), because an interpretation that "so completely diverges from any realistic meaning of [a statute] … cannot survive scrutiny under *Chevron*." *Natural Resources Defense Council, Inc. v. Daley*, 209 F.3d 747, 753 (D.C. Cir. 2000); *accord Blue Ocean Inst. v. Gutierrez*, 585 F. Supp. 2d 36, 44 (D.D.C. 2008), *app. dismissed*, 2009 WL 1456322 (D.C. Cir. May 5, 2009).  An "utterly unreasonable" agency construction of a statute must be rejected. *Nat'l Treas. Employees Union v. Chertoff,* 452 F.3d 839, 864 (D.C. Cir. 2006).

"The judiciary remains the final authority with respect to questions of statutory construction and must reject administrative agency actions which exceeds the agency's statutory

mandate or frustrate congressional intent." *Am. Fin. Servs. Ass'n v. F.T.C.*, 767 F.2d 957, 968 (D.C. Cir. 1985) (citations omitted).   The controlling canons are basic:   "statutes should be interpreted to avoid untenable distinctions, unreasonable results or unjust or absurd consequences." *Kaseman v. Dist. of Columbia,* 444 F.3d 637, 642 (D.C. Cir. 2006) (citations and quotations omitted).  "A statutory outcome is absurd if it defies rationality." *Landstar Exp. Am., Inc. v. Fed. Maritime Comm'n,* 569 F.3d 493, 498 (D.C. Cir. 2009) (citation omitted).

**b.    State's retroactive application of the yearly pay cap.**

The government is required to compute an employee's entitlement to "premium pay" under 5 U.S.C. § 5547.   5 C.F.R. § 550.102.   Overtime pay is "premium pay," within the meaning of Section 5547, 5 C.F.R. § 550.103(4), and is therefore subject to the statutory limitation that premium pay may not "cause the aggregate of basic pay and such premium pay for any pay period … to exceed the greater of" either "[t]he maximum rate of basic pay payable for GS-15" federal employees or "the rate payable for level V of the Executive Schedule." 5 U.S.C. § 5547(a).   The OPM, however, may waive the bi-weekly premium-pay cap and apply a yearly cap in certain situations, including emergencies "involv[ing] a direct threat to life or property," and "work that is critical to the mission of the agency." 5 U.S.C. § 5547(a)(b)(1)-(4).

Plaintiffs' total pay cap during their service in Iraq was $175,700.  (Exs.10-22; AR:23-27).  Their "premium pay" cap under Section 5547 was initially $130,305, based on their TDY status, pursuant to which Plaintiffs were paid as if they were in Washington, D.C.  *Id.*  Their premium pay cap was reduced in July 2004, when the U.S. Embassy opened in Baghdad, and Plaintiffs were reclassified as serving in Iraq.  *Id.*  Certain types of pay are allowed to "roll over" into the following year, at which time the employee is paid "[a]mounts in excess of cap … in lump sum," continuing "into succeeding years as necessary until all payable amounts [are] paid." (AR:27).  Premium pay, including overtime, "is capped with no rollover."  (AR:27).

The linchpin of State's determination that Plaintiffs had been overpaid is that their pay cap for the *entirety* of calendar year 2004 was $128,200, *i.e.*, the cap that became effective in

July 2004 when Plaintiffs, after having served in Iraq for many months, were detailed to the newly opened Embassy and formally assigned to Iraq.   (Exs.17, 20; AR:82-89).   Because Plaintiffs were designated by State under 5 U.S.C. § 5547 for an annual premium pay cap, OPM regulations required, consistent with the statutory provision, that "the employee may receive premium pay … only to the extent the payment does not cause the total of his or her basic pay and premium pay for the calendar year to exceed" the premium pay cap.  5 C.F.R. § 550.106(c).

Under the regulation, the rate "in effect on the last day of the calendar year" is the cap. *Id.*  Both State and the BCA have construed that language to be applicable to the change in Plaintiffs' pay status, such that the rate in effect as of July 2004, when the Embassy opened, applied retroactively to the entire year.

<blockquote>
c.      **State's interpretation of Section 5547 to allow retroactive reductions in earned and paid overtime pay is unreasonable.**
</blockquote>

Section 5547 does not expressly address the situation in which Plaintiffs found themselves, *i.e.*, Plaintiffs remained in precisely the same positions as they had held before the Embassy opened in Baghdad, and were merely moved to permanent posts that were created upon the Embassy's opening.   Under the BCA's analysis, had Plaintiffs worked in Iraq on a TDY status from their arrival in February 2004 through – to take an extreme example – December 2004, and spent only a single 2004 pay period on permanent assignment to the Embassy, their overtime pay would retroactively be reduced to the $128,000 cap *for the entire year.*

But Plaintiffs' position is not all that different from such an extreme hypothetical, because, under State's construction, Plaintiffs would likely have exhausted their retroactively imposed overtime allotment – except for one category of prepaid overtime for law enforcement officers – before they worked *the first hour of additional overtime.*  (Exs.14-15).  *See* 5 U.S.C. §§ 5542(d), 5545a.[14]  Mr. Bopp, for example, should have *stopped working completely* in the last

---

[14]  One component of Plaintiffs' overtime is paid under Law Enforcement Availability Pay (LEAP) Act of 1994, which covers approximately 400 hours of overtime per year.  5 U.S.C. §§ 5542(d), 5545a (authorizing payment of 25% of basic pay to law enforcement officers to ensure their availability for unscheduled duty in excess of 40-hour basic work week).

pay period of 2004, because his paycheck for that period (which does not include overtime) is roughly the amount that State is demanding that he repay.  (JBAR:44-48; Ex.14).  As Plaintiffs correctly argued to State, Section 5547 cannot rationally be construed to "require the rate that applies to the employees' *position* at the end of the year be used."  (Ex.16) (original emphasis).  State's contrary construction of Section 5547 surely produces irrational and absurd results.

The question whether an agency interpretation is reasonable "overlaps analytically" with the required analysis under 5 U.S.C. § 706(a)(2).  *Northpoint Tech., Ltd. v. F.C.C.*, 412 F.3d 145, 151 (D.C. Cir. 2005); *accord Nat'l Ass'n of Broadcasters v. F.C.C.,* 569 F.3d 416, 421 (D.C. Cir. 2009).  "A 'reasonable' explanation of how an agency's interpretation serves the statute's objectives is the stuff of which a 'permissible' construction is made; an explanation that is 'arbitrary, capricious, or manifestly contrary to the statute,' however, is not."  *Northpoint,* 412 F.3d at 151 (citations omitted); *accord Catholic Health Initiatives v. Sebelius*, 658 F. Supp. 2d 113, 118 (D.D.C. 2009).  State's interpretation fails this most basic test.

## 2.      State's construction of OPM regulations is untenable.

### a.      The regulations.

OPM issued regulations on September 17, 2004, to "govern[] payment of premium pay and premium pay limitations for Federal Employees" under Section 5547, effective October 18, 2004.  5 C.F.R. §§ 550, 550.106, 550.107; 69 F.R. 55941 (Sept. 17, 2004).  The regulations track Section 5547 for the pay cap "in effect at the end" of the pertinent calendar year.  *Id.*  Included in the final rule's issuance are comments from three (unidentified) government agencies, one expressing "concern that the exact method of applying the annual premium pay cap is not clearly described in the current regulations," such that "an employee may be employed in multiple locality pay areas over the course of a year" and, "if the annual cap is based on the last applicable locality pay area in a calendar year, an agency might have to correct payments made in past periods."  69 F.R. at 55941.  OPM responded that "the law expressly provides that the annual premium pay cap must be applied to an entire calendar year and that it is based on the applicable

rates in effect at the end of the calendar year." *Id.*

Thus, while "[a] geographic move to an area with different pay rates can raise or lower an employee's aggregate basic pay and the end-of-year annual cap on premium pay" or "a change in aggregate basic pay or the end-of-year cap can change retroactively the date on which an employee reached the annual premium pay cap," such that "an agency may have to recompute retroactively the amount of premium pay owed for one or more pay periods," OPM believed that "we cannot change the regulations without a legislative amendment to reduce or eliminate these administrative burdens." *Id.* The BCA relied on the regulations to reject Plaintiffs' challenge to State's overpayment determination. (AR:87-88).

> **b.** **State's interpretation of OPM regulations is irrational.**

OPM's interpretation of its regulations does not apply to Plaintiffs, because there was no "geographic move" from one area to another, but only a change in State's administrative designation for their service in Iraq. Regardless, State's interpretation of the OPM regulations cannot withstand judicial scrutiny, even under the deferential "plainly erroneous or inconsistent with the regulation" standard of *Auer v. Robbins*, 519 U.S. 452, 461 (1997), any more than State's interpretation of Section 5547 can be sustained.

To be sure, "administrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead*, 533 U.S. 218, 226-27 (2001). Where the Congress "has not directly spoken to the precise question" in statutory text, the courts "look first to the agency regulations, which are entitled to deference if they resolve the ambiguity in a reasonable manner." *Coeur Alaska, Inc. v. S.E. Alaska Conversation Council*, --- U.S. ---, 129 S. Ct. 2458, 2469 (2009) (citations omitted). The agency's interpretation is reviewed under the same "arbitrary or capricious" standard that governs review of an agency's statutory interpretation. *Mead*, 121 S. Ct. at 227. The courts will defer to an agency's

"reasonable interpretation" of a statute, which is articulated in the promulgation of regulations. *Am. Fed. of Gov't Employees, AFL-CIO v. Gates*, 486 F.3d 1316, 1326-28 (D.C. Cir. 2007). For the same reasons, however, that State's construction of the statute is irrational, so too is its construction of the regulation.

### 3. State's erroneous construction of Section 5547 and OPM regulations requires a remand.

Plaintiffs are entitled to have State apply the correct law in determining whether there indeed was any overpayment for overtime work. *E.g.*, *Doyle v. Brock*, 821 F.2d 778, 783 (D.C. Cir. 1987); *Motor Vehicle Mfrs. v. Ruckelshaus*, 719 F.2d 1159, 1164 (D.C. Cir. 1983); *N.E. Hosp., supra* at *12; *Am. Historical Ass'n v. Nat'l Archives & Records Admin.*, 516 F. Supp. 2d 90, 108-11 (D.D.C. 2007); *Bettucci v. United States*, 14 F. Supp. 2d 45, 51 (D.D.C. 1998). "When an agency wrongly concludes that its interpretation is mandated by the statute at issue, a court will not impose its interpretation of the statute," *Humane Soc'y of U.S. v. Kempthorne*, 579 F. Supp. 2d 7, 13 (D.C. Cir. 2008), but rather will vacate the agency's action so the agency can "interpret the statutory language anew." *Peter Pan Bus Lines, Inc. v. Fed. Motor Carrier Safety Admin.*, 471 F.3d 1350, 1354 (D.C. Cir. 2006).

"[W]hen a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end; the case must be remanded to the agency for further action consistent with the correct legal standards." *N.E. Hosp., supra* at *12 (citations and internal quotations omitted). Plaintiffs are entitled to that relief.

### B. State's August 2005 Decision Retroactively to Apply Increased Pay Caps Requires a Remand for Reconsideration of State's Overpayment Determination.

The BCA's June 2005 decision obviously did not address State's August 19, 2005 retroactive waiver of the premium pay cap limitation under the 2005 appropriations act, pursuant to which the "waiver was extended to the last pay periods of 2004 (for work performed) in pay period 25 of 2004 (pay date of January 8, 2005)," with excess premium pay rolled over in 2006. (Ex. 23). Plaintiffs were in Iraq during that pay period and were paid on January 8, 2005

25

(Exs.14-15), but have been denied the benefit of State's retroactive waiver.

Between State's misapplication of Section 5547 and the retroactive waiver, State should be required to apply the correct law and recompute the alleged overpayment. Moreover, even if State *correctly* had applied Section 5547, contrary to the argument set forth in Point III.A., *supra,* the retroactive waiver through the last pay period of 2004 would entitle Plaintiffs to the *$200,000 premium pay cap* (Ex.23) – and there could be *no* overtime pay in excess of the statutory cap. State should not be allowed to have it both ways, *i.e.,* to punish Plaintiffs because Plaintiffs' pay cap was reduced when they were permanently assigned to the newly opened Embassy, and then to deny Plaintiffs the retroactive enhanced pay cap that State promulgated only after the BCA's decision.

"[G]iven the tradition of allowing agencies to reconsider their actions where events pending appeal draw their decision in question," *Ethyl Corp. v. Browner,* 989 F.2d 522, 524 (D.C. Cir. 1993), Plaintiffs submit that this Court properly should remand to State for consideration of the August 2005 retroactive application of the 2005 pay caps in determining whether, and the extent to which, Plaintiffs purportedly were overpaid (should the Court not rule as a matter of law on the basis of the arguments set forth in Point III.A., *supra*). *See Sierra Club v. Van Antwerp,* 560 F. Supp. 2d 21, 23 (D.D.C. 2008) ("where an intervening event may affect the validity of the agency action at issue, a remand is generally required") (citations omitted).

## III.   STATE'S DENIAL OF PLAINTIFFS' WAIVER REQUEST IS ARBITRARY AND CAPRICIOUS.

### A.   Standard of Review.

Under 5 U.S.C. § 706(2)(A)'s "arbitrary and capricious" review standard, this Court's scope of review is narrow, *i.e.,* the Court "is not to substitute its judgment for that of the agency." *Clark County, Nev. v. Fed. Aviation Min.*, 522 F.3d 437, 441 (D.C. Cir. 2008) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins., et al.,* 463 U.S. 29, 43 (1983)). The Supreme Court nonetheless "insist[s] that an agency examine the relevant data and articulate a satisfactory explanation for its action." *F.C.C. v. Fox Television Station, Inc.*, ---

U.S. ---, 129 S. Ct. 1800, 1810 (2009) (citations omitted).

Although the courts "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," Section 706(2)(A) "requires the agency to examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Penick Corp., Inc. v. Drug Enforcement Admin.*, 491 F.3d 483, 488 (D.C. Cir. 2007) (citations and quotations omitted); *accord Lester E. Cox Med. Ctrs. v. Sebelius*, 2010 WL 779743 *4 (D.C. Cir. Mar. 9, 2010); *Raffin v. Surface Transp. Bd.*, 592 F.3d 195, 198 (D.C. Cir. 2010).   Because the Foreign Service Act adopts the APA's review standards, 22 U.S.C. § 4140, these standards apply to review of the FSGB's waiver ruling. *Bloch v. Powell*, 348 F.3d 1060, 1066-68 (D.C. Cir. 2003); *United States v. Paddack*, 825 F.2d 504, 513-14 (D.C. Cir. 1987); *Toy v. United States*, 263 F. Supp. 2d 1, 5-6 (D.D.C. 2002).

**B.      The FSGB Failed to Follow Its Regulations In Denying Waivers.**

**1.      The FSGB failed to redress DAS Millette's erroneous basis for denying waivers or to shift the burden of proof to State to snow that waivers properly would have been denied.**

**a.      DAS Millette's erroneous decision.**

Whether State should waive a debt is governed by 22 C.F.R. § 34.18(b)(iv), which provides, in pertinent part:

> Before a waiver can be granted, the deciding official must also determine that collection of the claim against an employee would be against equity and good conscience and not in the best interests of the United States.  Factors to consider when determining if collection of a claim against an employee would be against equity and good conscience and not in the best interests of the United States include, but are not limited to:
>
> * * * *
>
> (D) Whether failure to make restitution would result in unfair gain to the employee;
>
> (E) Whether recovery of the claim would be unconscionable under the circumstances.

22 C.F.R. § 34.18(b)(iv)(D), (E).   To the extent that DAS Millette's denial articulates a basis for

refusing to waive debt collection, it was that he had successfully recovered monies from other State employees, such that waiver would be "against equity and good conscience and not in the best interest of the United States," *i.e.,* he appears to be attempting to invoke 22 C.F.R. § 34.18(b)(iv)(D) (AR:363), and wrongly so.

DAS Millette stresses collections from other State personnel as somehow relevant to his decision, but never provides any details. *Id.* Whether anyone else availed themselves of administrative relief or even questioned their rights is therefore wholly unknown. What is clear, however, is that anyone who did not challenge DAS Millette's decisions, as Plaintiffs here have done, obviously has waived any entitlement to review State's assertions of overpayment.

State regulations provide for agency review of employee grievances, 3 Dep't of State Foreign Affairs Manual 4434, and the FSGB has jurisdiction to review the agency's decision. 22 U.S.C. § 4137; 22 C.F.R. § 905.1. Only a "final decision" by the Secretary or the FSGB is subject to judicial review. 22 U.S.C. § 4140(a) ("[a]ny aggrieved party may obtain judicial review of a final action of the Secretary or the Board on any grievance in the district courts of the United States in accordance with [the APA] … if the request for judicial review is filed not later than 180 days after the final action of the Secretary or the Board"). *See Gonzalez v. U.S. Dep't of State,* 135 F.Supp.2d 193, 194 (D.D.C. 2001).

This Court may not, of course, review an administrative decision if the plaintiff has not exhausted administrative remedies. *E.g., Scott v. England,* 264 F.Supp.2d 5, 8 (D.D.C. 2002).[15] All State personnel from whom DAS Millette may have recovered monies waived all administrative remedies, unlike Plaintiffs, and never obtained a final order that would be subject

---

[15] Even when exhaustion "is not a jurisdictional prerequisite to judicial review," the courts will require exhaustion "so that the agency has an opportunity to exercise its discretion and expertise on the matter and to make a factual record to support its decision," because to allow judicial review absent exhaustion "would undercut "the purposes of exhaustion, namely, 'preventing premature interference with agency processes, ... afford[ing] the parties and the courts the benefit of [the agency's] experience and expertise, ... [and] compil[ing] a record which is adequate for judicial review.'" *Benoit v. U.S. Dep't of Agric.,* 577 F.Supp.2d 12, 23 (D.D.C. 2008) (citations and internal quotations omitted; brackets in original).

to judicial review.  DAS Millette's position thus creates a "heads-I-win-tails-you-lose" dilemma for Plaintiffs:  judicial review would be barred if Plaintiffs did not pursue their remedies; but, because, unlike Plaintiffs, others resigned themselves to the DAS's decision and waived judicial review, it would not be fair for this Court to consider the Plaintiffs' claims.  This Court should decline to give any weight to the notion that, because some choose not to challenge a legal wrong or injustice, that failure should somehow be visited upon those who do challenge it.

Moreover, DAS Millette's ruling makes *no* reference to the "unconscionability" factor, 22 C.F.R. 34.18(b)(iv)(E), upon which Plaintiffs actually relied.  As the dissenting FSGB board member correctly noted, DAS Millette's "comments about … other employees who did not request waivers are undoubtedly accurate but do not apply … to the [Plaintiffs'] presentations or the merits of their cases."  (AR:416-17).  Stated otherwise, there is no "rational connection" between the facts as found by DAS Millette, *i.e.*, that unspecified other employees whose job descriptions and overpayment postures are left to the reader's imagination paid money back to State, and Plaintiffs' unconscionability claims, such that the ruling thus fails under the arbitrary and capricious standard.  *Raffin*, 592 F.3d at 198 (agency's order "is arbitrary and capricious because it does not adequately explain" the "rational connection between the facts found and the choice made") (citation omitted).  When a decision "is not supported by reasonable explanation based on the full administrative record, it is the court's responsibility to set is aside."  *Ehrman v. United States*, 429 F. Supp. 2d 61, 67 (D.D.C. 2006).

> **b.**   **The FSGB's erroneous decision to uphold DAS Millette's denial of waivers.**

The Court need not pause for long over the question whether DAS Millette's denial somehow subsumed the unconscionability factor in § 34.18(b)(iv)(E), because the FSGB acknowledged that it did not.  (AR:412) ("Millette's denial letter did not deal explicitly with the factor of whether recovery would be 'unconscionable'").[16]  The FSGB's first error was thus in

---

[16] The dissenter – who was also the only member to have been on the panel in FSGB Decision I – was more forthcoming, noting that Plaintiffs' waiver arguments "unmistakably address …

(continued . . .)

failing to follow its own regulations, which required the FSGB to shift the burden to State to show that DAS Millette's decision should be upheld.

Under 22 C.F.R. 905.1, which governs the burden of proof in FSGB proceedings, "the grievant has the burden of establishing, by preponderance of the evidence, that the grievance is meritorious, 22 C.F.R. 905.1(a), with two exceptions, one of which applies here:

> Where a grievant establishes that a procedural error occurred which is of such a nature that it may have been a substantial factor in an agency action with respect to the grievant, and the question is presented whether the agency would have taken the same action had the procedural error not occurred, *the burden will shift to the agency to establish, by a preponderance of the evidence, that it would have done so*.

22 C.F.R. 905.1(c) (emphasis added).  Here, DAS Millette, in his second rejection of Plaintiffs' waiver requests, nowhere addressed the regulatory criterion upon which Plaintiffs relied to support their waiver request (AR:362-63), yet the FSGB never shifted the burden to State to show that the waiver nonetheless would have been denied.

Not only did the FSGB ignore its own regulations, it undertook to bolster DAS Millette's ruling by suggesting that Plaintiffs, although having been adjudicated in FSGB Decision I to be free of any fault for State's purportedly erroneous overpayments (AR:412-13), were somehow sufficiently "at fault" to justify the waiver denial, a notion that appears nowhere in State's submissions or DAS Millette's rulings.  Although more will be said with respect to that ruling by the FSGB in Point III.C., *infra,* for present purposes it conclusively demonstrates that the FSGB failed to follow by its own regulations.

Instead of reaching out for extrinsic justifications for denying the waiver, the FSGB was obligated to shift the burden to *State* to show that, despite DAS Millette's unaccountable failure to abide by his commitment to consider the unconscionability factor, State would have reached

---

(. . . continued)

whether recovery of the claims would be unconscionable under the circumstances," and that DAS Millette failed to address Plaintiffs' contentions.  (AR:416).  As dissent rightly states, "[t]he phrase 'equity and good conscience' implies a careful consideration of the employees' waiver requests and there is no evidence that such a reasoned determination occurred."  *Id.*

the same result regardless of that error.  22 C.F.R. § 905.1(c).  As this Court has recognized, even under the deference with which the courts view FSGB rulings, the FSGB "is not free to apply the general burden of proof provision of 905.1(a) in such a way to render the ... burden-shifting provision meaningless." *Shea v. United States*, 45 F. Supp. 2d 54, 60 (D.D.C. 1999).[17]

Here, as in *Shea*, "[t]o the extent that the FSGB's decision rests on this allocation of the burden of proof, the decision is arbitrary and capricious and must be overturned" and the proper remedy is to require the FSGB to "determine the relief" to which Plaintiffs are entitled, "using the standards prescribed by law."  *Id.* at 61.  FSGB Decision II acknowledges that "it seems unfair that [Plaintiffs] have to refund payments for overtime worked that they actually performed, when they had no real option but to perform such work, and when those in similar positions in 2005 and subsequent years were paid." (AR:411).  But the FSGB "entirely failed to consider an important aspect of the problem," and instead "offered an explanation ... that runs counter to the evidence [and] is so implausible" that it cannot "be ascribed to a difference in view or the product of agency expertise."  *Wedgewood Village Pharm. v. Drug Enforcement Admin.,* 509 F.3d 541, 549 (D.C. Cir. 2007).

### C.    FSGB Decision II Is Based On an Erroneous Application of the Waiver Regulations and Is Unsupported by Substantial Evidence.

Even without the fatal procedural error discussed above, FSGB Decision II would be unsustainable for two reasons:  (i) the FSGB's creation of a *de facto* "at fault" basis for discretionarily denying a waiver – as opposed to determining *eligibility* for a waiver, as the regulations plainly authorize – cannot be countenanced; and (ii) the FSGB's denial of waivers is unsupported by substantial evidence.

---

[17]  In *Shea*, the pertinent burden-shifting provision was Section 905.1(b), which, like the provision upon which Plaintiffs rely, shifts the burden to the government, but in that instance, where "an evaluation contained falsely prejudicial material which may have been a substantial factor in an agency action." 22 C.F.R. § 905.1(b). *Shea*, 45 F. Supp. 2d at 59-60.

### 1.     The FSGB's *ad hoc* creation of an "at fault" basis for denying waiver.

Under Section 34.18(b), "[w]aiver may not be granted if there exists … an indication of fraud, misrepresentation, fault or lack of good faith on the part of the employee." 22 C.F.R. § 34.18(b)(i). In initially denying Plaintiffs' waiver requests in 2005, DAS Millette invoked this provision to rule that Plaintiffs were ineligible to seek a waiver because they purportedly "knew or should have known through the exercise of due diligence that an error existed but failed to take corrective action." (AR:43-45).[18] FSGB Decision I rejected DAS Millette's eligibility ruling because: (i) the 2004 e-mails between State administrative personnel and Plaintiffs "did not include any clear specific discussion on the alternative annual cap or how it would applied"; (ii) the July 2004 revised ISRP did not make "clear … exactly how the caps would be applied in this situation"; (iii) "[t]he government itself … did not know until late 2004 how it would handle the pay cap under the circumstances where employees changed assignments during the year"; and (iv) the November 2004 e-mail from State, which raised, for the first time, the possibility that Plaintiffs might be approaching the pay cap, was both insufficient notice and provided Plaintiffs with no opportunity to act, and "[e]ven if it had been more specific, it seems unlikely that [Plaintiffs] could have refused to work overtime." (AR:352-53).

Thus, "although the Department was in a better position to interpret the pay cap and monitor … overtime payments against the cap, there is no indication in the record that it took any actions to prevent excess overtime," *i.e.*, the Department "did not order [Plaintiffs] to stop working, or even to stop working overtime," failed to "issue clear instructions as to the pay cap figure that applied," and never "issue[d] general guidance [Plaintiffs] instructing [them] not to work or work overtime once it appeared that [they] would reach or exceed the pay cap." (AR:353). "Given the complexities, the lack of clarity surrounding application of the overtime cap, [Plaintiffs'] inability to take corrective action, and the Department's failure to either track

---

[18] In an elegantly tortured analysis, DAS Millette also ruled that – although State vigorously had sought to recover the purportedly erroneous overpayments – those payments were "proper" when made, such that Plaintiffs could not seek a waiver of "erroneous payments" under Section 34.18. (AR:42-43). The FSGB made short work of this in FSGB Decision I. (AR:348-49).

the payments adequately or avail itself of mechanisms to avoid the overpayments," Plaintiffs were "*not at fault* for the excess payments." *Id.* (emphasis added).

But the FSGB did a complete volte-face in FSGB Decision II. Notwithstanding its findings in FSGB Decision I, the FSGB, in a 2-1 decision, ruled in FSGB Decision II that Plaintiffs were *sufficiently* "at fault" for denial of a waiver. (AR:413).

The first flaw in the ruling is that it contravenes Section 34.18(b)(i)'s express language. An employee will be *barred* from even *requesting* a waiver "if there exists … an *indication* of … fault." 22 C.F.R. § 34.18(b)(i) (emphasis added). FSGB Decision I found that there was *no* "indication of … fault" on Plaintiffs' part, but FSGB Decision II found both sufficient indicia of "fault" *and* that waiver should be denied for that reason. (AR:347, 413). What the FSGB thus did in FSGB Decision II was essentially to import the "fault" language from Section 34.18(b)(i) into the list of factors that govern the discretionary decision whether to grant a waiver in Section 34.18(b)(iv). Although the list in subsection (b)(iv) is not exclusive, *i.e.*, "[f]actors to consider when determining if collection of a claim … would be against equity and good conscience and not in the best interest of the United States *include*, but are not limited to," the five listed factors, 22 C.F.R. § 34.18(b)(iv) (emphasis added), the decision to include "fault" in the initial gatekeeping section and *not* in subsection (b)(iv) must be given due weight.

It cannot be that an employee can be adjudicated sufficiently *free* of "fault" – particularly in light of the broad definition of fault, *i.e.*, "if in the light of the circumstances the employee knew or should have known through the exercise of due diligence that an error existed or failed to take corrective action," 22 C.F.R. § 34.18(b)(ii) – but sufficiently *at* "fault" as to be denied a waiver, once having cleared the gatekeeping test. The FSGB's rewriting of Section 34.18 to uphold DAS Millette's unprincipled denial of Plaintiffs' waiver request must be rejected as both "plainly erroneous" *and* "inconsistent with the regulation." *Auer*, 519 U.S. at 461.

Moreover, having departed from the construction of Section 34.18's "at fault" provisions applied in FSGB Decision I, the FSGB violated the rule that when an agency "changes course, it must supply a reasoned analysis establishing the prior policies and standards are being

33

deliberately changed." *Verizon Tel. Cos. v. F.C.C.*, 570 F.3d 294, 301 (D.C. Cir. 2009) (citations omitted); *accord Alcoa Inc. v. Fed. Energy Reg. Comm'n*, 564 F.3d 1342, 1347 (D.C. Cir. 2009). "[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position." *Fox*, 129 S. Ct. at 1811 (original emphasis). That is because "[r]easoned decision making … necessarily *requires* that agency to acknowledge and provide an adequate explanation for its departure from established precedent." *N.E. Hosp., supra* at 11 (citation omitted; emphasis added). "[A]n agency acts arbitrarily and capriciously when it abruptly departs from a position previously held without satisfactorily explaining its reason for doing so." *Verizon*, 570 F.3d at 301 (citation omitted).

Although this Court gives the FSGB's decisions "great deference," *Bettucci*, 14 F. Supp. 2d at 51; *accord Olson v. Clinton*, 602 F. Supp. 2d 93, 101 (D.D.C. 2009); *Wright v. Foreign Service Bd.*, 503 F. Supp. 2d 163, 172 (D.D.C. 2007), the FSGB's decisions "are presumed to be valid … only when they are supported by substantial evidence and are not contrary to statutory, procedural or constitutional requirements." *Bettucci*, 14 F. Supp. 2d at 51 (citation omitted). This Court has declared that it "must give the Board's determination a thorough, probing, in-depth review." *Id.* (citation and internal quotations omitted); *accord Ehrman,* 429 F. Supp. 2d at 67. Because FSGB Decision II provides no "reasonable explanation" for using supposed "fault," of which Plaintiffs had been found wholly innocent in FSGB Decision I, as a basis for denying waiver, "the FSGB acted arbitrarily and capriciously within the meaning of the APA." *Ehrman*, 429 F. Supp. 2d at 70.

## 2.    The FSGB's decision is unsupported by substantial evidence.

Under 5 U.S.C. § 706(2)(A), a court "is required to set aside agency findings that are unsupported by 'substantial evidence.'" *Robinson v. Nat'l Transp. Safety Bd.,* 28 F.3d 210, 215 (D.C. Cir. 1994) (footnote omitted). The review standard is similar to that which governs a district court's determination whether to grant judgment as a matter of law, such that "[t]he court's function is to determine only 'whether the agency … could fairly and reasonably find the

facts that it did.'" *Id.* (citation omitted). Thus, this Court "may reverse an FSGB's decision if it finds that it was "wholly unsupported by the evidence in the record" or if the "requisite 'rational connection' is missing," such that "the record belies the agency's conclusion." *Toy*, 263 F. Supp. 2d at 6, 10 (citation omitted); *accord Olson,* 602 F. Supp. 2d at 101 ("if the agency fails to provide a reasoned explanation or if the record belies the agency's conclusion, then a court must reverse it) (citations and quotations omitted); *Ehrman*, 429 F. Supp. 2d at 67 ("court must restrict itself to determining whether the FSGB's decision was reasonable and supported by the weight of the entire record").

FSGB Decision II's "at fault" determination cannot pass muster, even under this most generous of review standards.  The FSGB found in FSGB Decision I that *none* of State's communications with Plaintiffs and their colleagues in Iraq in 2004 "include any clear or specific discussion of the alternative annual cap or how it would be applied or tracked," that the July 2004 revised ISRP had not explained "exactly how the caps would be applied" to Plaintiffs, which was "not clarified until OPM issued regulations addressing the issue on September 17, 2004," and that the November 24, 2004 e-mail from State "was vague" because "[n]o specific dates or amounts are included."  (AR:350-52).  The decision further found that State – which "was in a better position to interpret the pay cap and monitor [Plaintiffs'] overtime payments against the cap" – took *no* "actions to prevent excess overtime," *i.e.,* State "did not order [Plaintiffs] to stop working, or even to stop working overtime," much less issue clear instructions as to the pay cap figure that applied" to Plaintiffs.  (AR:353).

In FSGB Decision II, although "agree[ing] with [Plaintiffs] that it seems unfair that they have to refund payments for overtime worked that they actually performed, when they had no real option but to perform such work, and when those in similar positions in 2005 and subsequent years were paid," the FSGB revived the November 24, 2004 e-mail and then gave it dispositive weight, ruling that Plaintiffs "were put on notice in November of the year the overpayment took place that they were approaching or had already exceeded the pay cap" and should have taken action at that point.  (AR:411-13).  That ruling is utterly unsupported by the

35

State's actual communication to DS personnel, which informed Plaintiffs that "[t]he Department is *currently conducting a review* of premium pay earnings involving employees supporting the effort in Iraq" (Ex.11-L), and that State had "determined that your earnings applicable toward a 2004 annual premium pay cap *have already or will shortly put you above the cap for the current pay year." Id.* (emphasis added).  But State made it clear that no final determination had been made, despite Plaintiffs' nearly completed service, and that "[w]e will contact you with additional details concerning your specific situation as we finalize our review of the overtime payments." *Id.* (emphasis added).  The e-mail does not say what FSGB Decision II says it says.

Moreover, a reviewing court "may not find substantial evidence merely on the basis of evidence which in and of itself" supports the decision, "without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn." *Morall v. D.E.A.*, 412 F.3d 165, 177 (D.C. Cir. 2005) (citation omitted).  With respect to whether State or Plaintiffs were responsible for any overpayment, State – in a direct response to Mr. Bopp's question as to how he could "track how much I had received annually to ensure that I did not exceed the $128,200 cap" – explained that "a change in payroll processing … led to this problem," and that "*the onus is not and should not be on the employee*."  (Exs.11-M, 11-N) (emphasis added).  That communication strips FSGB Decision II's determination that the onus nonetheless should have been on Plaintiffs – much less that Plaintiffs should have known that – of *any* evidentiary support whatsoever, and requires vacatur.  *Morall,* 412 F.3d at 177-80; *Robinson,* 28 F.3d at 215.

Finally, even if that were not so, the FSGB's failure to consider critical evidence on the question whether any fault properly could be attributed to Plaintiffs would require a remand to the FSGB.  In focusing exclusively on the vague November 24, 2004 e-mail, the FSGB failed to consider State's earlier commitments to monitor Plaintiffs' overtime pay and to structure the compensation payouts to ensure that Plaintiffs would not be overpaid in 2004:  (i) State's assurance to Plaintiffs in March 2004 that it would pay out earned overtime immediately and "roll over" other pay components into Plaintiffs' first 2005 paycheck, *i.e.,* State promised to "*pay any earnings that cannot be rolled over to the new calendar year as soon as possible up to the*

36

*appropriate capping level*," and "earnings that can be rolled will continue to be rolled from year to year until they are paid out in full" (Ex.11-K); and (ii) State's assurance to Iraq-based employees in the July 2004 ISRP that it would monitor overtime pay and that "[p]ayroll *will pay out any overtime pay first,* projecting out until the end of the year how much premium pay an employee can earn before hitting the annual cap."  (AR:27) (emphasis added).  But most critically, the FSGB failed to consider State's August 2004 Policy – despite having been provided with the policy on Plaintiffs' first appearance before the FSGB.  (AR:80).

The August 2004 Policy, which was promulgated by the Embassy for State personnel in Iraq, announced that, for employees such as Plaintiffs who were working under an annual premium pay cap, State would project "an employee's basic rate of pay and premium compensation over the course of the year and may defer payment of premium compensation to ensure that the employee does not receive large amounts early in the year, which could cause the employee to exceed the cap and thus be indebted to the government."  (AR:92).  State assured that it would pay out overtime only if payment would "not cause the projected amount to exceed the annual cap," and would otherwise defer overtime payments until the end of the year."  *Id.* State also promised that "payroll monitors an employee's basic rate of premium compensation over the course of the year" so as to ensure that overtime pay does not "jeopardize the employee's ability to receive basic pay by the end of the calendar  year or which could cause the employee to receive premium pay above the cap and thus be indebted to the government."  *Id.* But State's payroll system was simply not up to the task, and State simply defaulted on its promises to its employees, as State was forced to admit to then-Senator John Warner, who made inquiry on Mr. Lubow's behalf in June 2005:

> It has been an ongoing concern to the Department that some of our employees could exceed the annual pay cap.  While we wish this could be a failsafe automatic process, *our payroll system does not currently have the capability to automatically detect and stop payments in excess of this pay cap*….

(Ex.12).  As an apparently sympathetic administrative employee told Mr. Bopp in late 2004, the alleged overpayments were the result of a "payroll processing" issue.  (Ex.11-M).

The FSGB's myopic focus on the November 24, 2004 communication, to the exclusion of overwhelming evidence of State's responsibility, as well as State's repeated promises that it would monitor overtime pay to prevent precisely the stunningly unfair consequences that State seeks to visit upon Plaintiffs, requires, at a bare minimum, a vacatur for reconsideration by the FSGB. *Morall*, 412 F.3d at 178 (administrative decision cannot "withstand review [if] the agency decisionmaker *entirely ignored* relevant evidence") (citations omitted; original emphasis); *El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. U.S. Dep't of Health & Human Servs.*, 396 F.3d 1265, 1278 (D.C. Cir. 2005) (agency action is arbitrary and capricious if agency "failed to address relevant evidence before it"); *Robinson*, 28 F.3d at 216-17 (agency erred in ignoring critical testimony); *New Life Evangelistic Ctr., Inc. v. Sebelius,* 672 F. Supp.2d 61, 74-75 (D.D.C. 2009) ("[a]n agency errs when it ignores contradictory relevant evidence regarding a critical factor in its decision, requiring requires vacatur and remand) (citations omitted).

## CONCLUSION

Plaintiffs request the Court to grant summary judgment in their favor, to permanently enjoin Defendants from collecting the alleged overpayments for overtime work in 2004-05, and to grant such other and further relief as the Court shall deem appropriate.

Respectfully submitted,

Elliot H. Scherker
scherkere@gtlaw.com
Brigid F. Cech Samole
cechsamoleb@gtlaw.com
Greenberg Traurig, P.A.
1221 Brickell Avenue
Miami, FL 33131
Telephone:  305.579.0500
Facsimile:  305.579.0717

Joe R. Reeder (DC Bar No. 279786)
reederj@gtlaw.com
Danielle M. Diaz (DC Bar No. 982277)
diazd@gtlaw.com
Greenberg Traurig, LLP
2101 L Street, NW, Suite 1000
Washington, DC 20037
Telephone:  202.331.3125
Facsimile:  202.261.0124

By:  ___/s/ Joe R. Reeder_____

Dated:  May 10, 2010

Joe R. Reeder

*Counsel for Plaintiffs*