# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
))
**RICHARD LUBOW, et al.,**                      )
)
**Plaintiffs,**        )
)
v.                      )   **Civil Action No. 10-0510 (JDB)**
)
**UNITED STATES DEPARTMENT OF STATE, et al.,**  )
)
**Defendants.**        )
_____)

## DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs bring this action against Defendants, United States Department of State, *et al.*, ("Defendants"), pursuant to the Administrative Procedure Act, 5 U.S.C. § 706.  Plaintiffs claim that Defendants improperly determined that they were overpaid and not entitled to a waiver of the overpayments.  *See* Plaintiffs' Motion for Summary Judgment ("Pltfs' MSJ").  Defendants, by and through counsel, and pursuant to Federal Rule of Civil Procedure 56, respectfully move this Court for an order granting summary judgment in Defendants' favor.  In support of this motion, Defendants respectfully refer the Court to the accompanying Memorandum of Points and Authorities.  A proposed Order consistent with this motion is attached hereto.

Respectfully submitted,

RONALD C. MACHEN JR., D.C. Bar # 447889
United States Attorney
for the District of Columbia


RUDOLPH CONTRERAS, D.C. Bar # 434122
Chief, Civil Division


By:  /s/
MARIAN L. BORUM, D.C. Bar # 435409
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20530
(202) 514-6531
Marian.L.Borum@usdoj.gov



Of Counsel:

James H. Anderson
Attorney Adviser
Office of the Legal Adviser
U.S. Department of State
Global Financial Services
P.O. Box 150008
Charleston, SC 29415-5008

2

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **RICHARD LUBOW, et al.,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | )    **Civil Action No. 10-0510 (JDB)** |
| | ) |
| **UNITED STATES DEPARTMENT OF STATE, et al.,** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

### DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

Defendants, United States Department of State, *et al.*, ("Defendants"), by and through

counsel, hereby file this Memorandum of Points and Authorities in support of their Cross-Motion

for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment.

### TABLE OF CONTENTS

I.     Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

        A.    The Debt.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        B.    Hearing before the General Services Administration Board of Contract Appeals. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        C.    The Requests for Waiver of Indebtedness. . . . . . . . . . . . . . . . . . . . . . . . . . 9

        D.    The Grievances. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        E.    First Appeal to the Foreign Services Grievances Board. . . . . . . . . . . . . 10

        F.    Second Waiver Decision by the Department of State. . . . . . . . . . . . . . . . 11

        G.    Second Appeal to the Foreign Services Grievances Board . . . . . . . . . . . .13

III.   Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      A.   Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      B.   The State Department's Determination that Plaintiffs Were
          Overpaid is Based Upon a Proper Interpretation of
          5 U.S.C. § 5547. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

          1.   The Plain Meaning of 5 U.S.C. § 5547 Compels the
               Conclusion That Plaintiffs Were Overpaid . . . . . . . . . . . . . . 17

          2.   OPM's Interpretation of the Statute and its Regulations
               Is Reasonable, and the State Department Applied that
               Reasonable Interpretation . . . . . . . . . . . . . . . . . . . . . . . . . .19

          3.   The Department of State's Application of the Statute
               and the OPM Regulations Was Proper and No Remand is
               Required . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . 22

          4.   The Implementation of the 2005 Premium Pay Cap Waiver
               Does Not Apply to Plaintiffs and Does Not Require a
               Remand . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

      C.   The State Department's Denial of Plaintiffs' Waiver Request
          Was Neither Arbitrary Nor Capricious. . . . . . . . . . . . . . . . . . . . . . . . . 26

          1.   Deputy Assistant Secretary Millette's Decision Was Not
               Erroneous . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

          2.   The Foreign Service Grievance Board Properly Followed
               Its Regulations in Denying Waivers, and It Would Have
               Been Improper To Shift the Burden to the Department
               of State . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

      D.   The FSGB's January 2010 Decision Properly Applied the
          Regulations and Was Not Arbitrary, Capricious Nor an
          Abuse of Discretion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

          1.   The Foreign Service Grievance Board's Decision is
               Entitled to Substantial Deference . . . . . . . . . . . . . . . . . . . . . .33

          2.   The FSGB Properly Applied the Regulations . . . . . . . . . . . . 34

3.  The FSGB 2010 Decision Was Not Arbitrary, Capricious
or an Abuse of Discretion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

IV.    Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

# TABLE OF AUTHORITIES

**Cases**                                                                                       **Page**

*AT&T Corp. v. FCC*, 220 F.3d 607 (D.C. Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Ackerman v. United States*, 324 F.Supp.2d 1 (D.D.C. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Alpharma, Inc. v. Leavitt*, 460 F.3d 1 (D.C. Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077 (D.C. Cir. 2001). . . . . . . . . . . . . . . . . . . . . 15

*Am. Farm Bureau Fed. v. EPA*, 559 F.3d 512 (D.C. Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . 16

*Am. Paper Inst. v. Am. Elect. Power Servs. Corp.*, 461 U.S. 402 (1983). . . . . . . . . . . . . . . . . . 34

*Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227 (D.C. Cir. 2008). . . . . . . . . . . . . . . . . . . 16

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281(1974) . . . . . . . . 17, 31

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962). . . . . . . . . . . . . . . . . . . . . . 17

*Camp v. Pitts*, 411 U.S. 138 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Carstens v. Nuclear Regulatory Comm'n*, 742 F.2d 1546 (D.C. Cir. 1984). . . . . . . . . . . . . 33, 34

*Chevron U.S.A., Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837(1984). . . 16, 19, 20, 21

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971). . . . . . . . . . . . . . . . . . . 34

*DiSilvestro v. United States*, 405 F.2d 150 (2d Cir. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Domtar Maine Corp. v. FERC*, 347 F.3d 304 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . 17, 31

*Fansteel Metallurgical Corp. v. United States*, 172 F.Supp. 268 (Ct. Cl.1959). . . . . . . . . . . . . 40

*Fla. Power & Light Co. v. Lorion*, 470 U.S. 729 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*INS v. Wang*, 450 U.S. 139 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085 (D.C. Cir. 1996). . . . . . . . . . . . . . . . . 15

*Kelly v. United States*, 34 F.Supp.2d 8 (D.D.C. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Lodge 2424 v. United States*, 564 F.2d 66 (Ct. Cl. 1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158 (2007).. . . . . . . . . . . . . . . . . . . . . . . . . 17

*Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221 (D.C. Cir.1993). . . . . . . . . . . . 15

*Motor Vehicle Mfgr's Ass'n v. State Farm Mutual Auto Ins. Co.*,
    463 U.S. 29 (1983).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17, 34, 38

*Mount Royal Joint Venture v. Kempthorne*, 477 F.3d 745 (D.C. Cir. 2007). . . . . . . . . . . . . . . . 23

*N.E. Hosp. Corp. v. Sebelius*,  - - F.Supp.2d - - 2010 WL 1199311 (D.D.C. March 29, 2010).  . 23

*Olson v. Clinton*, 602 F.Supp.2d 93,100 (D.D.C. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

*Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680 (1991). . . . . . . . . . . . . . . . . . . . . . . . . 16, 34, 38

*Sierra Club v. Mainella*, 459 F. Supp. 2d 76 (D.D.C. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Southeast Conference v. Vilsack*, 684 F.Supp.2d 135 (D.D.C. 2010). . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Morrow*, 266 U.S. 531 (1925). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*United States v. Paddack*, 825 F.2d 504 (D.C. Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Univ. Med. Ctr v. Shalala*, 173 F.3d 438 (D.C. Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Veitch v. England*, 471 F.3d 124 (D.C. Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Vill. of Bergen v. FERC*, 33 F.3d 1385 (D.C. Cir. 1994).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Wis. Cent. R.R. Co. v. United States*, 164 U.S. 190 (1896). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

## **Statutes**

5 U.S.C. § 706. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 33, 34

5 U.S.C. § 706(2)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23, 34

5 U.S.C. § 706(2)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

5 U.S.C. § 706(2)(D). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 34

22 U.S.C. § 4046. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

22 U.S.C. §4137. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

22 U.S.C. § 4139. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 25

22 U.S.C. § 4140(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 34

5 U.S.C. § 5304. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

5 U.S.C. § 5547. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 8,18, 20, 24

5 U.S.C. §5547(a),(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 27

5 U.S.C. § 5547(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 18

5 U.S.C. § 5547(b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

5 U.S.C. § 5584. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 11, 13

5 U.S.C. § 5584(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

## Regulations

22 C.F.R. § 34.18(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

22 C.F.R. § 34.18(b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

22 C.F.R. § 34.18 (b)(1)(iv). . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 28, 29, 30, 35

22 C.F.R. §34.18(b)(1)(iv)(D). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 38

22 C.F.R. §34.18(b)(1)(iv)(E). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

22 C.F.R. §34.18(b)(1)(ii). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

22 C.F.R. § 905.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32

22 C.F.R. § 905.1(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32, 33

5 C.F.R. § 531.603(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

5 C.F.R. §§ 550.105-107. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

5 C.F.R. § 550.106. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 21, 27

5 C.F.R. §§ 550.106(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

5 C.F.R. §§ 550.106(c), (d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

## Other Authorities

69 Fed. Reg. 55,941 (Sept. 17, 2004) .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9, 23

69 Fed. Reg. 10891 (Mar. 3, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

71 Fed. Reg. 16481 (April 3, 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Fed. R. Civ. P. 56 (c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

# I. __INTRODUCTION__

Plaintiffs bring this action challenging Defendants' decision that they were overpaid and not entitled to a waiver of the overpayment.  *See* Plaintiffs' Motion for Summary Judgment ("Pltfs' MSJ").  Because the Foreign Service Grievance Board's decision was rational and its conclusions are supported by evidence in the Administrative Record, Plaintiffs cannot meet their burden of showing that the decision was arbitrary, capricious, or otherwise contrary to law.  5 U.S.C. § 706(A).  Accordingly, for the reasons set forth below, Defendants' Cross-Motion for Summary Judgment should be granted.

# II. __STATEMENT OF FACTS__[1]

Plaintiffs are current and retired Diplomatic Security Officers, employed or formerly employed by the U.S. Department of State (the "Department" or "Agency") as Foreign Service Specialists.  In 2004, Plaintiffs were assigned to Iraq as Regional Security Officers.  Initially, Plaintiffs were on temporary duty status ("TDY") in Iraq, from the Department of State.  After the U.S. Embassy in Iraq was opened, each Plaintiff received new orders effective June 27, 2004.  AR:02.  In accordance with these orders, Plaintiffs were assigned permanently to the embassy in Iraq, and were no longer on TDY status.  *Id.*

As Foreign Service Specialists, Plaintiffs are eligible for basic and premium pay.[2]

---

[1]Defendants adopt Plaintiffs' page numbering system for the Foreign Service Grievance Board ("FSGB") Administrative Record.  The record consists of six separate volumes with duplicate documents omitted.  "The symbol 'AR' will designate the FSGB record in Plaintiff Landis's proceedings, which includes most items pertaining to all Plaintiffs. Where necessary, reference will be made to the administrative records for Mr. Benevento ('FBAR'), Mr. Bennett ('DBAR'), Mr. Bopp ('JBAR'), and Mr. Lubow ('RLAR')."  *See* Pltfs' MSJ at 2, n.1.

[2]Premium pay is payment for overtime, compensatory time off, holiday premium pay, Sunday premium pay, night pay differential and law enforcement availability pay.  *See* FBAR:67-68.

However, the aggregate of basic pay and premium pay cannot exceed limits established by law.

Pursuant to 5 U.S.C. § 5547,

> (a)  [a]n employee may be paid premium pay . . . only to the extent that the payment does not cause the aggregate of basic pay and such premium pay <u>for any pay period</u> for such employee to exceed the greater of - -
>
>> (1) the maximum rate of basic pay payable for GS-15 (including any applicable locality-based comparability payment under section 5304 or similar provision of law . . .); or
>>
>> (2) the rate payable for level V of the Executive Schedule.

5 U.S.C. § 5547 (emphasis added).  This pay cap is normally applied biweekly.  However, subsection (b) of § 5547 provides that, subject to regulations to be issued by the Office of Personnel Management ("OPM"), employees who are paid premium pay in connection with an emergency are not subject to subsection (a) of § 5547, and that "no employee" paid premium pay in connection with an emergency may be paid premium pay

> if, or to the extent that, the aggregate of the basic pay and premium pay under those provisions for such employee would, in any calendar year, exceed the greater of -
>
> (A) the maximum rate of basic pay payable for GS-15 in effect at the end of such calendar year (including any applicable locality-based comparability payment . . .); or
>
> (b) the rate payable for level V of the Executive Schedule in effect at the end of such calendar year.

In August 2004, OPM issued regulations which provided for agencies to apply the pay cap annually for employees who earned premium pay in connection with an emergency.[3]

---

[3]In this way, employees could work more hours of overtime.  The work year for regular pay consists of 2080 hours paid over 26 pay periods.  If an employee made $40 per hour and the applicable annual premium pay cap were $128,200, the employee could work a total of 2080 hours of regular pay plus 1125 hours of overtime ($45,000) before reaching the annual pay cap.

2

Therefore, "an employee who is paid premium pay by reason of work in connection with an emergency that involves a direct threat to life or property,"[4] *see* 5 U.S.C. § 5547(b)(1), may be paid premium pay

> only to the extent that the payment does not cause the total of his or her basic pay and premium pay <u>for the calendar year</u> to exceed the greater of - -
>
>> (1) the maximum annual rate of basic pay payable for GS-15 (including any applicable locality-based comparability payment under section 5304 or similar provision of law . . . ***in effect on the last day of the calendar year***; or
>>
>> (2) the annual rate of pay for level V of the Executive Schedule ***in effect on the last day of the calendar year***.

5 C.F.R. § 550.106 (emphasis added).  Pursuant to 5 C.F.R. §§ 550.105-107, an employee's physical location at the end of the calendar year will determine what the applicable salary cap be for the entire year.

During 2004, the maximum rate of basic pay payable for GS-15 was $113,674.  AR:84. The maximum rate of basic pay for GS-15, including the applicable locality-based comparability payment for the Washington, D.C. area, was $130,305. AR:84 (citing 5 U.S.C. § 5304 (2000)).

---

($40 x 2080 hours = $83,200; $128,200-83,200 = $45,000 in overtime).  But, if the pay cap were applied biweekly ($128,000/26 + $4,932), then the maximum pay would be $3,200 in regular pay and a maximum of $1,737 in premium pay. ($40 x 80 = $3,200: $4,931 - $3,200 = $1,737).

Therefore, in this example, the employee who earns no overtime for the first six months of the year and then begins to earn overtime for the second half of the year would only have the potential to earn $1,737 each pay period of the rest of the year. ($1,737 x 13 pay periods = $22,581).  But, when the pay cap is lifted and he or she transfers to Iraq in the middle of the year, the employee still has the potential to earn up to $45,000 in premium pay over the last 13 pay periods in the year.  The benefit to the employee is the potential amount of overtime is doubled by lifting the biweekly cap.

[4]The ongoing response to the September 11 terrorists attacks and the war in Iraq were determined by the Department to constitute such an emergency.  *See* AR:29; 83.

However, the rate payable for Executive Schedule V was $128,200.[5]  AR:84 (citing

http://www.opm.gpv/oca/04tables/index.asp)).  "[N]o locality-based comparability payments . . .

were applicable to overseas locations."  AR:85 (citing 5 C.F.R. § 531.603(b) (2004)).  Therefore,

for employees of the Department of State "assigned to overseas areas at the end of the 2004

calendar year, the premium pay limitation [wa]s the rate payable for Executive Schedule V [- -

$128,000] . . . ."  AR:83.  This rate of pay "was greater than the maximum basic rate of pay

payable for GS-15 [- - $113,764]."  AR:83.  *See* 5 U.S.C. § 5547(b)(1).

Through cables and notices, Plaintiffs were aware of the annual premium pay cap.

Specifically, on or about July 30, 2004, the Department provided each Plaintiff with a document

entitled: "Revised Iraq Service Recognition Package."  AR:24; AR:149; AR:245.  This document

informed Plaintiffs of the following:

> H. Effect of Pay Caps on Compensation: USG employee compensation, including
> allowances and differentials, is subject to the statutory aggregate pay cap, which limits
> compensation to a calendar year to the Executive Schedule I rate (currently $175,000).[6]
>
> > (a) Rollover of benefits to the following year:  If an employee's pay reaches the
> > statutory aggregate pay cap within a calendar year, danger pay, post hardship
> > differential and certain other payments will roll over into following calendar
> > year(s) until all amounts due are paid.  (Premium pay does not roll over.) …
> >
> > (b) For those eligible for Title 5 Premium Pay:  By law, the combination of base

---

[5]Executive Order 13332, 69 Fed. Reg. 10891; 10896 (Mar. 3, 2004).

[6]"Aggregate pay cap" or "Aggregate limitation" means the limitation on aggregate
compensation received in any given calendar year as established by 5 U.S.C.§ 5307.  The
limitation on aggregate compensation is equal to the rate for Level I of the Executive Schedule in
effect at the end of the applicable calendar year.  5 C.F.R. § 530.202.  ("Aggregate
compensation" means the total of all compensation, including basic pay, locality payments,
premium pay, awards, differentials, etc.  *Id.*  For 2004, Level I of the Executive Schedule was set
at $175,700 by the President in Executive Order 13332, 69 Fed. Reg. 10891; 10896, Schedule 5
(March 3, 2004).

4

> pay plus premium pay (whether in the form of overtime pay or compensatory time off) for those serving in Iraq is capped annually at EX-V or GS-15 step 10 (currently, this translates to $128,200 for those assigned to Iraq; $130,305 for those on TDY to Iraq from Washington, D.C.) … *Any amount of premium pay over the cap is forfeited; premium pay does not roll over into succeeding years as danger pay and hardship differential do.*

AR:24 (emphasis added).

Moreover, on August 15, 2004, the Department's U.S. Mission in Iraq issued an

Administrative Notice to employees entitled, "DOS Overtime Premium Compensation Policy,

Baghdad." AR:80, 90-97. This policy indicated that the State Department had waived the

biweekly overtime cap for eligible employees, replacing it with an annual cap. AR:92. More

specifically, the policy informed each Plaintiff that he could not

> be compensated for overtime or other premium hours to the extent that the combination of their basic pay and premium compensation . . . would exceed the annual rate for a GS-15 step 10 (including any applicable locality pay or special rate of pay) for those assigned to Washington ($130,305 in 2004) or the rate of pay for Level V of the Executive Schedule ($128,200 in 2004) for those assigned overseas. *There is no rollover provision for the premium pay cap, and excess amounts are forfeited.*

AR:92 (emphasis added).

Finally, on or about November 24, 2004, the Department advised each Plaintiff as

follows:

> We have determined that your earnings applicable toward the 2004 annual premium pay cap have already or could shortly put you above the cap for the current pay year. Because you are assigned overseas, the rate of the annual premium pay cap that applies to you is $128,200 (the rate for Level V of the Executive Schedule). Thus, for 2004 the combination of your basic pay and all forms of premium compensation (overtime, compensatory time off, holiday premium pay, Sunday premium pay, night pay differential, law enforcement availability pay) cannot exceed $128,200. Title 5 does not allow for rollover of any excess amounts. The Department cannot pay any premium compensation that would cause your combined basic pay to exceed $128,200. If such payments are made erroneously, *the Department is obligated to seek collection of such*

5

*overpayments*. . . .

AR:316 (emphasis added).

### A. The Debt

By identical letters dated April 27, 2005, each Plaintiff was notified, in accordance with

Department of State regulations,[7] that he had exceeded the premium pay cap for 2004 and had

therefore been overpaid.[8]  The letters stated:

> Everyone from the Secretary of State and down appreciates the efforts you have
> been putting forth in support of the President's Foreign Policy goal under such
> trying conditions.  While we have used every administrative means possible to
> enhance your working benefits, we must operate within the confines of the law.
> Section 5547 of Title V of the United States Code imposes a cap on the total basic
> pay plus premium pay a Federal Employee may earn. This cap is normally applied
> bi-weekly but can be applied annually when a covered employee is performing
> overtime or other premium pay hours in connection with a situation that has been
> deemed to be an emergency posing a threat to life or property. The ongoing
> response to the September 11 terrorists attacks and the war in Iraq have each been
> determined to constitute such an emergency. Unfortunately, since the law that
> permits this flexibility envisioned a short-term emergency, the extended period of
> your emergency support service has led to an overpayment in your paid year 2004
> earnings.

AR:29.  *See also* RLAR: 45; FBAR:12; JBAR: 44.  Plaintiffs were further notified about their

rights under Department regulations to inspect and copy records relating to the debt.  Each

Plaintiff was informed that if he wished to contest the debt, he had the right to request either an

internal administrative review or a hearing conducted by a non-Department of State official with

---

[7] *See* 22 C.F.R. Part 34 (2004).  The State Department revised Part 34 in 2006.  71 Fed.
Reg. 16481 (April 3, 2006).

[8] Plaintiff  Landis was notified he was indebted in the amount of $442.35.  AR:29.
Plaintiff  Bennett was notified he was indebted in the amount of $6,308.07.  DBAR:36.  Plaintiff
Benevento was notified he was indebted in the amount of $7,765.83.  FBAR:12.  Plaintiff Bopp
was notified he was indebted in the amount of $5,702.69, JBAR:44, and Plaintiff  Lubow was
notified he was indebted in the amount of $10,514.98.  RLAR:45.

respect to the existence and amount of the debt or the payment schedule.  *Id.*

**B.  Hearing before the General Services Administration Board of Contract Appeals**

Each Plaintiff disputed the debt.  Plaintiff Benevento requested and received an internal

review[9] by Deputy Assistant Secretary ("DAS") James L. Millette which found Plaintiff

Benevento owed a valid debt.[10]  FBAR:25.  The other Plaintiffs elected to have the existence and

amount of the debt reviewed in an outside hearing.  The outside hearings were conducted by an

administrative judge of the General Services Board of Contract Appeals.

In substantively identical decisions, dated June 22, 2005,[11] Judge Martha H. DeGraff

upheld the Department's determination of the applicable premium pay limitation of $128,200.

AR:88.  She expressly rejected the four Plaintiffs' argument that the cap was $130,305 rather

than $128,200 in view of the plain statutory language of 5 U.S.C. § 5547(b):

> We cannot accept [this] position because it is not consistent with the plain terms
> of section 5547(b).  The limitation established by the statute is the greater of the
> maximum rate of pay payable for GS-15, including any applicable locality-based
> comparability payment, or the rate payable for Executive Schedule V at the end of
> the relevant calendar year.  The rate of pay payable for GS-15 in effect at the end
> of 2004 [for overseas employees], did not include a locality-based comparability
> payment . . . made pursuant to 22 U.S.C. § 4046.  Although section 4046 explains
> how to take locality-based comparability payments into account for purposes of
> annuity computations, it does not provide for making locality-based comparability
> payments . . .

---

[9]FBAR:25; FBAR:37, n.2.

[10]22 C.F.R. § 34.9(c)(4)(2004).  Plaintiff Benevento received a final decision from DAS
Millette on August 30, 2005.  FBAR:25.  The decision amended the amount owed from
$7,889.09 to $7,765.83.  FBAR:26.

[11]The hearing for Plaintiff Landis was designated as GSBCA 16656-DBT, AR:82; for
Plaintiff Bopp, GSBCA 16654-DBT, JBAR:01; for Plaintiff Bennett, GSBCA 16655-DBT (a
copy of which is not in DBAR); and for Plaintiff Lubow, GSBCA 16653-DBT (a copy of which
is not in RLAR).

> For State [Department] employees assigned to overseas areas at the end of 2004, the premium pay limitation is the rate payable for Executive Schedule V, because this rate was greater than the maximum basic rate of pay payable for GS-15, which did not include any applicable locality-based comparability payment for overseas locations.

AR:88.  She also upheld the determination that Plaintiffs Landis, Bennett, Bopp, and Lubow had been overpaid and owed a valid debt for the amount by which their basic pay plus premium pay exceeded the amount of the applicable premium pay limitation.  *See* AR:82.

Judge DeGraff reviewed the four Plaintiffs' pay records and found them to be accurate.

AR:87.  In her decisions upholding the basis and amount of each debt.  She found:

> Federal law imposes a limitation upon the amount of several types of premium pay certain federal civilian employees can receive, and authorizes the Office of Personnel Management (OPM) to issue regulations to implement this law.[12]

AR:84-85 (citing 5 U.S.C.A. § 5547 (West Supp. 2004); 5 C.F.R. pt. 500. Subpt. A (2005));

JBAR:03.  Judge DeGraff noted that "[w]hen OPM issued its regulations, it realized a transfer from one agency to another or from one duty station to another during a calendar year could lower the annual limitation applicable to an employee, which could result in an agency having to collect an overpayment."  *Id.* (citing 69 Fed. Reg. 55,941 (Sept. 17,2004); JBAR:03.[13]

---

[12]OPM's regulations explain how the annual premium pay limitation will be applied and computed.  AR:84.  OPM explains the computation of the limitations as follows:
(1)  Compute an hourly rate by dividing the published annual rate of basic pay by 2,087 hours and rounding the result to the nearest cent; then
(2)  Compute a biweekly rate by multiplying the hourly rate by eighty hours; then
(3)  Compute an annual rate of pay by multiplying the biweekly rate by the number of pay periods for which a salary payment was issued in the relevant calendar year under the agency's payroll cycle.

5 C.F.R. § 550.106(c), (d).

[13]Judge DeGraff found she had insufficient documentation before her to determine whether the proposed repayment schedule was consistent with the relevant regulations.  AR:89.

**C. The Requests for Waiver of Indebtedness**

Following Judge DeGraff's decisions upholding the basis and amount of Plaintiffs' debts,

each Plaintiff requested that the State Department waive his indebtedness.  AR:34; FBAR:28;

DBAR:47; RLAR:50; JBAR:50.  In substantively identical decisions dated October 20, 2005,

DAS Millette reviewed each Plaintiff's request for waiver in accordance with 5 U.S.C. § 5584.

Citing 5 U.S.C. § 5584, which indicates that waiver may not be granted if there exists in

connection with the claim "an indication of fraud, misrepresentation, fault, or lack of good faith

on the part of the employee or other person having an interest in obtaining a waiver of the

claim[,]" DAS Millette found that a waiver of recovery of overpayment could not be made

because each Plaintiff "was not without fault."  AR:61.  Fault is considered to exist if the

employee

> knew of should have known through the exercise of due diligence that an error
> existed but failed to take corrective action.  Employees are . . . expected to have a
> general understanding of the Federal pay system applicable to them.

22 C.F.R. § 38.14(b)(1)(ii).  DAS Millette concluded that the employees "had or should have had

the requisite knowledge that he[] was subject to a pay cap," AR:06, because the "existence and

amount of the annual premium pay cap for 2004 was specifically included in the Revised Iraq

Service Recognition Package issued in July 2004 and was the subject of both Department and

Post notices."  *Id.*  Also, emails submitted in support of the waiver request showed Plaintiff had

an awareness as early as "March 2004 . . .[of being] subject to the Title 5 cap on premium pay."

AR:06.  DAS Millette offered each Plaintiff repayment options.  AR:43-44.

**D. The Grievances**

On or about November 17, 2005, each Plaintiff filed a similar grievance, under State

9

Department regulations,[14] of the Department's decision denying his request to waive the collection of the overpayment of premium pay.  Plaintiffs contended they were not "at fault" and sought to have the decision reversed and to be granted a waiver.  AR:15.

In a decision dated July 26, 2006, Linda S. Taglialatela, Deputy Assistant Secretary for Human Resources, denied the grievances.  AR:04  She found that DAS Millette's decision was within his delegated authority.  AR:08.  DAS Taglialatela noted:

> the language of 5 U.S.C. 5584 . . . provides that overpayments of pay *may* be waived by the head of the agency if collection would be against equity and good conscience and not in the best interests of the United States."

*Id.*  She found that:

> the issue whether to grant a waiver is a discretionary act by the agency head or designee.  Therefore, an employee has no entitlement to receive, nor is the Department obligated to grant, a requested waiver.  Finally[,] . . . [DAS Taglialatela found] that DAS Millette properly applied well-established principles and policies regarding the issue of waiver of overpayments in reaching the decision not to grant the requested waiver and, moreover, that the decision not to grant the waiver was neither arbitrary nor unfair.

AR:08 (emphasis in original).

### E.  First Appeal to the Foreign Service Grievance Board

On August 7, 2006, Plaintiffs appealed the Department's decisions to deny them waivers and to collect overpayments for amounts by which they exceeded [the] premium pay cap.[15] (AR:1; FBAR:1; DBAR:22: RLAR:22; JBAR:22).  In a decision dated July 28, 2008, the Foreign Service Grievance Board ("FSGB") declined to consider the argument regarding which premium

---

[14]*See* 3 Foreign Affairs Manual 4434.

[15]The Foreign Service Grievance Board has jurisdiction to review the agency's grievance decision.  22 U.S.C. § 4137.

pay cap was applicable to Plaintiffs because, pursuant to 22 U.S.C. § 4139:

> A grievant may not file a grievance with the Board if the grievant has formally requested, prior to filing a grievance, that the matter or matters which are the basis of the grievance be considered or resolved and relief be provided under another provision of law, regulation, or Executive order . . . and the matter has been carried to final decision under such provision on its merits or is still under consideration.

AR:347.  Plaintiffs Landis, Bennett, Bopp and Lubow had received a final decision on the merits from the Board of Contract Appeals regarding which premium pay cap was applicable, and that they had been overpaid.  AR:82.  *See supra* at 7-9.  The FSGB concluded: "[w]e agree with the Department that [they are] barred from raising this issue . . . [and t]he matter . . . may not be reopened in this grievance appeal."  AR:348.

However, the FSGB did find that Plaintiffs were "not 'at fault' for excess premium payments made to [them] during [their] service in Iraq . . . [Therefore,] the Department was . . . not precluded from granting [Plaintiffs] . . . waiver[s] . . . under the authority of 5 U.S.C. 5584."  AR:339.  "The Department was directed to reconsider, on the merits, [each Plaintiff's] request for a waiver with respect to those funds."  *Id.*  The FSGB denied the grievance appeals in all other respects.  *Id.*

### F.  Second Waiver Decision by the Department of State

Pursuant to 22 C.F.R. § 34.18 (b)(1)(iv),

> if the deciding official finds no indication of . . . fault . . . the employee is not automatically entitled to a waiver.  Before a waiver can be granted, the deciding official must also determine that collection of the claim . . . would be against equity and good conscience and not in the best interest of the United States.

Because the FSGB's July 28, 2008 Decision and Order found Plaintiffs not to be at fault for the excess premium payments, DAS Millette undertook consideration of whether collection of

payments made to each Plaintiff would be "against equity and good conscience and not in the best interests of the United States." Before making his decision, by identical letters dated August 12, 2008, DAS Millette advised each Plaintiff that he (DAS Millette) had received the Board's decision and must determine whether collection of the salary overpayment would be "against equity and good conscience and not in the best interests of the United States." AR:382. DAS Millette extended an invitation for the submission of any additional facts or discussion of the five factors to be considered when determining whether indebtedness should be waived under 22 C.F.R. § 34.18 (b)(1)(iv). In his letter of August 12, 2008, DAS Millette informed each Plaintiff that the factors to be considered under 22 C.F.R. § 34.18(b)(1)(iv) included, but were not limited to:

> (A) Whether collection of the claim would cause serious financial hardship to the employee from whom collection is sought;
> (B) Whether, because of the erroneous payment, the employee either has relinquished a valuable right or changed positions for the worse, regardless of the employee's financial circumstances;
> (C) The time elapsed between the erroneous payment and discovery of the error and notification of the employee;
> (D) Whether failure to make restitution would result in unfair gain to the employee[; and]
> (E) Whether recovery of the claim would be unconscionable under the circumstances.

By letter dated September 23, 2008 to DAS Millette, Plaintiffs' counsel failed to address any of these factors. Rather, he stated:

> In connection with your reconsideration of the . . . employees' waiver requests, we rely upon the record already developed in this matter. In addition, I note that provisions of the Iraq Service Recognition Package had been modified to authorize waiver of the pay cap limitations. . . . Please factor into your waiver decision the recent decisions by the Agency to waive the pay cap as a matter of Agency policy.

AR:398.[16]

In his decision letters dated December 23, 2008, DAS Millette stated that Plaintiffs'

attorney "did not address any of the factors which [he (DAS Millette)] may consider with regard

to whether collection would be 'against equity and good conscience and not in the best interests

of the United States'." AR:360.  Moreover, Plaintiffs' attorney failed to

> mention that the Department lacked the authority to raise the annual pay cap until
> passage of the DOD Emergency Supplemental Appropriations Act for Defense,
> the Global War on Terror, and Tsunami Relief, 2005 (P[ublic Law] 109-13) on
> May 11, 2005; this bill and subsequent legislation have covered calendar years
> 2005-2008, but not calendar year 2004.

*Id.*  DAS Millette informed each Plaintiff that:

> [a]fter careful consideration of the factors in 22 C.F.R. 34.18(b)(1)(iv), I have
> concluded that it would <u>not</u> be 'against equity and good conscience' and would be
> in the 'best interest of the United States' to recover the overpayment[s] . . . for
> exceeding the applicable premium pay cap in calendar year 2004.  I find that your
> failure to make restitution would result in an unfair gain to you.  I have had to
> make this determination for over thirty other employees in the exact same
> situation and they have paid their debts in full. Therefore, a waiver of your salary
> overpayment cannot be made under the provisions of 5 U.S.C. § 5584.

*Id.*; AR:363, 366, 369, 372.

## G.  Second Appeal to the Foreign Service Grievance Board

Plaintiffs appealed again to the FSGB.  (AR:374-76, 378-79, 388-90, 393).  On January 7,

2010, the FSGB upheld DAS Millette's denial of the waivers.  AR:403-17.  The FSGB held that

Plaintiffs failed to "show that the decision to deny a waiver was arbitrary, capricious, an abuse of

---

[16]The modification of the Iraq Service Recognition Package occurred in May 2005, well
after the events at issue.  The modification occurred in response to Congress's passing the
Department of Defense Emergency Supplemental Appropriations Act for Defense, the Global
War of Terror, and Tsunami Relief, 2005 (P.L. 109-13).  This law . . . covered calendar year[]
2005 . . . not 2004.  AR:372.  Therefore, the Department lacked the authority to raise the annual
pay cap in 2004.

discretion or otherwise not in accordance with law." AR:412.  The FSGB ruled that DAS

Millette had addressed "the equities of the waiver request[,]" and that the FSGB had "no basis to

overturn the agency's judgment that granting a waiver to grievants would create an unfair gain

for them vis-à-vis all those similarly situated employees who repaid their excess premium pay for

2004 as requested." AR:412-13.

The FSGB concluded that:

> having applied the factors set forth in its regulations and duly considered the
> equities involved, the Department did not abuse its discretion in denying
> [Plaintiffs] waivers of repayment of the excess premium payments they received
> for 2004.

AR:413.  Plaintiffs requested judicial review of the FSGB's final action in District Court.[17]

## III.  ARGUMENT

### A.  Standard of Review

When a party seeks review of agency action under the Administrative Procedure Act

("APA") "[t]he entire case on review is a question of law, and only a question of law," and can

be resolved on the administrative record in the context of a motion for summary judgment.[18]

*Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993); *see Am.*

*Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083-84 (D.C. Cir. 2001); *Univ. Med. Ctr v.*

*Shalala*, 173 F.3d 438, 440 n.3 (D.C. Cir. 1999).  In such record review cases, the district court

---

[17]Pursuant to 22 U.S.C. § 4140(a), "[a]ny aggrieved party may obtain judicial review of a
final action of the Secretary or the Board on any grievance in the district courts of the United
States in accordance with standard set forth in [the APA] … if the request for judicial review is
filed not later than 180 days after the final action of the Secretary or the Board . . . ."

[18]Plaintiffs have submitted Exhibits 1 through 28 in support of their Motion for Summary
Judgment.  However, none of these exhibits are part of the Administrative Record in this case.

generally does not resolve factual issues or duplicate agency fact-finding efforts, but instead functions as an appellate court addressing a legal issue. *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1096 (D.C. Cir. 1996). For this reason, the normal standard of review for a summary judgment motion, which requires a district court to decide whether there is any "genuine issue of material fact," *see* Fed. R. Civ. P. 56(c), does not apply. *Southeast Conference v. Vilsack*, 684 F.Supp.2d 135, 142 (D.D.C. 2010); *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 89-90 (D.D.C. 2006); *see* LCvR 7(h)(2) (statement of undisputed material facts not required for cases "in which judicial review is based solely on the administrative record"). To the contrary, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). Summary judgment, therefore, is the mechanism through which the Court decides whether as a matter of law the agency action under review is supported by the administrative record and is otherwise consistent with the APA standard of review. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985) ("The task of the reviewing court is to apply the appropriate APA standard of review . . . to the agency decision based on the record the agency presents to the reviewing court.").

Under the APA standard of review, a court must only "hold unlawful and set aside agency action, findings, and conclusions" when they are "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), in excess of statutory authority, *id.* § 706(2)(C), or "without observance of procedures required by law," *id.* § 706(2)(D). The scope of review is "narrow," and "[t]he court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfgr's Ass'n v. State Farm Mutual Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

The arbitrary and capricious standard is "[h]ighly deferential," and "presumes the validity of agency decisions." *AT&T Corp. v. FCC*, 220 F.3d 607, 616 (D.C. Cir. 2000). Deference is especially appropriate in areas that are "complex and highly technical." *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 697 (1991); *see, e.g., Am. Farm Bureau Fed. v. EPA*, 559 F.3d 512, 519 (D.C. Cir. 2009); *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 233 (D.C. Cir. 2008).

It is well settled that when courts review legal challenges to an agency's interpretation of a statute it administers, they must use the two-part test adopted by the Supreme Court in *Chevron, USA, Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837, 842 43 (1984). Under the first part of this test, the court must determine whether Congress has directly spoken to the precise question at issue. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* Under second part of the test, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. In reviewing an agency's interpretation of its authority under a statute it administers, the court will uphold that interpretation as long as it is a reasonable interpretation of the statute. *See EPA v. Nat'l Crushed Stone Ass'n*, 449 U.S. 64, 83 (1980)("When construing statutes, we show 'great deference to the interpretation given the statute by the officers or agency charged with its administration.'"); *Vill. of Bergen v. FERC*, 33 F.3d 1385, 1389 (D.C. Cir. 1994). An agency's interpretation of its own regulations is "controlling unless plainly erroneous or inconsistent with the regulation being interpreted." *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 171 (2007) (internal quotation and citations omitted).

16

In order to satisfy the APA standard of review, "the agency must examine the relevant

data and articulate a satisfactory explanation for its action including a 'rational connection

between the facts found and the choice made.'" *Motor Vehicle Mfgr's Ass'n*, 463 U.S. at 43

(quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)); *accord*

*Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 6 (D.C. Cir. 2006).   The administrative record, however,

need not include explicit discussion of every factor that is relevant to the agency's decision so

long as the bases for the agency's policy choices are otherwise clear from the nature and context

of the challenged action.   *See Domtar Maine Corp. v. FERC*, 347 F.3d 304, 311-12 (D.C. Cir.

2003), *cert. denied*, 541 U.S. 1029 (2004).   "While [the court] may not supply a reasoned basis

for the agency's action that the agency itself has not given, [the court should] uphold a decision

of less than ideal clarity if the agency's path may reasonably be discerned."   *Bowman Transp.,*

*Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974) (internal citation omitted).

"If the agency's reasons and policy choices . . . conform to certain minimal standards of

rationality . . . the [agency decision] is reasonable and must be upheld."   *Olson v. Clinton*, 602

F.Supp.2d 93,100 (D.D.C. 2009) (internal quotations and citations omitted).

> **B.   The State Department's Determination that Plaintiffs Were Overpaid is**
> **Based Upon a Proper Interpretation of 5 U.S.C. § 5547.**

> > 1.   <u>The Plain Meaning of 5 U.S.C. § 5547 Compels the Conclusion That</u>
> > <u>Plaintiffs Were Overpaid.</u>

Plaintiffs argue that the Department of State's interpretation of 5 U.S.C. § 5547, which

"require[s] the rate that applies to the employees' position at the end of the year be used[,] Pltfs'

MSJ at 23, is irrational.   However, the plain language of the statute makes it clear that the

Department's interpretation is correct.   Pursuant to 5 U.S.C. § 5547(a),

17

[a]n employee may be paid premium pay . . . only to the extent that the payment does not cause the aggregate of basic pay and such premium pay for any pay period for such employee to exceed the greater of - -

> (1) the maximum rate of basic pay payable for GS-15 (including any applicable locality-based comparability payment under section 5304 or similar provision of law . . . ; or

> (2) the rate payable for level V of the Executive Schedule.

Section 5547(b) provides (with emphasis added),

> (1)  subject to regulations prescribe by the Office of Personnel Management, subsection (a) shall not apply to an employee who is paid premium pay by reason of work in connection with an emergency.

> (2) Notwithstanding paragraph (1), *no employee* referred to in such paragraph may be paid premium pay under the provisions of law cited in subsection (a) if, or to the extent that, the aggregate of the basic pay and premium pay under those provisions for such employee would, *in any calendar year*, exceed the greater of -

>> (A) the maximum rate of basic pay payable for GS-15 in effect at the end of such calendar year (including any applicable locality-based comparability payment under section 5304 or similar provision of law . . . ; or

>> (B) the rate payable for level V of the Executive Schedule *in effect at the end of such calendar year.*

Here, the intent of Congress could not be more clear.  Congress said that "no employee" can earn premium pay if the aggregate of basic and premium pay would, in any calendar year, exceed the maximum basic pay for a GS-15 employee at the end of the calendar year, or the rate payable for level V of the Executive Service in effect at the end of the calendar year.  Courts are to presume that a legislature says in a statute what it means and means in a statute what it says. *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992).  Here, "no" means "no."  The statute means that no employees - - to include Plaintiffs - - could earn the aggregate of basic plus premium pay beyond the cap.  Specifically, Plaintiffs' premium pay could not exceed the

18

applicable rate payable for level V of the Executive Service in calendar year 2004 - - $128,200.

Because the intent of Congress is quite clear, "the court as well as the agency, must give effect to

the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43.  There is no

need to proceed to the second part of the *Chevron* test.

Plaintiffs, nevertheless, state that "the statute is silent or ambiguous with respect to the

specific issues."  Pltfs' MSJ at 20.  They contend that they "remained in precisely the same

positions[, in 2004]" so "Section 5547 does not expressly address the[ir] situation . . . ."  Pltfs'

MSJ at 22.  Plaintiffs are mistaken.  Short of addressing them by name, the statute could not be

clearer in governing their situation.  Section 5547 does not turn on what "position" a particular

employee is in; it states that "no employee" may earn more than the greater of two specified

limits.  It does not provide that "some employees" are subject to the cap, and delegate to OPM

the authority to determine to which employees the cap applies.  Nor does it specify that certain

employees are subject to the cap but fail to define those that are not subject to it.  Plaintiffs

clearly are not pleased by the fact that the statute provides that "no employee" can earn pay in

excess of the specified cap, but they were employees, like all others, to which the cap applied.

The statute at issue here is neither silent nor ambiguous, but commanding and clear.

2. OPM's Interpretation of the Statute and its Regulations Is Reasonable, and the State Department Applied that Reasonable Interpretation.

Assuming *arguendo* that the "statute is silent or ambiguous" with respect to their

situations, under the *Chevron* test, the question for the Court is "whether the agency's answer is

based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843.  In this case, the

agency charged with issuing regulations to implement 5 U.S.C. § 5547 is OPM, and accordingly

the Court should defer to OPM's construction of 5 U.S.C. § 5547 so long as that construction is

reasonable.

On  September 17, 2004, OPM issued regulations governing premium pay and annual

maximum earning limitations under 5 U.S.C. § 5547.  When an agency determines that an

emergency exists,

> the employee may receive premium pay . . . only to the extent that the payment
> does not cause the total of his or her basic pay and premium pay for the calendar
> year to exceed the greater of  - -
>
> > (1) the maximum annual rate of basic pay payable for GS-15 (including
> > any applicable locality-based comparability payment under section 5304 or
> > similar provision of law . . . ) *in effect on the last day of the calendar*
> > *year*;  or
> >
> > (2) the annual rate of pay for level V of the Executive Schedule *in effect*
> > *on the last day of the calendar year.*

5 C.F.R. § 550.106(c) (emphasis added).  Plaintiffs acknowledge, as they must, that these

regulations were "consistent with the statutory provision."  Pltfs' MSJ at 22.  The regulations put

the pay cap in terms of what the employee may "only" receive, but they too are clear that the caps

at issue at the end of the year govern for the entire calendar year.  The pay cap at the end of

calendar year 2004 was $128,200.  Under OPM's regulation, Plaintiffs could "only" receive that

amount.

The facts of Plaintiffs' assignment status bear repeating in this context.  After the opening

of the U.S. Embassy, Plaintiffs received orders, effective June 27, 2004, by which they were

permanently assigned to Embassy Baghdad.  The agency made the internal decision that they

should be so assigned, and they were no longer on TDY assignment from Washington, D.C.

While Plaintiffs' positions may have been the same, their assignment status was not.  The agency

then determined that its regulations *required* that they receive premium pay which did not exceed

20

the annual rate of pay for level V of the Executive Service in effect on the last day of the calendar year - - $128,200.  If Plaintiffs had not been permanently assigned to Iraq, but on TDY status from Washington, D.C., at the end of the calendar year, their premium pay cap would have been $130,305.  However, because of this change in their status to assignment in Baghdad, the premium pay cap necessarily was reduced, because locality pay does not apply to outside the United States.

In *Chevron*, the Supreme Court held that ambiguities in statutes within an agency's jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in reasonable fashion.  467 U.S. at 865-66.  Filling these gaps, the Court explained, involves difficult policy choices that agencies are better equipped to make than courts.  *Id.*  If a statute is ambiguous, and if the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation.  *Id.* at 843.

Plaintiffs cite to the response OPM provided to comments by "three (unidentified) government agencies, Pltfs' MSJ at 23, and appear to argue that the regulations only applied when there was a "geographic move to an area with different pay rates."  *See* 69 Fed. Reg. 55,941 at 2.  However, nowhere in the preamble to OPM's regulation is there an indication that the regulations only applied in that instance.  In fact, the OPM response addressed employees who were "employed in multiple locality pay areas over the course of a year[;]" "transfer[red] to a different agency[;]" or "move[d] from one . . . activity to another."  *Id.* at 1-2.  Indeed, this interpretative guidance is very close to Plaintiffs' own situation, where their duty station and their pay area – but not their geographic location – changed.  Further, OPM stated that an agency that

21

deferred premium payment might be able to avoid an overpayment, thereby implying that if the agency did not do so, in some instances the ultimate calculation of the cap would result in an overpayment. *Id.* Plaintiffs do not explain how, under OPM's regulations and its explanation of its regulations, a move from one duty station (with locality pay) to another (without locality pay) would not lower the cap and result in an agency having to collect an overpayment.

OPM did not consider every possible permutation where a change in an employee's assignment could result in lower pay, because it was responding to specific agency comments. But the logic of OPM's approach to the statute covers the situation presented by Plaintiffs. Here, assuming arguendo that the statute was silent with respect to Plaintiffs' situation, OPM made a policy choice to issue broad regulations which covered Plaintiffs' situation. Further, OPM's interpretation of its regulations indicated that in certain circumstances - - including those very similar to plaintiffs' - - the recalculation of the pay cap could result in an overpayment. OPM's interpretation of the statute was reasonable, and the Court is required to accept it.

3. <u>The Department of State's Application of the Statute and the OPM Regulations Was Proper and No Remand is Required.</u>

Plaintiffs argue that the Department of State's construction of Section 5547 and OPM regulations was in error, and the "case must be remanded to the agency for further action consistent with the correct legal standards." Pltfs' MSJ at 25 (citing *N.E. Hosp. Corp. v. Sebelius*, - - - F.Supp.2d - - -, 2010 WL 1199311, * 12 (D.D.C. March 29, 2010)). However, a review of the language of the statute, the regulation, and OPM's guidance, make clear that the Department's construction was not in error, and remand would be improper. Because the Department construed the statute consistently with its plain meaning, OPM's regulations interpreting the statute, and OPM's interpretation of its regulations, the Department's

construction cannot have been erroneous.

Under the APA standard of review, the court must only "hold unlawful and set aside agency action, findings, and conclusions" when they are "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  The scope of review under the APA's standards is narrow, and the Court is not to substitute its judgment for that of the agency.  *Mount Royal Joint Venture v. Kempthorne*, 477 F.3d 745, 753 (D.C. Cir. 2007); *Veitch v. England*, 471 F.3d 124, 132 (D.C. Cir. 2006).  While Plaintiffs contend that the regulations only apply to geographical moves, neither the language of the statute nor the regulation bears this out.  Moreover, OPM itself issued guidance indicating that more than geographic moves could result in a lower cap and, in turn, a repayment.[19]  Therefore, Plaintiffs' request for remand should be denied.

### 4.   The Implementation of the 2005 Premium Pay Cap Waiver Does Not Apply to Plaintiffs and Does Not Require a Remand.

The 2005 Premium Pay Cap came into effect on May 13, 2005 after Congress passed Public Law 109-13, the DOD Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, ("2005 Premium Pay Waiver").  This Act authorized "the head of an Executive Agency to waive the limitation, up to $200,000, established in 5

---

[19]As the Board of Contract Appeals stated: "[w]hen OPM issued its regulations, it realized that a transfer from one agency to another or from one duty station to another during a calendar year could lower the annual limitation applicable to an employee, which could result in an agency having to collect an overpayment."  AR:84 (citing 69 Fed. Reg. 55,941 (Sept. 17, 2004)) (emphasis added)).  This situation precisely covers Plaintiffs.  During the course of 2004, they were transferred from one duty station - - Washington, D.C. (where locality pay applies) TDY to Baghdad - - to permanent assignment to Baghdad (where locality pay does not apply).  Such a transfer could result in a lower cap, which in turn could result in an overpayment.  Thus, whatever conceivable ambiguity there could be in the statute itself, an interpretation of the regulations reasonably covers Plaintiffs' situation.

U.S.C. § 5547 on the aggregate of basic pay and premium pay *payable in calendar year 2005*."

AR:184 (emphasis added).   On August 19, 2005, the Under Secretary for Management exercised

her authority and raised the premium pay cap.  *Id.*  Plaintiffs argue that the 2005 Premium Pay

Cap Waiver should apply to them because the "waiver was extended to the last pay periods of

2004 (for work performed) in pay period 25 of 2004 (pay date of January 8, 2005)," and

"Plaintiffs were in Iraq during that pay period and were paid on January 8, 2005 . . . ."  Pltfs'

MSJ at 25-26 (citing Ex. 14-15, 23).[20]

Plaintiffs' argument clearly is unsupported by the record.  The Department Cable (State

162679) on the Implementation of 2005 Premium Pay cap Waiver specifically states that the

2005 pay cap waiver applied to "the aggregate of basic pay and premium pay payable ***in calendar***

***year 2005***."  AR:184 (emphasis added).  All of the Plaintiffs left Iraq in early 2005 and were

reassigned to the United States.  To the extent that Plaintiffs continued to work in Iraq after

January 8, 2005, any payments made beyond January 1, 2005 were applicable to calendar year

2005, and the 2005 Premium Pay Cap Waiver would be applicable from that date forward.

Again, any premium pay earned was "subject, still, to the statutory limit on aggregate pay[,]"

AR:185, and the aggregate of basic pay and premium pay could not exceed $200,000 for the

2005 *calendar year*.

While Plaintiffs argue that the Department of State should "recompute the alleged

overpayment[,]" Pltfs' MSJ at 26, such that all of Plaintiffs' salary would be subject to the

$200,000 pay cap, the cable describing the Implementation of the 2005 Premium Pay Cap

Waiver specifically states that, "for employees who have served in Iraq or Afghanistan[,] the

---

[20]None of these cited exhibits are part of the Administrative Record.

24

Department may recompute premium payments that were payable before the law's enactment in May 11, 2005, but after January 1, 2005," AR:186, referring to payments made in the 2005 tax year.  Therefore, recomputing Plaintiffs' entire salary for tax year 2004 would be in direct contravention of the language of the 2005 Premium Pay Cap Waiver as well as Congressional intent in enacting Public Law 109-13.

Moreover, a recomputation would be improper for Plaintiffs Landis, Bennett, Bopp and Lubow.  Pursuant to 22 U.S.C. § 4139:

> A grievant may not file a grievance with the [Foreign Service Grievance] Board if the grievant has formally requested, prior to filing a grievance, that the matter or matters which are the basis for the previous grievance be considered or resolved and relief be provided under another provision of law, regulations or Executive Order . . . and the matter has been carried to a final decision under such provision on its merits . . . .

Prior to filing the grievances underlying their appeal to the FSGB, Plaintiffs Landis, Bennett, Bopp and Lubow "elected to have the validity of the debt reviewed at a hearing by a non-State Department Official . . . the Board of Contract Appeals.  In determining the correct amount of the debt, [the Administrative] Judge . . . reviewed the issue of which pay cap should be applied.  She determined that the Department was correct in applying the $128,000 cap."[21] AR:348; DBAR:12; JBAR:08; RLAR:06.  Therefore, "[t]he existence of the debt and the issue of the appropriate pay cap for purposes of determining premium pay [were] . . .previously litigated in a forum of competent jurisdiction."  AR:318.  Therefore, they properly were barred from the FSGB's consideration and cannot be challenged here.  Hence, Plaintiffs' request that the

---

[21]The Foreign Service Grievance Board later agreed that Plaintiffs were barred from "raising the issue of the validity of the debt[,]" and concurred with the Judge's reasoning on the issue of the correct premium pay.  AR: 348 and n.2, DBAR:13 and n.2; JBAR:13 and n.2; RLAR:13 and n.2.

overpayment be recomputed must be denied.  The only issue for review here, in the cases of Plaintiffs Landis, Bennett, Bopp and Lubow, is whether their request for a waiver of the debt was properly considered.[22]

### C.  The State Department's Denial of Plaintiffs' Waiver Request Was Neither Arbitrary Nor Capricious.

1.  Deputy Assistant Secretary Millette's Decision Was Not Erroneous.

Pursuant to 22 C.F.R. § 34.18(a)

> Waivers of indebtedness may be granted only as provided for certain types of debt by specific statutes and according to the standards set out under those statutes.

Debts arising out of erroneous payments of pay and allowances *may be* waived in whole or in part, "if collection would be against equity and good conscience and not in the best interest of United States."  22 C.F.R. § 34.18(b)(1)(emphasis added).  *See* 5 U.S.C. § 5584(a).  "Waiver may not be granted if there exists in connection with the claim an indication of fraud, misrepresentation, fault, or lack of good faith on the part of the employee . . . .  22 C.F.R. § 34.18(b)(1)(i).  However,

> [i]f the deciding official finds no indication of fraud, misrepresentation, fault, or lack of good faith on the part of the employee . . . the employee is *not automatically entitled to a waiver.*  Before a waiver can be granted, the deciding official must also determine that collection of the claim against an employee would be against equity and good conscience and not in the best interests of the United States.  Factors to consider when determining if collection of a claim against an employee would be against equity and good conscience and not in the best interests of the United States include, but are not limited to:

---

[22]Plaintiff Benevento requested and received an internal administrative review in which it was determined that the "applicable annual pay cap applied to [him] was $128,200."  FBAR:25. Along with the other Plaintiffs, Plaintiff Benevento grieved this determination and twice appealed the Defendants' decisions not to waive the overpayment to the FSGB.  The FSGB ultimately determined that the "Department did not abuse its discretion in denying Plaintiffs' waiver of repayment of the excess premium payments . . . ."  AR:413.

(A) Whether collection of the claim would cause serious financial hardship to the employee from whom collection is sought;

(B) Whether, because of the erroneous payment, the employee either has relinquished a valuable right or changed positions for the worse, regardless of the employee's financial circumstances;

(C) The time elapsed between the erroneous payment and discovery of the error and notification of the employee;

(D) Whether failure to make restitution would result in unfair gain to the employee;

(E) Whether recovery of the claim would be unconscionable under the circumstances.

22 C.F.R. §34.18(b)(iv)(emphasis added).

Plaintiffs contend that DAS Millette's denial of their waiver requests incorrectly invoked 22 C.F.R. §34.18(b)(iv)(D) because, in the letter denying the waiver, he noted that he "had to make this determination for over thirty other employees in the exact same situation and they have paid debts in full." AR:360. Plaintiffs state that "[a]ll State personnel from whom DAS Millette may have recovered monies waived all administrative remedies . . . and never obtained a final order that would be subject to judicial review." Pltfs' MSJ at 28-29. Therefore, they argue, "[t]his Court should decline to give any weight to the notion that, because some choose not to challenge a legal wrong or injustice, that failure should somehow be visited upon those who challenge it." *Id.* at 29.

Plaintiffs' argument misses DAS Millette's point. Whether or not these other individuals availed themselves of administrative remedies does not bear upon whether they paid back their debts or not. Rather, having over thirty employees in the same position as Plaintiffs pay back the debt while waiving Plaintiffs' debt "would result in unfair gain" to Plaintiffs, one of the factors

DAS Millette considered when determining if collection of the claims against Plaintiffs would be against equity and good conscience and not in the best interests of the United States.  22 C.F.R. §34.18(b)(1)(iv)(D).  Indeed, immediately prior to noting that he "had to make this determination for over thirty other employee in the exact same situation . . . [,] DAS Millette explicitly stated, "I find that your failure to make restitution would result in an unfair gain to you."  AR:360.

> 2.  <u>The Foreign Service Grievance Board Properly Followed its Regulations in Denying Waivers, and It Would Have Been Improper To Shift the Burden to the Department of State.</u>

> > a)  DAS Millette Was Not Required to Specifically Address Each Factor in § 34.18(b)(1)(iv).

Plaintiffs argue that "DAS Millette's ruling ma[de] no reference to the 'unconscionability' factor[,]" Pltfs' MSJ at 29, and this was in error.  However, on August 12, 2008, prior to making his decision regarding whether the collection of the debt from Plaintiffs "would be against equity and good conscience and not in the best interests of the United States," DAS Millette sent a letter to each Plaintiff inviting him "to submit any additional facts or discussion for his consideration" regarding the factors to be considered pursuant to 22 C.F.R. § 34.18(b)(1)(iv).  AR:359.  DAS Millette also provided Plaintiffs with each of the factors in writing.  *Id.*

On September 23, 2008, Plaintiffs' attorney responded to DAS Millette's letter.  *See* AR:398.  However, he failed to address each of the factors as requested.  *Id.*  As stated by the FSGB, Plaintiffs "provided no information with respect to financial hardship, nor did they specifically comment on the other factors outlined in the regulations."[23]  Rather, Plaintiff's

_____

[23]Specifically, Plaintiffs failed to address: "(A) Whether collection of the claim would cause serious financial hardship to the employee from whom collection is sought; (B) whether,

attorney stated that Plaintiffs "reply upon the record already developed." *Id.*  He referred to the

2005 Premium Pay Cap Waiver established by Congress in August of 2005, subsequent to

Plaintiffs' departure from Iraq, and stated "[o]bviously, the Agency decided to waive pay caps

because it believed it equitable to do so."[24]  *Id.*

While Plaintiffs argue that DAS Millette's not addressing the unconscionability factor

was error, Pltfs' MSJ at 30, the FSBG stated that "[a]lthough Millette's denial letter did not deal

explicitly with the factor of whether recovery would be 'unconscionable,' it did address the

equities of the waiver request."  AR:412.  The Board correctly stated that "the only question at

issue here is whether the Department abused its discretion in denying grievants the waivers they

requested for the year 2004 in the circumstances of their cases."  *Id.*  The Board found that "the

Department did not abuse its discretion . . . ."  AR:413.

The Board was correct.  While DAS Millette did not specifically address each of the

factors in his decision letter, he specifically stated that he "careful[ly] consider[ed] the factors in

22 C.F.R. §34.18(b)(1)(iv)."  AR:360.  After such consideration he concluded "that it would not

be 'against equity and good conscience' and would be in the 'best interests of the United States'

---

because of the erroneous payment, the employee either has relinquished a valuable right or
changed positions for the worse, regardless of the employee's financial circumstances; (C) the
time elapsed between the erroneous payment and discovery of the error and notification of the
employee; and (D) whether failure to make restitution would result in unfair gain to the
employee."  22 C.F.R. §34.18(b)(1)(iv).

[24]The FSGB considered this argument to have addressed the factor of whether recovery
would be unconscionable.  AR:411.  But, the Iraq Service Recognition Package did not exist
until after May 11, 2005, when Congress passed the DOD Emergency Supplemental
Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief.  AR:360.  "The
Department lacked the authority to raise the annual premium pay cap until passage [of this law]."
*Id.*

to recover the overpayment . . . ."  *Id.*  Although Plaintiffs assert that DAS Millette's decision should not have been upheld, DAS Millette was not required to specifically discuss each factor in 22 C.F.R. § 34.18(b)(1)(iv) in his decision letter.  Indeed, it has been determined that the administrative record need not include explicit discussion of every factor that is relevant to the agency's decision so long as the bases for the agency's policy choices are otherwise clear from the nature and context of the challenged action.  *See Domtar Maine Corp.*, 347 F.3d at 311-12, *cert. denied*, 541 U.S. at 1029.  The bases for DAS Millette's decision are otherwise clear. Moreover, as the FSGB stated, the only question at issue is whether the Department abused its discretion in denying the waivers, and the Department did not.

> b)  No Procedural Error Occurred That Required the FSGB to Shift the Burden of Proof to the Department of State.

Nevertheless, Plaintiffs argue that DAS Millette's not specifically addressing the unconscionability factor was a "procedural error" requiring the burden of proof to be shifted to the Department of State to "show that the waiver nonetheless could have been granted."  *Id.* at 30.  They contend that in not doing so, the FSGB failed to follow its own regulations.

Pursuant to 22 C.F.R. § 905.1,

> (a) In all grievances other than those concerning disciplinary actions, the grievant has the burden of establishing, by a preponderance of the evidence, that the grievance is meritorious.
> . . .
> (c) Where a grievant established that a procedural error occurred which is of such a nature that it may have been a substantial factor in an agency action with respect to the grievant, and the question is presented whether the agency would have taken the same action had the procedural error not occurred, the burden will shift to the agency to establish, by a preponderance of the evidence, that it would have done so.

Although Plaintiffs argue that a procedural error occurred, this is incorrect.[25]  As indicated *supra*, it is not necessary that each factor be specifically discussed as long as the "agency's path may reasonably be discerned."  *Bowman Transp., Inc.*, 419 U.S. at 285-86. Hence, failure to discuss one of the five factors could not constitute "procedural error" requiring the burden to proof to be shifted to Defendants.  *Compare Ackerman v. United States*, 324 F.Supp.2d 1, 6 (D.D.C. 2004)(characterizing a failure to provide formal performance counseling as a procedural error under 22 C.F.R. § 905.1(c)); *Kelly v. United States*, 34 F.Supp.2d 8, 11 (D.D.C. 1998)(failing to conduct a Limited Career Extension review constituted procedural error)).

Here, DAS Millette invited Plaintiffs to address each of the five factors.  He addressed the one factor that Plaintiffs' attorney did address, by noting that the Department was without authority to increase the pay cap in 2004 (so the decision not to waive their debt could not be unconscionable).[26]  DAS Millette also addressed a remaining factor he could address - - that

_____

[25]Plaintiffs apparently do not contend that DAS Millette's not specifically addressing factors (A) and (B), 22 C.F.R. § 34.18(b)(iv), in his decision constituted procedural error. Perhaps this is because, despite his request, Plaintiffs failed to provide him with the information, available only to them, which would have allowed him to address these factors.  In fact, in his denial letter, DAS Millette stated that Plaintiffs' attorney

> did not address any of the factors which I may consider with regard to whether collection would be 'against equity and good conscience and not in the best interest of the United States.'  For example, he did not provide any financial data . . . for determination as to whether collection of this claim would cause serious financial hardship.

AR:360.

[26]Unconscionable is defined as  "unscrupulous" or "beyond prudence or reason." *Webster's II, New Riverside Univ. Dictionary* 1256 (1994).

"failure to make restitution would result in unfair gain to the employee." 22 C.F.R. § 34.18(b)(1)(iv)(E). Finally, he concluded that "it would <u>not</u> be 'against equity and good conscience' and would be in the 'best interest of the United States' to recover the overpayment[s] . . . . AR:360 (emphasis in original). DAS Millette's path is easily discerned, and no "procedural error" occurred which would have required the FSGB to shift the burden to the Department of State to establish that it would have taken the same action had a procedural error occurred. *See* 22 C.F.R. § 905.1(c).

Assuming *arguendo* that not discussing one factor did constitute a "procedural error," this would not be the end of the analysis. As the regulation states, the procedural error must

> be of such a nature that it may have been a substantial factor in an agency action . . . <u>and</u> the question is presented whether the agency would have taken the same action had the procedural error not occurred . . . .

22 C.F.R. § 905.1 (emphasis added). Here, not specifically discussing that one factor was not a substantial factor in the agency action. DAS Millette clearly indicated that he "careful[ly] consider[ed] all of the factors." AR:360. Moreover, not making specific reference to one factor did not play a major role in his decision to deny the waiver requests because he found that a review of the equities required that the waiver requests be denied.

In addition, the question of "whether the agency would have taken the same action had the procedural error not occurred" has not been presented. 22 C.F.R. § 905.1(c). That question, undoubtedly, has not been presented because it is clear that the agency would have taken the same action. In his decision, DAS Millette stated that Plaintiffs' "failure to make restitution would result in an unfair gain . . . ." AR:360. He concluded that "a waiver of the salary overpayment [could not] be made under the provisions of 5 U.S.C. §5584." *Id.* Therefore, even

32

if DAS Millette should have specifically referenced the unconscionability factor in the decision, the Department still would have taken the same action and denied Plaintiffs' requests for waivers.

Moreover, for any APA claim, "due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706.  In other words, APA violations are only actionable if the plaintiff was prejudiced by the violation.  Procedural irregularities are not per se prejudicial, and it is the plaintiff's burden to establish prejudice.  *See Carstens v. Nuclear Regulatory Comm'n*, 742 F.2d 1546, 1558 (D.C. Cir. 1984).  Here, even if there were a procedural error, Plaintiffs have not and cannot establish that this error was per se prejudicial because whether or not DAS Millette specifically addressed this one factor in his decision, the result would have been the same.

### D.  The FSGB's January 2010 Decision Properly Applied the Regulations and Was Not Arbitrary, Capricious Nor an Abuse of Discretion.

1.  The Foreign Service Grievance Board's Decision is Entitled to Substantial Deference.

Under the Foreign Service Act of 1980, an aggrieved party can obtain review of a final decision of the FSGB in federal district court in accordance with the standards of the APA.  Thus, a decision of the Board will not be set aside under 5 U.S.C. § 706(2)(A) unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[27]  This highly deferential standard of review reflects a legislative judgment that "the Board's familiarity with the foreign service ought to be respected by the judiciary."  *United States v. Paddack*, 825 F.2d 504, 514 (D.C. Cir. 1987).   A decision by the Board is presumed to be valid, and it must be

---

[27]"Section 706 of Title 5 shall apply without limitation or exception" to judicial review of a final action by the FSGB.  22 U.S.C. § 4140(a).

upheld as long as there is any rational basis for it.  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 42-43.

A court is not empowered to "substitute its judgment" for that of the Board.  *Id.*  As long as a

decision is reasonable, it "need not be the best or most natural one" in the eyes of the court.

*Pauley*, 501 U.S. at 702; *see also Citizens to Preserve Overton Park, Inc.*, 401 U.S. 402, 416

(1971); *Am. Paper Inst. v. Am. Elect. Power Servs. Corp.*, 461 U.S. 402, 422 (1983); *INS v.*

*Wang*, 450 U.S. 139, 144 (1981).  The court's review is limited to the administrative record that

was before the Board at the time it made its decision.  *Fla Power & Light v. Lorion*, 470 U.S. at

743-44; *Citizens to Preserve Overton Park*, 401 U.S. at 420.

With regard to alleged procedural problems, a decision of the Board will not be set aside

under 5 U.S.C. § 706(2)(D) unless it was made "without observance of procedure required by

law."  Moreover, as indicated *supra*, for any APA claim, "due account shall be taken of the rule

of prejudicial error."  5 U.S.C. § 706.  In other words, APA violations are only actionable if the

plaintiff was prejudiced by the violation.  Procedural irregularities are not per se prejudicial, and

it is the plaintiff's burden to establish prejudice.  *See Carstens v. Nuclear Regulatory Comm'n*,

742 F.2d 1546, 1558 (D.C. Cir. 1984).

### 2.  The FSGB Properly Applied the Regulations.

Plaintiffs argue that, in its January 2010 decision, the FSGB "ruled . . . th[at] Plaintiffs

were *sufficiently* 'at fault' for denial of a waiver."  Pltfs' MSJ at 33 (citing AR:413).  This

argument is without merit.

In the 2010 decision, the FSGB merely noted that the "grievants were put on notice in

November of [2004] that they were approaching or had already exceeded the pay cap."[28]

AR:413.  Nowhere in this decision did the FSGB find that grievants were "at fault."[29]  *See* 22

C.F.R. § 34.18(b)(ii), (iv).  In fact, the FSGB specifically stated that the Department of State's

determination to deny the waiver requests was "in line with Comptroller General Decisions

which have discouraged the approval of waivers when the employee had reasonably prompt

notice that payments were or may have been erroneous, *even if the employee was <u>not</u> at fault.*[30]

AR:413 (emphasis added).  *See, e.g., Matter of John Wessels*, 1996 U.S. Comp. Gen. LEXIS 254

(May 22, 1996)(waiver of overpayment denied where employee was issued travel orders which

authorized reimbursement for the shipment and storage of household goods under one rate and,

after employee completed the shipment and was reimbursed, his orders were amended reducing

the reimbursement rate).  Therefore, despite Plaintiffs' contention, the FSGB did not "change

course" or abruptly "depart from established precedent."  Pltfs' MSJ at 33, 34.  Rather, as the

FSGB stated, it "applied the factors set forth in its regulations[,] . . . duly considered the equities

involved[, and determined that] the Department of State did not abuse its discretion in denying

grievants['] waivers of repayment of the excess premium payments they received . . . ."  AR:413.

---

[28]Indeed, in its 2008 decision, when the FSGB first held that Plaintiffs were not at fault and remanded the matter to the Department, the FSGB also noted that Plaintiffs were aware that they were approaching or had exceeded the pay cap.  AR:350 ("It appears from the record that grievant was aware of the application of the premium pay cap during the first half of the year, and certainly after the July 2004 cable was disseminated.").

[29]"Fault is considered to exist if . . . the employee knew or should have known . . . that an error existed [and] failed to take corrective action.  22 C.F.R. § 34.18(b)(1)(ii).  In neither its 2008 nor 2010 decision did the FSGB find that Plaintiffs failed to take corrective action.

[30]Although individual may be determined to not be at fault, whether it would be equitable to require repayment remains a consideration.  *See* 22 C.F.R. § 34.18(b)(1)(iv).

### 3.  The FSGB 2010 Decision Was Not Arbitrary, Capricious or an Abuse of Discretion.

Plaintiffs state that "the FSGB revived the November 24, 2004 e-mail [in which Plaintiffs were notified that they were approaching or had already exceeded the pay cap,] and then gave it dispositive weight, ruling that Plaintiffs 'were put on notice of . . . the overpayment' . . . *and should have taken action at that point*."  Pltfs' MSJ at 35 (emphasis added) (citing AR:411-13). However, at no point in the FSGB's 2010 decision was it determined that Plaintiffs "should have taken [any] action."[31]  As indicated *supra*, the FSGB noted that Plaintiffs were put on notice of possible overpayments in November, but the FSGB attributed no fault to Plaintiffs because of that.

Plaintiffs also discuss communications between Department of State personnel and Plaintiffs to demonstrate that the Department made commitments to monitor overtime pay, but did not do so.[32]  Plaintiffs assert that these communications are "critical evidence on the question whether any fault properly could be attributed to Plaintiffs[, and whether the FSGB's failure to consider these communications] . . . require[s] a remand."  Pltfs' MSJ at 36.  Plaintiffs are incorrect.

First, the FSGB did not attribute any fault to Plaintiffs.  Indeed, in its 2008 decision, the FSGB specifically found that Plaintiffs were "not at fault for the excess payments [and] the Department's finding that it was precluded from granting . . . waiver[s on that basis] must be

_____

[31]Not even in its 2008 decision did the FSGB find that Plaintiffs failed to take corrective action.

[32]In doing so, Plaintiffs cited to documents which are not a part of the Administrative Record.

36

overturned as contrary to law." AR:353. The FSGB then remanded the matter to the Department

of State to reconsider the matter on the merits. *Id.* In addition, in its 2010 decision, the FSGB

stated that its "earlier decision found that [Plaintiffs] were not at fault," AR:413, and, again, the

FSGB did not find Plaintiffs at fault. The FSGB merely noted that Plaintiffs "were put on

notice" of the overpayments in November of 2004. *Id.* Therefore, no question arises regarding

"whether any fault properly could be attributed to Plaintiffs[,]" Pltfs' MSJ at 36, because no fault

was attributed to Plaintiffs at all.

Second, despite Plaintiffs' contention, the FSGB did not "entirely ignore[]" evidence

regarding these communications. *Id.* at 38. In its decision, the FSGB specifically indicated that

Plaintiffs "relied on the Department's assurances that it would monitor premium pay to ensure

that the caps would not be exceeded . . . and the Department itself took no action to prevent

excess overtime." AR:408. The FSGB then "duly considered the equities involved[,]" AR:413,

and determined that the Department did not abuse its discretion in denying the waivers.[33] *Id.*

Third, even if commitments were made by Department of State personnel to monitor

overtime pay, the FSGB properly stated that

---

[33]Plaintiffs state that "the FSGB failed to consider State's August 2004 Policy . . . ."
Pltfs' MSJ at 37. But, the FSGB specifically considered the fact that the Department indicated
that it would monitor premium payments as was indicated in that policy. *See* AR:408. Notably,
this policy also stated that:

> employees cannot be compensated for overtime or other premium hours to the
> extent that the combination of their basic pay and premium compensation . . .
> would exceed . . . the rate of pay for Level V of the Executive Schedule ($128,200
> in 2004) for those assigned overseas. There is no rollover provision for the
> premium pay cap, and excess amounts are forfeited.

AR:092.

> the only question at issue . . . [was] whether the Department abused its discretion in denying grievants the waivers they requested for the year 2004 in the circumstances of their cases.

AR:412.  The FSGB stated that the burden was on the employees to make their showing[,]"and concluded that they did not.  *Id.*  Specifically, the FSGB found that the Department of State's "decision to deny [the] waiver[s] was [not] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[34]  *Id.*  The FSGB's decision is presumed to be valid, and it must be upheld because there is a rational basis for it.  *See Motor Vehicle Mfrs. Ass'n of the U.S. Inc.*, 463 U.S. at 42-43.  A court is not empowered to "substitute its judgment" for that of the Board.  *Id.*  As long as a decision is reasonable, it "need not be the best or most natural one" in the eyes of the court.  *Pauley*, 501 U.S. at 702.  Because the FSGB's decision was reasonable, it should not be disturbed.

Moreover, whether or not commitments were made by Department of State employees is not pivotal.[35]  Defendants are "neither estopped nor bound by the unauthorized acts or

---

[34]The FSGB also found "no basis to overturn the agency's judgment that granting a waiver to grievants would create an unfair gain for them . . . ."  AR:413.  *See* 22 C.F.R. § 34.18(b)(1)(iv)(D).

[35]Plaintiffs contend that the Department of "State made it clear that no final determination [regarding overpayments] had been made" and the November 2004 "e-mail does not say what FSGB Decision II says it says."  Pltfs' MSJ at 36.  However, the substance of the November 2004 e-mail is quite clear.

> During our review we have determined that your earnings applicable toward the 2004 annual premium pay cap have already or could shortly put you above the cap for the current pay year.

> Because you are assigned overseas, the rate of the annual premium pay cap that applies to you is $128,200 (the rate for Level V of the Executive Schedule).  Thus, for 2004 the combination of your basic pay and all forms of premium compensation (overtime pay, compensatory time off, holiday premium pay,

commitments of its agents.  Accordingly, where an official . . . approves and promises

reimbursement beyond that allowed by applicable law, any payments made under such

unauthorized actions are recoverable by the Government."  *West. Pa Horological Inst., Inc. v.

United States*, 146 Ct. Cl. 540 (1959).  Few principles are so well established as the right of the

Government to recover by offset or otherwise sums illegally or erroneously paid.  Moreover, it

cannot be estopped from doing so by the mistakes of its officers or agents.  AR:86 *(citing Lodge

2424 v. United States*, 564 F.2d 66 (Ct. Cl. 1977); *United States v. Morrow*, 266 U.S. 531 (1925);

*Wis. Cent. R.R. Co. v. United States*, 164 U.S. 190, 210 (1896); *DiSilvestro v. United States*, 405

F.2d 150, 155 (2d Cir. 1968), *cert. denied*, 396 U.S. 964 (1969)(additional citations omitted).

Indeed, "where money is allegedly erroneously paid it is the duty of the Government to sue for its

return."  *Fansteel Metallurgical Corp. v. United States*, 172 F.Supp. 268, 271 (1959).

Therefore, because Defendants made a rationale decision which is supported by the record, the

decision to deny Plaintiffs' grievances should be upheld.

---

Sunday premium pay, night pay differential, law enforcement availability pay)
cannot exceed $128,000.  Title 5 does not allow for rollover of any excess
amounts.  The Department cannot pay any premium compensation that would
cause your combined basic pay plus premium pay to exceed $128,200.  *If such
payments are made erroneously, the Department is obligated to seek collection of
such overpayments.*

We will contact you with additional details concerning your specific situation as
we finalize our review of the overtime payments.  At that time we will provide
information about repayment options, tax implications, etc.

AR:316 (emphasis added).

## IV.  <u>CONCLUSION</u>

For the reasons set forth above, Defendants respectfully requests that this Court deny

Plaintiffs' Motion for Summary Judgment and grant Defendants' Cross-Motion for Summary

Judgment.

Respectfully submitted,

RONALD C. MACHEN JR., D.C. Bar # 447889
United States Attorney
for the District of Columbia

RUDOLPH CONTRERAS, D.C. Bar # 434122
Chief, Civil Division

By:  /s/
MARIAN L. BORUM, D.C. Bar # 435409
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20530
(202) 514-6531
Marian.L.Borum@usdoj.gov

Of Counsel:

James H. Anderson
Attorney Adviser
Office of the Legal Adviser
U.S. Department of State
Global Financial Services
P.O. Box 150008
Charleston, SC 29415-5008

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of June, 2010, the foregoing was served, via

the Court's ECF System, to counsel for Plaintiffs:

| | |
|---|---|
| Elliott H. Scherker | Joe R. Reeder |
| Brigid F. Cech Samole | Danielle M. Diaz |
| Greenberg Traurig, P.A. | Greenberg Traurig, P.A. |
| 1221 Brickell Avenue | 2101 L Street, N.W., Suite 1000 |
| Miami, Florida 33131 | Washington, D.C.  20037 |

 /s/
MARIAN L. BORUM
Assistant United States Attorney

41

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
**RICHARD LUBOW, et al.,**                          )
                                                    )
            **Plaintiffs,**                         )
                                                    )
      **v.**                                        )    **Civil Action No. 10-0510 (JDB)**
                                                    )
**UNITED STATES DEPARTMENT OF STATE, et al.,**  )
                                                    )
            **Defendants.**                         )
_____              )

<u>**ORDER**</u>

     Upon consideration of Plaintiffs' Motion for Summary Judgment, Defendants' Cross-

Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment,

and the entire record herein, it is this _____ day of _____, 2010

     **ORDERED** that Plaintiffs' Motion for Summary Judgment be and is hereby **DENIED**;

and it is

     **FURTHER ORDERED** that Defendants' Cross-Motion for Summary Judgment be and

is hereby **GRANTED**; and it is

     **FURTHER ORDERED** that this case be, and it is, dismissed with prejudice.


                                    _____
                                    UNITED STATES DISTRICT JUDGE