UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RICHARD LUBOW, et al.

    Plaintiffs,
         v.
UNITED STATES DEPARTMENT OF STATE,
et al.

    Defendants.

Civil Action No.  10-0510 (JDB)

## MEMORANDUM OPINION

Plaintiffs Richard Lubow, Joseph Bopp, David Bennett, Frank Benevento, and James Landis, each a current or retired Diplomatic Security Officer at the U.S. Department of State, brought this suit challenging the Department's decision to collect alleged salary overpayments for plaintiffs' work in Iraq in 2004. Plaintiffs challenge both the Department's determination that their pay exceeded overtime limits and the decision to deny waiver of repayment. The parties have filed motions and cross-motions for summary judgment. For the reasons explained herein, the Court will deny plaintiffs' motion for summary judgment and will grant the Department's cross-motion.

## BACKGROUND

In January 2004, plaintiffs, then all Diplomatic Security Officers at the State Department, began service in Iraq as Regional Security Officers. See Administrative Record [Docket Entry 27] at 340 (July 14, 2010) ("A.R.").[1] As Foreign Service Specialists, plaintiffs were eligible for basic pay—compensation for a forty-hour work week—and premium pay—compensation for overtime, compensatory time off, holiday and Sunday premium pay, night pay differential, and

---

[1] Because the records for the different plaintiffs are substantively identical in relevant part, the Court will cite records pertaining to one of the plaintiffs as representative.

law enforcement availability pay. Plaintiffs also received danger pay, post hardship differential, and certain other payments that are not at issue here. See id. The Department classified the war in Iraq as an emergency, and plaintiffs' work qualified as "emergency support service." Id. at 29.

Federal law establishes the aggregate amount of basic and premium pay an employee may receive. Pursuant to 5 U.S.C. § 5547(a),

> [a]n employee may be paid premium pay . . . only to the extent that the payment does not cause the aggregate of basic pay and such premium pay for any pay period for such employee to exceed the greater of—
> > (1) the maximum rate of basic pay payable for GS-15 (including any applicable locality-based comparability payment . . . and any applicable special rate of pay . . . ); or
> > (2) the rate payable for level V of the Executive Schedule.

This cap applies to each "pay period," i.e., biweekly. Things change somewhat, however, when the employee's premium pay is earned for "work in connection with an emergency." 5 U.S.C. § 5547(b)(1). In that case, the limitation of subsection (a) is replaced by an annual cap. An annual cap allows an employee to collect more total overtime: if the employee works no or little overtime in some pay periods, he has the potential to earn that overtime in later periods. For example, if the employee works no overtime the first six months (first 13 pay periods) of the year, he can earn twice as much overtime in each of the remaining 13 pay periods than he would be able to earn under a biweekly cap. The annual cap set out in 5 U.S.C. § 5547(b)(2) provides,

> no employee [paid premium pay for work in connection with an emergency] may be paid premium pay . . . if, or to the extent that, the aggregate of the basic pay and premium pay under those provisions for such employee would, in any calendar year, exceed the greater of—
> > (A) the maximum rate of basic pay payable for GS-15 in effect at the end of such calendar year (including any applicable locality-based comparability payment . . . and any applicable special rate of pay . . . ); or
> > (B) the rate payable for level V of the Executive Schedule in effect at the end of such calendar year

(emphasis added).

In 2004, the maximum rate of basic pay payable for GS-15 was $113,674. See A.R. at 84. Including the locality-based comparability payment for the Washington, D.C., area, the maximum rate was $130,305. Id. And the rate payable for Executive Schedule V was $128,200. Id. Accordingly, the annual pay cap for those assigned to Washington, D.C., was $130,305, the higher of the GS-15 locality-adjusted pay and the Executive Schedule V Pay. But no locality-based comparability payment is applicable to overseas employees. Id. at 85; see also 5 C.F.R. § 531.603 (2004). Hence, for those assigned to an overseas post, the maximum, locality-adjusted GS-15 payment for 2004 was $113,674. The Executive Schedule Level V remained at $128,200 regardless of the employee's assignment. The annual pay cap for overseas employees was hence $128,200, the greater of the two.

Plaintiffs began serving in Iraq in 2004. Initially, they were on a temporary duty assignment, and so were formally assigned to Washington, D.C. After the U.S. Embassy in Iraq opened in July 2004, however, plaintiffs received new orders, taking them off temporary duty status and permanently assigning them to that embassy. See A.R. at 340. Their assignment at the start of the year, then, qualified for a $130,305 annual pay cap. Their assignment at the end of the year qualified for a $128,200 pay cap.

The Department provided various cables and notices addressing the payment scheme. In July 2004, the Department distributed a cable informing plaintiffs that "the combination of base pay plus premium pay . . . for those serving in Iraq is capped annually" and that "currently, this translates to $128,200 for those assigned to Iraq; $130,305 for those on [temporary duty assignment] to Iraq from Washington, D.C.," and that "[a]ny amount of premium pay over the cap is forfeited." Id. at 27. In August 2004, the Department's U.S. Mission in Iraq issued an Administrative Notice repeating these points. See id. at 92.

On November 24, 2004, the Department advised each plaintiff:

[W]e have determined that your earnings applicable toward the 2004 annual premium pay cap have already or could shortly put you above the cap for the current pay year. Because you are assigned overseas, the rate of the annual premium pay cap that applies to you is $128,200 (the rate for Level V of the Executive Schedule). Thus, for 2004 the combination of your basic pay and all forms of premium compensation (overtime pay, compensatory time off, holiday premium pay, Sunday premium pay, night pay differential, law enforcement availability pay) cannot exceed $128,200. Title 5 does not allow for rollover of any excess amounts. The Department cannot pay any premium compensation that would cause your combined basic pay plus premium pay to exceed $128,200. If such payments are made erroneously, the Department is obligated to seek collection of such overpayments.

Id. at 316.

Finally, on April 27, 2005, the Department sent each plaintiff a letter notifying him that he had exceeded the premium pay cap for 2004 and that the Department was "obligated to seek the return of the U.S. Government funds that were improperly disbursed." Id. at 29. Using the $128,200 pay cap based on plaintiff's overseas assignment at the end of the year, the letters requested repayment between $435.94 and $10,514.98.[2]

Each plaintiff disputed the debt. Plaintiff Benevento elected an internal review by Deputy Assistant Secretary James Millette; the other plaintiffs elected an outside hearing by an administrative judge of the General Services Board of Contract Appeals. Both Secretary Millette and the Board of Contract Appeals upheld the Department's decision, finding that plaintiffs owed valid debts.

Plaintiffs then requested that the Department waive their indebtedness pursuant to 5 U.S.C. § 5584, which allows an agency official to waive a claim by the United States "arising out of an erroneous payment of pay" where the collection of such a claim "would be against equity and good conscience and not in the best interests of the United States." 5 U.S.C.

_____

[2] Because the statutory cap the Department applied was $2,105 less than the cap plaintiffs argue should have been applied, only part of the larger overpayments can be attributed to the Department's decision to use the $128,200 rather than the $130,305 pay cap.

§ 5584(a). State Department regulations direct that "[w]aiver may not be granted if there exists in connection with the claim an indication of . . . fault" by the employee seeking the waiver. 22 C.F.R. § 34.18(b)(1)(i). If the deciding official finds "no indication of . . . fault," he can then grant the waiver, but only if he also finds "that collection of the claim against an employee would be against equity and good conscience and not in the best interests of the United States." 22 C.F.R. § 34.18(b)(1)(iv).

Deputy Assistant Secretary Millette reviewed each plaintiff's waiver request. He rejected the requests, finding that each plaintiff was "not without fault." See A.R. at 62. Plaintiffs filed a grievance within the Department challenging the waiver denial. When the grievance was denied, they appealed to the Foreign Service Grievance Board the Department's decisions to deny them waivers and to apply the $128,200 annual cap. The Board granted the grievance appeal as to the waivers' propriety, finding that plaintiffs were not at fault for the excess payments. It sent the waiver question back to the Department to determine whether collection "would be against equity and good conscience and not in the best interests of the United States." Id. at 355. The Board denied the grievance appeal in all other respects. Id.[3]

On remand, Deputy Assistant Secretary Millette found that collecting the debt would not be against equity and good conscience and would be in the best interests of the United States, again denying the waiver. See id. at 360. Plaintiffs again appealed, and this time the Board upheld the waiver denial. Plaintiffs then filed this action challenging the Department's decision that defendants owe a valid debt and the Board's decision to deny the waiver.

Continuing this case's lengthy course, after the parties submitted their cross-motions for summary judgment, this Court remanded the action based on "an intervening event." See

---

[3] The Board rejected plaintiff Benevento's pay cap argument on the merits, but declined to reach the other plaintiffs' identical arguments, finding that it lacked authority to review decisions of the Board of Contract Appeals. See A.R. at 347-48 & n.2.

Remand Decision [Docket Entry 31] at 5 (Aug. 10, 2010) (internal quotation marks omitted). In 2005, Congress passed the Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, 2005 ("Appropriations Act of 2005"), which, in relevant part, permitted federal agencies to waive the pay cap for certain employees up to $200,000 during 2005. See Appropriations Act of 2005, § 1008, Pub. L. No. 109-13, 119 Stat. 231, 243. Pursuant to this authorization, the Department raised to $200,000 the cap for certain employees. See A.R. at 184. This premium cap waiver applied "to all premium pay earnings payable in calendar year 2005, i.e., for work performed in pay period 25 of 2004 (pay date January 8, 2005) through pay period 24 of 2005 (pay date December 22, 2005)." Id. at 184-85. Because the waiver by its terms applied to some work performed in 2004 and because the Department did not consider the effect of the waiver on plaintiffs' purported debts, the Court remanded for the agency to consider in the first instance whether—and if so, how—the waiver affects plaintiffs' claims. The Department has since responded to the remand, and the cross-motions are now ready for resolution.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In a case involving review of a final agency action under the Administrative Procedure Act, 5 U.S.C. § 706, however, the standard set forth in Rule 56(a) does not apply because of the limited role of a court in reviewing the administrative record. See Loma Linda Univ. Med. Ctr. v. Sebelius, 684 F. Supp. 2d 42, 52 (D.D.C. 2010) (citing Sierra Club v. Mainella, 459 F. Supp. 2d 76, 89 (D.D.C. 2006)), aff'd, 408 F. App'x 383 (D.C. Cir. 2010); see also Am. Bioscience, Inc. v. Thompson,

269 F.3d 1077, 1083 (D.C. Cir. 2001) ("[W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal. The entire case on review is a question of law." (footnote and internal quotation marks omitted)). Under the APA, it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." See Occidental Eng'g Co. v. INS, 753 F.2d 766, 769-70 (9th Cir. 1985); see also James Madison Ltd., by Hecht v. Ludwig, 82 F.3d 1085, 1096 (D.C. Cir. 1996) ("Like appellate courts, district courts do not duplicate agency fact-finding efforts. Instead, they address a predominantly legal issue: Did the agency articulate a rational connection between the facts found and the choice made?" (internal quotation marks omitted)). Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review. See Richard v. INS, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977); see also Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 743-44 (1985) ("The task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court.").

Plaintiffs challenge the decisions of the Foreign Service Grievance Board and the Board of Contract Appeals. The Court must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2); see also 22 U.S.C. § 4140(a) (section 706 applies "without limitation or exception" to challenges of Foreign Service Grievance Board final actions). The "scope of review under the 'arbitrary and capricious' standard is narrow and a court

is not to substitute its judgment for that of the agency." <u>Motor Vehicle Mfrs. Ass'n of U.S., Inc.</u> <u>v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43 (1983). The Court must be satisfied that the agency has "'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" <u>Alpharma,</u> <u>Inc. v. Leavitt</u>, 460 F.3d 1, 6 (D.C. Cir. 2006). The agency's decisions are entitled to a "presumption of regularity," <u>Citizens to Pres. Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 415 (1971), and although "inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one," <u>id</u>. at 416. The Court's review is confined to the administrative record, subject to limited exceptions not at issue here. <u>See</u> <u>Camp v. Pitts</u>, 411 U.S. 138, 142 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."); <u>see also</u> <u>James Madison</u> <u>Ltd.</u>, 82 F.3d at 1096 (the district court's inquiry is predominantly legal, though the court may "need to resolve factual issues regarding the process the agency used in reaching its decision," which, in rare instances, could "require[] district courts to engage in independent fact-finding").

<u>**ANALYSIS**</u>

I.      <u>**Application of the Statutory Cap to Plaintiffs**</u>

Plaintiffs first challenge the Department's finding that they were overpaid because their basic and premium pay exceeded the $128,000 pay cap.[4] Again, the governing statute provides that

> no employee [paid premium pay for work in connection with an emergency] may be paid premium pay . . . if, or to the extent that, the aggregate of the basic pay and premium pay

---

[4] The Department seems to argue that only one of the plaintiffs, plaintiff Benevento, can contest the Department's overpayment determination because the Board properly declined to reach the question for the plaintiffs who obtained review from the Board of Contract Appeals. As the Court previously ruled, the other plaintiffs' arguments are appropriate as a challenge to the Board of Contract Appeals decision, which was itself a final agency action. <u>See</u> Remand Decision at 7-8 & n.5.

under those provisions for such employee would, <u>in any calendar year</u>, exceed the greater of—

> (A) the maximum rate of basic pay payable for GS-15 <u>in effect at the end of such calendar year</u> (including any applicable locality-based comparability payment . . . and any applicable special rate of pay . . . ); or
> (B) the rate payable for level V of the Executive Schedule <u>in effect at the end of such calendar year</u>.

5 U.S.C. § 5547(b)(2) (emphasis added).

The Office of Personnel Management ("OPM") issued regulations that tracked the language of 5 U.S.C. § 5547(b)(2), providing in relevant part that the annual cap is the higher of the "maximum annual rate of basic pay payable for GS-15 (including any applicable locality-based comparability payment . . . and any applicable special rate of pay . . . ) in effect on the last day of the calendar year" or the "annual rate payable for level V of the Executive Schedule in effect on the last day of the calendar year." <u>See</u> 5 C.F.R. § 550.106(c). In promulgating these regulations, OPM addressed concerns by an agency that basing the annual cap "on the last applicable locality pay area in a calendar year" could result in the agency needing "to correct payments made in past pay periods." 69 Fed. Reg. 55941, 55941 (Sept. 17, 2004). OPM responded:

> While we understand the agency's concerns about administrative burdens, the law expressly provides that the annual premium pay cap must be applied to an entire calendar year and that it is based on the applicable rates in effect at the end of the calendar year. A geographic move to an area with different pay rates can raise or lower an employee's aggregate basic pay and the end-of-year annual cap on premium pay. In turn, a change in aggregate basic pay or the end-of-year cap can change retroactively the date on which an employee reached the annual premium pay cap. In some cases, an agency may have to recompute retroactively the amount of premium pay owed for one or more pay periods. . . . Agencies cannot avoid certain administrative burdens based on the express statutory language in 5 U.S.C. 5547(b)(2), and we cannot change the regulations without a legislative amendment to reduce or eliminate these administrative burdens.

<u>Id.</u> OPM also explained that an agency may avoid "the burden of collecting an overpayment in some cases" by deferring the payment of some premium pay until the end of the year. <u>Id.</u>

### a.   Construction of Section 5547

The parties agree that <u>Chevron</u> deference applies to OPM's interpretation of section 5547 and that further deference applies to the Department's interpretation of applicable regulations. No deference is required, however, because the statute's plain language resolves the dispute. <u>See</u> <u>Carcieri v. Salazar</u>, 129 S. Ct. 1058, 1063-64 (2009) (under "settled principles of statutory construction . . . [the Court] must first determine whether the statutory text is plain and unambiguous" and if so the Court "must apply the statute according to its terms"). Section 5547 provides that total pay is capped annually at the higher of "the maximum rate of basic pay payable for GS-15 in effect at the end of such calendar year (including any applicable locality-based comparability payment . . . )" or "the rate payable for level V of the Executive Schedule in effect at the end of such calendar year." <u>See</u> 5 U.S.C. § 5547(b)(2). Plaintiffs' 2004 cap was, hence, the higher of the locality-adjusted GS-15 rate "in effect at the end of" 2004 or the Executive Schedule V rate "in effect at the end of" 2004. <u>See</u> <u>id.</u> Because plaintiffs were assigned overseas at the end of 2004, plaintiffs' locality-adjusted GS-15 rate in effect at that time was $113,674. Their annual pay cap was, then, the higher Executive Schedule V rate in effect at the end of 2004, $128,200.

Plaintiffs argue that "[t]he linchpin of State's determination that Plaintiffs had been overpaid is that their pay cap for the <u>entirety</u> of calendar year 2004 was $128,200," Pls.' Mot. for Summ. J. [Docket Entry 19-1] at 21 (May 10, 2010) ("Pls.' Mot."). And they contend it was error for the Department to find that "the rate in effect as of July 2004, when the Embassy opened, applied retroactively to the entire year." <u>See</u> <u>id.</u> at 22. Yet using the end-of-the-year figures is precisely what the statute dictates. By specifying the end of the year as the relevant time frame, <u>see</u> 5 U.S.C. § 5547(b)(2) (the cap is to be determined based on rates "in effect at the

10

end of such calendar year"), the statute recognizes that the applicable rate can change. And it establishes that the rate in effect at the end of the year (i.e., as the regulation clarifies, on December 31) will determine the annual cap.

Indeed, while protesting the perceived unfairness of such a rule, plaintiffs have identified no specific ambiguity in the statute. They argue simply that Congress "has not directly addressed the precise question at issue" because "Section 5547 does not expressly address the situation in which Plaintiffs found themselves, i.e., Plaintiffs remained in precisely the same positions as they had held before the Embassy opened in Baghdad, and were merely moved to permanent posts that were created upon the Embassy's opening." Pls.' Mot. at 20, 22. But as the Department aptly puts it, "[s]hort of addressing [plaintiffs] by name, the statute could not be clearer in governing their situation." Defs.' Cross-Mot. for Summ J. [Docket Entry 21] at 19 (June 16, 2010). Statutes do not apply their rules to every conceivable set of facts. The rule section 5547 establishes—that the rates at the end of the year determine the cap—dictates the outcome in exactly the situation where the applicable rate changes during the course of the year, regardless of the reason for that change. Similarly, the text provides no basis for separating rates that are in effect at the end of the year for a certain reason (e.g., a statutory increase in the GS-15 rate) from rates that are in effect at the end of the year for a different reason (e.g., a change in location and hence to the locality-based comparability payment). Rather, the language Congress used, "rate of basic pay payable for GS-15 in effect at the end of such calendar year," 5 U.S.C. § 5547(b)(2)(A)—where the rate is defined to include any applicable comparability payments— encompasses all the reasons the rate is at a certain level at year's end.

Perhaps recognizing that the statute's plain text is against them, plaintiffs urge the Court to avoid "the literal reading of a statutory term" because it would lead to "absurd" results while

the "more rational interpretation" would limit "'the rate payable . . . in effect at the end of such calendar year,' . . . to statutory changes" in the rate. Pls.' Resp./Reply to Defs.' Cross-Mot. [Docket Entry 23] at 2 (June 28, 2010). What makes the rule so irrational, plaintiffs argue, is that they might have exceeded the newly lowered pay cap before working a single day in Iraq. See id. at 1 ("[Under the Department's interpretation,] Plaintiffs would all but have exhausted the purported retroactive cap on their overtime upon their arrival in Iraq."). As a preliminary matter, it is unclear what is so odd about this result. A cap on premium pay, by definition, prevents individuals from earning premium pay for certain hours that would have otherwise qualified. At some point, then, no additional premium pay can be earned. To be sure, using the end of year as a measure (instead of, say, looking at where the individual spent the most time over the year) can lead to unfair results in marginal cases. For instance if an officer is transferred on December 28th to an overseas post after having spent nearly the entire year in D.C., his cap would be lowered based on his location for only a tiny fraction of his service.[5]

But this is a far cry from a case where the absurdity doctrine might override the statute's plain text. Congress picked, for administrative efficiency, a certain point at which the annual cap is to be measured. This will necessarily lead to a gain for some (who are subject to a higher cap on the last day of the year than they were earlier in that year) and a loss for others (who become subject to a lower cap on the last day than they were at an earlier point). Drawing the line in this way "may be debatable policy, but it is hardly irrational." Landstar Express Am., Inc. v. Fed. Mar. Comm'n, 569 F.3d 493, 499 (D.C. Cir. 2009) (holding that "[t]he absurdity doctrine is inapposite" for that reason). The applicable rate on the last day of the year "serve[s] as an effective and efficient administrative proxy," Barnhart v. Thomas, 540 U.S. 20, 28 (2003), for

---

[5] This hypothetical is, of course, far from the facts of the case. Here, nearly half of plaintiffs' work occurred after their formal assignment to Iraq.

the conditions that should determine the cap. This rule, hence, has all the merit of a bright line. And there is nothing absurd in Congress's decision to use a bright line rule in place of an individualized inquiry, although such a line will inevitably be a better approximation for some individuals than for others. See id. ("There is good reason to use a workable proxy that avoids the more expansive and individualized . . . analysis.").[6]

Nor is the absurdity doctrine a way for the Court to second-guess Congress's policy judgments. Rather, the doctrine applies when Congress could not have meant what it appears to have said. Conroy v. Aniskoff, 507 U.S. 511, 516 (1993) (asking whether "a literal construction . . . is so absurd or illogical that Congress could not have intended it"); Green v. Bock Laundry Mach. Co., 490 U.S. 504, 510-11 (1989) (when result is "unfathomable" a court may conclude that the statute "can't mean what it says"). But here, it is clear that Congress meant precisely what it said: the annual cap is to be determined based on the applicable rates at year's end. Plaintiffs prefer an individualized inquiry, or a line drawn in a different place. But their argument must be directed at Congress, not this Court.

### b.  Effect of the 2005 Pay Cap Waiver

The parties also dispute the effect of the Appropriations Act of 2005 and the Department's subsequent waiver of the annual pay cap on the overpayment determination. The Appropriations Act of 2005 provides that "[d]uring calendar year 2005 and notwithstanding [5 U.S.C. § 5547] the head of an Executive agency may waive the limitation, up to $200,000, established in that section for total compensation, including limitations on the aggregate of basic pay and premium pay payable in a calendar year." See Appropriations Act of 2005, § 1008, Pub.

---

[6] Indeed, in Barnhart, the Supreme Court was considering whether an agency's interpretation of an ambiguous statute was unreasonable under Chevron step 2. See 540 U.S. at 26. The irrationality plaintiffs must show to prevail here is far higher, for they need to overcome clear statutory text, rather than just undermine an agency's judgment in the face of statutory ambiguity.

L. No. 109-13, 119 Stat. 231, 243. Pursuant to this authorization, on August 19, 2005, the Department waived the annual pay cap up to $200,000 "on the aggregate of basic pay and premium pay payable in calendar year 2005 for employees working in Iraq and Afghanistan." See A.R. at 184. The $200,000 cap applied "to all premium pay earnings payable in calendar year 2005, i.e., for work performed in pay period 25 of 2004 (pay date January 8, 2005) through pay period 24 of 2005 (pay date December 22, 2005)." Id. at 184-85 (emphasis added). Because the record was unclear as to whether any payments made in 2005—e.g., those earned during the final pay period of 2004—were included in calculating plaintiffs' overpayments, the Court remanded the case to the Secretary to determine the impact of the 2005 waiver. See Remand Decision at 7 ("[The waiver] does apply, by its plain terms, to work performed during pay period 25 of 2004. Hence, the State Department, at the least, must evaluate whether and how the waiver affects any overpayments made to plaintiffs during pay period 25.").

After inviting and receiving responses from plaintiffs and evaluating their pay histories, Under Secretary for Management Patrick Kennedy found that the amounts paid for period 25 of 2004 "were paid on January 6, 2005" and were not "reflected in the overpayments relative to the 2004 statutory pay cap or the debts at issue." Letter from Patrick F. Kennedy to Elliot H. Scherker [Docket Entry 40-5] at 3 (Dec. 12, 2011). He hence concluded that "the fact that the pay cap for Calendar Year 2005 had been raised to $200,000 had no bearing on the overpayments that each [plaintiff] received in 2004." Id. This analysis responds fully to the Court's remand.[7] And the clarification leaves no doubt that the pay cap waiver is, indeed,

---

[7] Plaintiffs are incorrect insofar as they assert that the Court made a "legal ruling[]" that the waiver had an effect on the overpayment determination. See Pls.' Supplemental Br. in Supp. of Summ. J. [Docket Entry 40-5] at 4 (Dec. 12, 2011). The Court expressly left the question open. See Remand Decision at 6 ("Perhaps the State Department could conclude that the waiver either affects the fact or the amount of plaintiffs' debts. Perhaps not. But it is not for the Court to conduct a de novo inquiry into the matter . . . ." (internal quotation marks omitted)). The Court's sole "legal ruling" was that the Department's waiver, by its plain terms, applies to work performed during pay period 25 of 2004, i.e., to the payment made on January 6, 2005. The Department fully agrees with that ruling.

irrelevant to plaintiff's case: because the waiver applied only to amounts paid in 2005, and because none of the amounts paid in 2005 were reflected in the overpayment calculation (even if they were for work performed in 2004), the 2005 waiver applied to none of the payments that resulted in the overpayment determination.

Plaintiffs are mistaken, then, in arguing that the Department "failed to apply the retroactive waiver to work performed during pay period 25 of 2004." Pls.' Supplemental Br. in Supp. of Summ. J. [Docket Entry 40-5] at 5 (Dec. 12, 2011) (internal quotation marks omitted). The Department applied the waiver to that work: the payments for that work were made in 2005 and counted towards the increased, $200,000 cap for all payments received in 2005. But those payments were irrelevant to the overpayment determination at issue here, which was based on payments made in 2004. Similarly, the waiver is not "meaningless," id. at 9, it is just not applicable here.

Plaintiffs' argument that the Department is using "untenable, back-and-forth positioning" conflates the date a payment is received with the date the work is performed. See id. at 7. The Department uniformly—and consistently with the governing statutes—applied a cap based on the date the payment was received. Any payments made on or before December 31, 2004, were subject to the section 5547(b)(2) cap on basic and premium pay—$128,200 for plaintiffs. Any payments made January 1, 2005, through December 31, 2005—including, of course, those for work performed at the end of 2004—were subject to the $200,000 pay cap.

Finally, insofar as plaintiffs argue that the 2005 waiver affects the section 5547 pay cap for payments made in 2004, the argument does not get far: neither the Appropriations Act of 2005 nor the Department's waiver affected the GS-15 rate in effect on December 31, 2004, nor the Executive Schedule V rate in effect on December 31, 2004. And "the aggregate of the basic

15

pay and premium pay" plaintiffs received "in" 2004 still exceeded both of those measures. See 5

U.S.C. § 5547(b)(2). Accordingly, the Department used the appropriate pay cap, $128,200, in

calculating whether the payments plaintiffs received in 2004 exceeded the cap and in

determining the overpayments.

**II.      The Board's Waiver Decision**

The Department followed the statute's clear mandate in finding that plaintiffs were

overpaid. Congress did, however, leave a safety valve for cases of overpayment, allowing an

agency to waive repayment in certain circumstances. But the Department declined to employ that

provision in the second action plaintiffs challenge here.

An agency official may waive a claim of the United States "arising out of an erroneous

payment of pay" where the collection of such a claim "would be against equity and good

conscience and not in the best interests of the United States." 5 U.S.C. § 5584(a). Pursuant to

regulations (which plaintiffs do not challenge), a "[w]aiver may not be granted if there exists in

connection with the claim an indication of . . . fault" by the employee seeking the waiver. See 22

C.F.R. § 34.18(b)(1)(i). "Fault is considered to exist" under the regulations "if in light of the

circumstances the employee knew or should have known through the exercise of due diligence

that an error existed but failed to take corrective action." 22 C.F.R. § 34.18(b)(1)(ii). Where

> the deciding official finds no indication of . . . fault . . . the employee is not automatically
> entitled to a waiver. Before a waiver can be granted, the deciding official must also
> determine that collection of the claim against an employee would be against equity and
> good conscience and not in the best interests of the United States.

22 C.F.R. § 34.18(b)(1)(iv). The regulations guide the deciding official's "against equity and

conscience" and "not in the best interests of the United States" inquiry by providing a list of

factors:

Factors to consider when determining if collection of a claim against an employee would be against equity and good conscience and not in the best interests of the United States include, but are not limited to:

> (A) Whether collection of the claim would cause serious financial hardship to the employee from whom collection is sought.
> (B) Whether, because of the erroneous payment, the employee either has relinquished a valuable right or changed positions for the worse, regardless of the employee's financial circumstances.
> (C) The time elapsed between the erroneous payment and discovery of the error and notification of the employee;
> (D) Whether failure to make restitution would result in unfair gain to the employee;
> (E) Whether recovery of the claim would be unconscionable under the circumstances.

Id.

Deputy Assistant Secretary Millette reviewed the plaintiffs' waiver requests. He rejected all the requests because he found that each plaintiff was "not without fault." See A.R. at 61. Plaintiffs filed grievances within the Department challenging the waiver denial. When the grievances were denied, they appealed to the Foreign Service Grievance Board. The Board granted the appeal, finding that plaintiffs were not at fault for the excess payments. The Board emphasized "the lack of clarity surrounding application of the overtime cap" and plaintiffs' "inability to take corrective action," as well as "the Department's failure to either track the payments adequately or avail itself of mechanisms to avoid the overpayments." Id. at 353. The Board hence overturned the Department's "finding that it was precluded from granting [plaintiffs] a waiver." Id. Because waivers "are discretionary, not mandatory," the Board directed the Department to determine whether collection "would be against equity and good conscience and not in the best interests of the United States." Id. at 354.

After the Board's "fault" decision, Deputy Assistant Secretary Millette informed each plaintiff of the decision and invited plaintiffs' counsel to submit "additional facts or discussion" addressing the 22 C.F.R. § 34.18(b)(1)(iv) factors. See id. at 359. Plaintiffs' counsel declined to

provide additional information. Rather, counsel cited the Department's subsequent waiver of the premium pay cap for 2008 as evidence of the Department's own view that it was equitable to waive these pay caps. See id. Secretary Millette rejected this argument, noting that legislation has allowed waivers for 2005-2008, but no such waivers were authorized for 2004. He also observed that counsel provided no "financial data" that could aid the Secretary's determination of financial hardship, one of the factors enumerated in the regulation. See id. at 360. Secretary Millette stated that "[a]fter careful consideration of the factors in 22 CFR Part § 34.18(b)(1)(iv), I have concluded that it would not be 'against equity and good conscience' and would be in the 'best interest of the United States'" to recover the overpayments. Id. Secretary Millette also noted that he had had to make this determination "for over thirty other employees in the exact same situation," that they "have paid their debts in full," and that granting plaintiffs the waiver "would result in an unfair gain." Id.

In a 2-1 decision, the Board upheld the waiver denial. The Board explained that by declining to provide additional information, plaintiffs "relied on arguments already on the record," i.e., that it was inequitable to deny them the premium pay they earned under dangerous conditions in Iraq, especially given the higher cap in subsequent years. See id. at 411. The Board agreed "that it seems unfair" that plaintiffs have to refund payments in such circumstances. Id. But it found Secretary Millette's decision within his discretion because "[t]here are equities on both sides of the equation," because similarly situated employees repaid their excess 2004 premium pay, and because waivers are discouraged when an employee "had reasonably prompt notice that payments were or may have been erroneous, even if the employee was not 'at fault.'" Id. at 412-13. The Board found that plaintiffs were "put on notice in November" of 2004 that they were approaching or had already exceeded the cap. Finally, the Board noted that

18

"[g]rievants have cited no decisions that more specifically support their positions." Id. at 413. It accordingly denied the grievance appeals.

Plaintiffs raise three specific challenges to the Board's decision. First, they contend that Secretary Millette committed a procedural error by omitting the unconscionability factor from his analysis, and that the Board was hence required to conduct a harmless error analysis pursuant to its regulations. This argument rests on a false premise. The regulations never require the agency official to discuss every factor in writing, just "to consider" the factors when making the determination. 22 C.F.R. § 34.18(b)(1)(iv). And Secretary Millette did just that: his decision letter expressly states that he "careful[ly] consider[ed]" each of the factors. A.R. at 360. Moreover, the Board recognized that although the denial letter "did not deal explicitly" with the unconscionability factor, "it did address the equities of the waiver request," i.e., the substance of the unconscionability inquiry. Id. at 412 & n.2. Accordingly, Secretary Millette did not err, the Board did not "note[]" any error, see Pls.' Mot. at 3, and no harmless error analysis was required.

Second, plaintiffs argue that the Board found plaintiffs "were sufficiently 'at fault' for denial of a waiver" despite its prior ruling that plaintiffs were not at fault, doing an arbitrary "volte-face" in its second decision. See id. at 33. If the Board reversed course from its prior decision that would, indeed, be troubling. But plaintiffs' argument again mischaracterizes the Board's decision. The Board's second decision did not find plaintiffs "at fault" to any extent. Rather, it expressly recognized that "our earlier decision found that grievants were not at fault in accepting or failing to prevent excess premium payments in 2004." A.R. at 413. It then explained that, despite not being at fault, "grievants were put on notice" in late 2004 that they were approaching or had already exceeded the cap. Id. The Board was careful to point out that notice is relevant "even if the employee was not 'at fault.'" Id. Factoring in the notice plaintiffs

received was entirely consistent with the Board's "no fault" finding. Indeed, the regulations expressly direct a deciding official who "finds no indication of . . . fault" to consider, among other factors "[t]he time elapsed between the erroneous payment and discovery of the error and notification of the employee." 22 C.F.R. § 34.18(b)(1)(iv). Hence, the regulations themselves leave no doubt that early notification of the possible overpayment is consistent with the employee's lack of fault. Logically so. Notice weighs against waiver not because it indicates fault, but because it reduces the burden of repayment, decreasing the employee's reasonable reliance on the payment and the hardship of returning it. Compare 22 C.F.R. § 34.18(b)(1)(iv)(A), (B). Thus, although—as the Board found in its first decision—the Department was to blame for the overpayment due to its "failure to either track the payments adequately or avail itself of mechanisms to avoid the overpayments," A.R. at 353, and although plaintiffs were unable "to take corrective action" because they could not refuse the work at such a late date, id., the notice assured that the harm from these overpayments befalling the faultless plaintiffs was minimized.[8]

Third, plaintiffs contest the Board's finding that a waiver would create unfair gain to plaintiffs relative to those who returned their 2004 overpayments as requested, arguing that "[t]his Court should decline to give any weight to the notion that, because some choose not to challenge a legal wrong or injustice, that failure should somehow be visited upon those who challenge it." Pls.' Mot. at 29. But Secretary Millette indicated that the other employees did apply for a waiver, which he denied. See A.R. at 360. Moreover, although the determination as to others might be irrelevant for something to which plaintiffs have a freestanding legal right, the position of similarly situated employees is relevant for equitability, which is precisely the

---

[8] Plaintiffs' argument that the Board's "'at fault' determination" lacks substantial evidence and a rational connection to the record, see Pls.' Mot. at 35, similarly rests on the faulty premise that the Board made an "at fault" finding.

question here. Indeed, the "unfair gain" factor expressly asks the Department to consider plaintiffs' situation relative to that of others, and the Board's consideration of similarly situated employees in considering this factor was thus entirely proper.

Finally, insofar as plaintiffs raise a general challenge to the adequacy of the Board's explanation (and it is not clear that they do), that argument also fails. "The burden is on the employee [seeking waiver] to demonstrate that the applicable waiver standard has been met." See 22 C.F.R. § 34.18(d). Plaintiffs provided information only on one factor—unconscionability—and even there only indirectly, by discussing the general equities of the situation. Given the dearth of information, the Board had no choice but to conclude that financial hardship and detrimental reliance factors weighed against waiver. The Board found an unfair gain to plaintiffs given the large number of similarly situated employees who paid back their debt, and it found that the prompt notice plaintiffs received of the overpayment weighed against waiver. To be sure, given the nature of plaintiffs' service and the Department's agreement (evidenced by waivers in future years) that raising the cap was desirable, there was some unfairness in collecting the payment. But there were equities on both sides. Collecting the payment would thus not be "unconscionable" under the circumstances. Accordingly, the Board reasonably concluded that none of the factors favored waiver, or that at least four out of five (financial hardship, detrimental reliance, notice, and unfair gain) favored denial. This analysis, apparent from the Board's explanation, may, at the very least, "reasonably be discerned" from its decision. See Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 286 (1974); see also Domtar Me. Corp. v. FERC, 347 F.3d 304, 312 (D.C. Cir. 2003) (upholding agency decision supported by a reasonable framework even where agency "does not explicitly advance this framework"). Given the "narrow" standard of review, see Bowman Transp., 419 U.S. at 285,

and all the circumstances of the case, the Court will not disturb the Board's conclusion that collection of the overpayments made to plaintiffs was not "against equity and good conscience" and was "in the best interests of the United States."

## **CONCLUSION**

For these reasons, the Court will deny plaintiffs' motion for summary judgment and will grant the Department's cross-motion. A separate order has been issued on this date.

_____/s/_____
JOHN D. BATES
United States District Judge

Dated:  <u>January 28, 2013</u>